## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROBERT MICHAELSON OF ADVISORY TRUST GROUP, LLC, IN HIS CAPACITY AS DEBTOR REPRESENTATIVE AND LIQUIDATING TRUSTEE, | CASE NO: _____ |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| PETER BARONOFF, KEITH REUBEN, BRIAN DUNN, DAVID ARMSTRONG, JAMES HOPWOOD, RICHARD GOLD, BRYAN DAY, STAN GRABISH, RICHARD COHEN, STEVEN HELLAND, MALINDA BARONOFF, SHANNA BARONOFF, and JOHN DOES 1-100, | |
| Defendants. | |

## <u>COMPLAINT</u>

Robert Michaelson of Advisory Trust Group, LLC, in his capacity as Debtor

Representative and Liquidating Trustee ("<u>Plaintiff</u>") of the estates of Promise Healthcare Group,

LLC and its debtor affiliates (the "<u>Debtors</u>"),[1] by and through his undersigned counsel, for his

---

[1] The Debtors in the chapter 11 cases captioned *In re Promise Healthcare Group, LLC* et al., Case No. 18-12491 (the "<u>Bankruptcy Cases</u>"), now pending in the United States Bankruptcy Court for the District of Delaware, together with the last four digits of each Debtor's federal tax identification number, are as follows: HLP HealthCare, Inc. (8381), PH-ELA, Inc. (9180), Promise Healthcare #2, Inc. (1913), Promise Healthcare Group, LLC (1895), Promise Healthcare Holdings, Inc. (2601), Bossier Land Acquisition Corp. (6644), HLP of Los Angeles, LLC (9102), HLP of Shreveport, Inc. (1708), HLP Properties at The Villages Holdings, LLC (0006), HLP Properties at the Villages, L.L.C. (1938), HLP Properties of Vidalia, LLC (4255), HLP Properties, Inc. (0068), Promise Healthcare of California, Inc. (9179), Promise Healthcare, Inc. (7953), Promise Hospital of Ascension, Inc. (9219), Promise Hospital of Baton Rouge, Inc. (8831), Promise Hospital of Dade, Inc. (7837), Promise Hospital of Dallas, Inc. (0240), Promise Hospital of East Los Angeles, L.P. (4671), Promise Hospital of Florida at The Villages, Inc. (2171), Promise Hospital of Louisiana, Inc. (4886), Promise Hospital of Lee, Inc. (8552), Promise Hospital of Overland Park, Inc. (5562), Promise Hospital of Phoenix, Inc. (1318), Promise Hospital of Salt Lake, Inc. (0659), Promise Hospital of Vicksburg, Inc. (2834), Promise Hospital of Wichita Falls, Inc. (4104), Promise Properties of Dade, Inc. (1592), Promise Properties of Lee, Inc. (9065), Promise Properties of Shreveport, LLC (9057), Promise Skilled

Complaint against (i) each of the following former directors of Promise Healthcare Inc. ("PHI"): Peter Baronoff ("Baronoff") and Keith Reuben ("Reuben"), (collectively, the "PHI Directors"), (ii) each of the following former directors and/or managers of Success Healthcare, LLC ("Success," and together with PHI, the "Companies"): Baronoff, Reuben, and Brian Dunn ("Dunn") (collectively, the "Success Directors," and together with the PHI Directors, the "Company Directors"), (iii) each of the following current or former officers and/or individuals with executive control of PHI and/or Success: Baronoff, Dunn, David Armstrong ("Armstrong"), James Hopwood ("Hopwood"), Richard Gold ("Gold"), Bryan Day ("Day"), Stan Grabish ("Grabish"), Richard Cohen ("Cohen"), and Steven Helland ("Helland") (as to PHI, the "PHI Officers," as to Success, the "Success Officers," and collectively, the "Company Officers," and together with the Company Directors, the "Company D&Os"); (iv) any employees, officers, managers and/or directors of the Companies and/or any subsidiaries of the Companies that owed duties to the Debtors and their estates as may be subsequently discovered ("John Does 1-100"), and (v) each of the following recipients of fraudulent transfers and/or preferential transfers: Baronoff, Malinda Baronoff, Shanna Baronoff, Reuben and certain other Company D&Os (the "Avoidance Parties") ((i) through (v) collectively, the "Defendants"), avers as follows:

---

Nursing Facility of Overland Park, Inc. (5752), Promise Skilled Nursing Facility of Wichita Falls, Inc. (1791), Quantum Health, Inc. (4298), Quantum Properties, L.P. (8203), Success Healthcare 1, LLC (6535), Success Healthcare, LLC (1604), Vidalia Real Estate Partners, LLC (4947), LH Acquisition, LLC (2328), Promise Behavioral Health Hospital of Shreveport, Inc. (1823), Promise Rejuvenation Centers, Inc. (7301), Promise Rejuvenation Center at the Villages, Inc. (7529), and PHG Technology Development and Services Company, Inc. (7766).

7494326

## <u>DESCRIPTION OF ACTION</u>[2]

1.       This complaint seeks redress for the injuries caused by the Defendants to the Debtors.

2.       Prior to March 2014, Baronoff, Howard Koslow ("<u>Koslow</u>") and Lawrence Leder ("<u>Leder,</u>" and together with Baronoff and Koslow, the "<u>Principals</u>"), together with their spouses (the "<u>Spouses</u>") and Mark Dawson ("<u>Dawson</u>"), owned the struggling Companies and their subsidiaries.  To stay afloat despite their financial difficulties, the Companies entered into factoring arrangements with, and received working capital advances from, Sun Capital, Inc. ("<u>SCI</u>") and Sun Capital Healthcare, Inc. ("<u>SCHI</u>," and together with SCI, "<u>Sun Capital</u>").  Sun Capital was also owned by the Principals.

3.       To fund its factoring operations, Sun Capital received loans from Founding Partners Stable-Value Fund, LP ("<u>Stable-Value</u>"), which in turn received investments from its investors (the "<u>Investors</u>").  In April 2009, the SEC initiated a lawsuit against Stable-Value, alleging that Stable-Value's loans to Sun Capital (who used the loans to fund the failing Companies) were riskier than disclosed to Stable-Value's Investors.  Accordingly, Daniel S. Newman, the receiver appointed on behalf of Stable Value and other related entities, (the "<u>Receiver</u>" or "<u>Newman</u>"), initiated a complaint in July 2009 against Sun Capital to recover the unpaid loans from Stable-Value aggregating approximately $550 million (the "<u>Sun Capital Litigation</u>").

---

[2] The allegations in this Complaint are based upon the documents and information available to Plaintiff at the time of its filing, and are subject to clarification, amendment, revision, or other modification in light of new documents and information, obtained through subsequent discovery in this action or the Bankruptcy Cases, or otherwise.  No statement in this Complaint is intended to waive or impair any right of the Plaintiff or the Debtors' estates with respect to any of the Defendants or any third parties, and shall not have any estoppel effect with respect to any subsequent action brought against the Defendants or third parties.  All rights of the Plaintiff and the Debtors' estates with respect to the Defendants and third parties are expressly reserved.

7494326

4.      To resolve the Sun Capital Litigation, the Principals used the Companies (who were not named defendants and had no independent representation in the Sun Capital Litigation) as currency in the context of a settlement with the Receiver and Investors.  To effectuate the settlement arrangement, the Receiver, the Principals, the Companies, Sun Capital and certain Investors who opted  in to the arrangement (the "Consenting Investors") entered into a settlement agreement (the "Settlement Agreement"), effective March 17, 2014, whereby the Principals, Spouses and Dawson transferred the majority of their ownership interests in the struggling Companies to a newly formed entity now known as Promise Healthcare Group, LLC ("PHG"), which would ultimately be owned by the Consenting Investors.  Given that the Companies remained financially troubled at the time of entry into the Settlement Agreement (and as such remained a risky form of compensation for the Consenting Investors), the Principals also caused PHI to execute two secured intercompany notes in the aggregate amount of $200 million in favor of PHH for the ultimate benefit of the Consenting Investors.  However, to the detriment of PHI, the intercompany notes were only "deemed funded" and PHI never received any actual funds or loan proceeds such that PHI was burdened with an additional $200 million in debt with no concomitant source of repayment.

5.      After using the Companies as a settlement pawn to resolve litigation with the Receiver and Investors, the Principals, Spouses and Dawson secured the following benefits from the Companies (collectively, the "Principal Benefits"):  (i) alleged indemnifications and releases of certain actions of the Principals, (ii) an employment agreement for Baronoff as CEO and President of PHI and Success (the "Employment Agreement") pursuant to which the Companies would pay Baronoff an annual salary starting at $750,000 plus several bonuses, (iii) PHI's assumption of certain of the Principals' guaranty obligations and liabilities aggregating at least

4

$1,780,000, (iv) forgiveness of loans totaling $1,700,000 made by the Companies and/or Sun Capital to the Principals and Spouses, and (v) retention of, collectively, 4% ownership interest in the common stock of PHI, on account of which the PHI Directors caused PHI to make the following distributions to the Principals, Spouses and Dawson:

      (i)     An alleged consulting fee embedded in Baronoff's Employment Agreement—referred to as the "Sun Capital Consultancy Payment"—aggregating $1.8 million, on account of which Baronoff provided no services nor did PHI receive any other benefit,

      (ii)    $1.8 million in alleged consulting fees paid by PHI to Koslow in exchange for his availability to provide consulting services if requested for a period of three years (upon information and belief, Koslow provided no such consulting services);

      (iii)   $1.75 million in alleged consulting fees paid by PHI to Leder in exchange for his availability to provide consulting services if requested for a period of twenty months (upon information and belief, Leder provided no such consulting services); and

      (iv)   secured notes for the benefit of the Principals, Spouses and Dawson in the aggregate amount of $5,884,000 payable by PHI for which PHI received no benefit and which were issued in proportion to each individuals' ownership interests in PHI ((i) through (iv), the "Disguised Equity Payments").

6.     In exchange for the Companies (i) agreeing to pay the Principals, Spouses and Dawson at least $10 million under the Settlement Agreement and incurring various obligations on account of the Principals, and (ii) becoming obligated to the Consenting Investors in the amount of $200 million, the Companies received releases from the Consenting Investors, the Receiver, the Principals, the Spouses and Dawson.  Yet, the Companies were never named as defendants in the lawsuit settled by the Settlement Agreement.  As such, the value of the releases received by the Companies was minimal, if any.

7.     Unfortunately, this disregard for the best interests of Companies and their creditors persisted after the Settlement Agreement.  After the Settlement Agreement closed, the Companies remained unable to pay their debts as they became due in the usual course of the Companies' activities.  Yet, the Company D&Os artificially prolonged the lives of the

Companies (thereby maintaining their jobs and ensuring the continued distribution of the Disguised Equity Payments) by failing to pay vendors and physicians and by presenting misleading information regarding the true financial condition of the Companies.  In doing so, the Company D&Os repeatedly breached their fiduciary duties to the Debtors' estates, causing payables, accrued expenses and other liabilities to grow while net income plummeted from negative $12 million in 2014 to negative $26 million in 2018, as represented in the charts below.



8.      Desperate to live another day after closing the Settlement Agreement (and maintain the Company D&Os' employment), on March 17, 2014, the Companies entered into a $49 million revolving line of credit (the "MidCap Revolver") with MidCap Financial, LLC (and subsequently MidCap Funding IV, LLC as successor-by-assignment) ("MidCap"), based on the

Company D&Os' provision of misleading financial information to MidCap regarding the quality and collectability of accounts receivable.  The Companies' inability to collect on their receivables, coupled with (i) the Companies' significant monetary obligations under the Settlement Agreement, and (ii) the failure of the Company D&Os to make appropriate operating adjustments regarding site neutral rules, resulted in the MidCap Revolver providing insufficient liquidity to the Companies.

9.     Upon information and belief, the lack of liquidity did not come as a surprise to the Company D&Os, who were well aware of the financial hole in which the Companies found themselves following the Settlement Agreement.  In fact, the Companies' solvency representations in the MidCap Revolver included a carve-out for a significant amount of the Companies' indebtedness, which, if included, would have rendered the Companies insolvent as of March 17, 2014.

10.     Recognizing that the Companies needed to refinance the MidCap Revolver and borrow additional funds to survive, on March 21, 2016, the Company D&Os caused the Companies to enter into a new revolving loan facility (the "Wells Revolver") with Wells Fargo Bank N.A. ("Wells") by providing Wells with misleading 2015 financial information.   PHI's Senior Vice President and Chief Accounting Officer stated that the 2015 financial statements provided to Wells "do not fairly present the financial position of the company and I am not comfortable distributing these financials to the lenders."  In fact, approximately two weeks after the Company D&Os provided such financial statements to Wells, the Chief Accounting Officer resigned from his position.  Since the Company D&Os were delinquent in delivering audit information to the Companies' auditors, Wells did not receive the audited 2015 financials until August 1, 2016—after the Wells Revolver had been executed.

7494326

11.     Continuing this pattern, the Company D&Os consistently provided Wells with misleading financial information that presented a better financial picture of the Company than reported in the audited financials.  Yet, because the Company D&Os continued to be delinquent in providing information to the auditors regarding the 2016 and 2017 audits, Wells did not receive the 2016 and 2017 audited financial statements until June 28, 2018—10 months after the Companies defaulted under the Wells Revolver on August 15, 2017.

12.     Upon information and belief, had Wells received accurate financial information in 2015, it would not have entered the Wells Revolver.  Similarly, had Wells received accurate financial information following entry into the Wells Revolver, the Companies would have defaulted under the Wells Revolver prior to August 2017.  Both scenarios would necessitate the Companies taking actions to protect their interests and the interests of their creditors, including potentially filing for chapter 11 protection, prior to November 5, 2018 (likely as early as at least March 2016), preventing the incurrence of additional payables, accrued expenses and/or other liabilities.

13.     Compounding this problem, the Company D&Os presented delayed and/or misleading information to the Companies' auditor, Crowe Horwath LLP ("Crowe").  Had Crowe received accurate information from the Company D&Os in response to its going concern questions regarding the 2014 and 2015 audits (the "PHG 2014 Audit" and "PHG 2015 Audit," respectively), it likely would have included going concern qualifications in such audits.  Further, had the Company D&Os not been delinquent in providing information regarding the 2016 and 2017 audits (the "PHG 2016/2017 Audit"), the PHG 2016/2017 Audit, which contained a going concern qualification, would have been prepared on an earlier basis.  This would have enabled creditors and other parties in interest to understand the Companies' significant financial troubles

8

prior to June 28, 2018—the date the PHG 2016/2017 Audit was delivered.  Such parties would

then have ceased doing business with the Companies, forcing the Companies to take protective

action earlier, including by filing for chapter 11 protection prior to November 5, 2018, and

reducing the Companies' incurrence of payables, accrued expenses and/or other liabilities

through the Petition Date.

14.     To conceal the Companies' financial difficulties, the Company Officers, including

Baronoff in his dual position as officer and director of PHI and Success, presented misleading

financial information regarding the Companies to the PHI board (the "PHI Board"), the Success

board (the "Success Board") and the PHG board (the "PHG Board," and collectively, the

"Boards").  For example, from March 2014 through October 2017 (when the PHG Board hired

an independent consulting company, FTI Consulting, Inc. ("FTI")), the Company Officers

consistently presented misleading forecasts and budgets to the Boards preventing the Boards

from understanding the true financial position of the Companies until the delivery of the audits,

many months after the year end.  For example:

- The PHI 2015 budget, presented by the PHI Officers on March 4, 2015, included a projected adjusted EBITDA of $40.8 million—yet the audit, delivered on August 1, 2016 (8 months after year end) reflected an EBITDA of $22.4 million.

- The PHI 2016 budget, presented by the PHI Officers on February 2, 2016, included a projected adjusted EBITDA of $45.3 million—yet the audit, delivered on June 28, 2018 (18 months after year end) reflected an EBITDA of $21.0 million.

- The PHI 2017 budget, presented by the PHI Officers on February 7, 2017, included a projected adjusted EBITDA of $42.9 million—yet the audit, delivered on June 28, 2018 (6 months after year end) reflected an EBITDA of $200,000.

- The Success 2015 budget, presented by the Success Officers on March 4, 2015, included a projected adjusted EBITDA of $7.3 million—yet the audit, delivered on August 1, 2016 (8 months after year end) reflected an EBITDA of $1.4 million.

- The Success 2016 budget, presented by the Success Officers on February 2, 2016, included a projected adjusted EBITDA of $8.3 million—yet the audit, delivered on June 28, 2018 (18 months after year end) reflected an EBITDA of $3.9 million.

- The Success 2017 budget, presented by the Success Officers on April 25, 2017, included a projected adjusted EBITDA of $2.4 million—yet the audit, delivered on June 28, 2018 (6 months after year end) reflected an EBITDA of negative $1.2 million.

15.     In light of the Company Officers' misleading forecasts and budgets, in FTI's initial assessment report, dated September 2017, FTI noted that "Promise's forecasting and annual budget process is seriously deficient . . . Variations of this magnitude increase the risk and complexity of managing the business as well as the reliability of information distributed to the Board of Directors."

16.     Additionally, upon information and belief, the Company Officers presented misleading information regarding the quality and collectability of the Companies' accounts receivable, thus presenting a better picture to the Boards of the Companies' financial position than was accurate.

17.     Had the Boards received accurate information from the Company Officers, one or all of them would have taken actions to protect the interests of the Companies and their creditors, including by causing the Companies to file for chapter 11 protection, earlier than November 5, 2018.  This would have reduced the incurrence of payables, accrued expenses and/or other liabilities through the Petition Date.

18.     The Company D&Os also disregarded corporate separateness between and among PHI and its subsidiaries, Success and its subsidiaries, PHH and PHG—despite the Company D&Os awareness of the vastly different economic position of each entity.  For example, the Company D&Os established a consolidated cash management system whereby the Debtors "shared" overhead, accounting, and other related expenses, despite that some entities contributed

10

substantially less to those "shared" costs.  For instance, among other examples set forth below, all of the accounting personnel utilized by the Debtors were employed and paid by PHI.  Further, the funds from the Debtors' secured loans were funded into a single master disbursement account owned by PHI that was then transferred into various operating and related accounts of operating subsidiaries based on need, not ability to repay such amounts.  As such, the better performing hospitals subsidized the weaker performing hospitals without any reasonable prospect of repayment, to the detriment of the creditors of the better performing hospitals.

19.     The Company D&Os were aware since as early as 2014 that the Companies were unable to pay their debts as they became due.  Yet, the Company D&Os caused the Companies in early 2017 to invest over $4.5 million in iCare.com, Inc. ("iCare")—an electronic health records ("EHR") startup with no other customers and no established business plan.  Baronoff was to sit on the iCare board and would own 1% of iCare, effective on the date the Companies entered the iCare transaction (the "iCare Transaction").  In connection therewith, Baronoff presented the Boards misleading information regarding iCare and the Companies' need and ability to invest in new EHR technology.  In early 2018, after paying iCare over $4.5 million, the Companies terminated the iCare agreements after iCare failed to "go live".  The Companies received no benefit from the iCare agreements.

20.     While the Companies were unable to pay their debts as they became due, the Company Directors caused funds from PHI and/or Success to be distributed to PHH and/or PHG without the ability to access such funds for later use (except though purported loans from PHG) (the "PHH/PHG Equity Distributions").  Similarly, while PHI was unable to pay its debts as they became due, the PHI Directors (including Baronoff) caused PHI to make the Disguised Equity Payments.  Upon information and belief, the PHI  Directors (including Baronoff) also caused

PHI to make recurring equity payments to Malinda Baronoff three times each year (the "Annual Equity Payments," and together with the PHH/PHG Equity Distributions and the Disguised Equity Payments, the "Company Equity Payments").  The Company Directors' approval of the distributions of the Company Equity Payments—each made when the Companies were unable to pay their debts as they became due in the ordinary course—were a violation of applicable Florida and California law and as such, the Company Directors are personally liable for the applicable Company Equity Payments pursuant to such applicable law.

21.     After realizing that Baronoff, among other Company Officers, had presented the Boards misleading financial information since the Companies' inception, the Boards caused Baronoff to resign as CEO and President in March 2018, and ultimately resign as director from the Boards in May 2018.  However, the separation agreement entered in connection therewith (the "Separation Agreement") provided Baronoff, among other benefits, broad contingent releases for which the Companies received no reasonably equivalent value in exchange.  Plaintiff thus seeks to avoid the Companies' obligation with respect to the contingent releases pursuant to section 548 of chapter 5 of title 11 of the United States Code (the "Bankruptcy Code"). Alternatively, Plaintiff seeks declaratory relief that the releases are void as Baronoff, among other things, knowingly committed or condoned acts of fraud against the Company which nullifies the releases pursuant to the terms of the Separation Agreement.

22.     Under the direction of the Company D&Os, the Companies engaged in a series of other fraudulent and/or preferential transfers whereby the Companies made payments to the Avoidance Parties which Plaintiff seeks to avoid and recover under section 544, 547, 548, and 550 of the Bankruptcy Code, as well as applicable state law.

23.     In addition, Plaintiff seeks to disallow, pursuant to sections 502(d) of the Bankruptcy Code, any claim that any of the Avoidance Parties (defined below) has filed or asserted against the Debtors or that has been scheduled for the benefit of such Avoidance Party.

24.     Plaintiff also seeks to equitably subordinate any and all claims of the Defendants, including any alleged indemnification claims arising under the Settlement Agreement, under section 510(c) of the Bankruptcy Code.

25.     Plaintiff reserves all of its rights and the rights of the Debtors' estates to object to any claim of any Defendant for any reason.

## JURISDICTION

26.     This Complaint seeks the entry of money judgments against the Defendants.

27.     This action arises in and relates to the Debtors' Bankruptcy Cases now pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

28.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1334.

29.     Venue of this action is proper in the District Court for the District of Delaware pursuant to 28 U.S.C. §§ 1408 and 1409.

## PARTIES

30.     On November 5, 2018 (the "Petition Date"), each of the Debtors filed a voluntary petition in the Bankruptcy Court commencing a case for relief under chapter 11 of the Bankruptcy Code.  The Bankruptcy Cases are jointly administered under lead case number 18-12491.

31.     Plaintiff Robert Michaelson of Advisory Trust Group, LLC, is the Debtor Representative and Liquidating Trustee under the *Second Amended Joint Plan of Liquidation* (as modified, the "Plan") confirmed by the Bankruptcy Court on September 17, 2020.

7494326

32.     Upon information and belief, Defendant Baronoff is or was (i) a Principal, (ii) a board member of PHI from March 17, 2014 through May 11, 2018 (during which time he was the sole board member from April 26, 2016 through May 11, 2018), (iii) a board member of Success from March 17, 2014 through May 11, 2018 (during which time he was the sole board member from April 26, 2016 through May 11, 2018), (iv) a board member of PHG from 2014 through May 11, 2018, (iv) the President and CEO of PHI from March 17, 2014 through March 13, 2018, (iv) the President and CEO of Success from March 17, 2014 through March 13, 2018, and (v) a shareholder of PHI.  Baronoff is also the recipient of certain fraudulent and/or preferential transfers.

33.     Upon information and belief, Baronoff resides in Temecula, California.

34.     Upon information and belief, Defendant Reuben was (i) a board member of PHI and Success from March 17, 2014 through no later than April 26, 2016 and (ii) a board member of PHG from April 26, 2016 through March 31, 2018.  Reuben is also the recipient of certain fraudulent and/or preferential transfers

35.     Upon information and belief, Reuben resides in Maryland.

36.     Upon information and belief, Defendant Dunn was a board member of Success from March 17, 2014 through no later than April 26, 2016 and the Chief Executive Officer of Success from March 17, 2014 through September 2017.

37.     Upon information and belief, Dunn resides in Sandy, Utah.

38.     Upon information and belief, Defendant Armstrong was the Executive Vice President and Secretary of PHI and Success from March 17, 2014 through December 6, 2017.

39.     Upon information and belief, Armstrong resides in Deerfield Beach, Florida.

40.     Upon information and belief, Defendant Gold was the President and Chief Operating Officer of PHI and Success from March 17, 2014 through July 12, 2018.

41.     Upon information and belief, Gold resides at Parkland, Florida.

42.     Upon information and belief, Defendant Hopwood was the Executive Vice President, Chief Financial Officer and Treasurer of PHI and Success from March 17, 2014 through October 13, 2018.

43.     Upon information and belief, Hopwood resides in Coppell, Texas.

44.     Upon information and belief, Defendant Day was an executive officer at PHI and Success from March 17, 2014 through November 2017.

45.     Upon information and belief, Day resides in Baton Rouge, Louisiana.

46.     Upon information and belief, Defendant Grabish was Senior Vice President— Strategic Planning and Financial Analysis, at PHI and Success from May 24, 2015 through at least the Petition Date.

47.     Upon information and belief, Grabish resides in Delray Beach, Florida.

48.     Upon information and belief, Defendant Cohen was the Senior Vice President, Chief Administrative Officer of Promise and/or Success from at least May 27, 2015 through at least October 15, 2017.

49.     Upon information and belief, Cohen resides in Boynton Beach, Florida.

50.     Upon information and belief, Defendant Helland had executive control over operations at PHI and Success from June 2014 through November 3, 2018.

51.     Upon information and belief, Helland resides in Dallas, Texas.

52.     Defendant Malinda Baronoff is the recipient of certain fraudulent and/or preferential transfers.

15

53.     Upon information and belief, Malinda Baronoff resides in Boca Raton, Florida.

54.     Defendant Shanna Baronoff is the recipient of certain fraudulent transfers.

55.     Upon information and belief, Shanna Baronoff resides in Florida.

## PROCEDURAL HISTORY

56.     The Debtors operated short-term acute care hospitals ("STACHs"), long-term acute care hospitals ("LTACHs"), and skilled nursing facilities ("SNFs") across nine (9) states and were headquartered in Boca Raton, Florida.  As of the Petition Date, the Debtors operated two (2) STACHs, fourteen (14) LTACHs, and two (2) co-located SNFs, consisting of 424 licensed STACH beds, 950 licensed LTACH beds, and 131 licensed SNF beds. The Debtors' LTACHs consisted of twelve (12) freestanding hospitals and two (2) hospital-in-hospital units.

57.     On the Petition Date, the Debtors filed, among other motions, a motion requesting the court authorize the Debtors' continued use of their cash management system (the "Cash Management Motion").

58.     The Cash Management Motion provides:

> [T]he Debtors request authority to continue, in the ordinary course, certain transactions (the "***Intercompany Transactions")*** between and among the Debtors including, for example, payments in connection with intercompany agreements, loans, or advances by or between Debtors, allocations of overhead, and other charges between and among the Debtors.
> . . . .
> Likewise, the Promise Master Disbursement Account [a master disbursement account held in the name of PHI] receives proceeds of the Debtors' prepetition revolver and distributes the cash to various other disbursement accounts, including petty cash accounts held by its subsidiaries.

59.     Although the Cash Management Motion states the Debtors track the intercompany transfers, the Cash Management Motion does not explain how the weaker performing hospitals have the means to repay such intercompany transfers from the better performing hospitals.

60.     On November 6, 2018, the Bankruptcy Court entered an interim order allowing the relief requested in the Cash Management Motion.  On December 4, 2018, the Bankruptcy Court entered a second interim order granting such relief.  On January 3, 2019, the Bankruptcy Court entered a final order granting the relief requested in the Cash Management Motion on a final basis.

61.     During the pendency of the chapter 11 cases, the Debtors conducted the following asset and equity sales:

| Debtor-Seller | Buyer | Asset | Purchase Price[3] |
|---|---|---|---|
| Quantum Properties, L.P. | 5550 University Holdings, LLC | San Diego real estate | $16,165,000 |
| Success Healthcare, LLC; Success Healthcare 1, LLC; HLP of Los Angeles, LLC | LA Downtown Medical Center LLC | Silver Lake Assets | $84,150,000 |
| Success Healthcare, LLC | Americore Holdings, LLC | Equity interests in Success Healthcare 2, LLC (St. Alexius) | $10,000,000 |
| Promise Hospital of Florida at The Villages, Inc.; HLP Properties at the Villages, L.L.C.; Promise Properties of Lee, Inc.; Promise Hospital of Lee, Inc., dba Promise Hospital of Ft. Myers; Promise Hospital of Dade, Inc., dba Promise Hospital of Miami; Promise Properties of Dade, Inc. | Select Medical Corporation | Select Assets located in Florida | $63,000,000 |
| Promise Hospital of East Los Angeles, L.P. | KND Real Estate 40, LLC and Kindred Healthcare Operating, LLC | East LA/Suburban Facility | $19,747,096 |
| Vidalia Real Estate Partners and Professional Rehabilitation Hospital LLC | Sentry Concordia Real Estate, LLC and Sentry Concordia, LLC | Miss Lou Assets (equity interests in Professional Rehabilitation Hospital, LLC and assets of Vidalia Real Estate Partners, LLC) | $6,500,000 |

---

[3] Subject to adjustments in each purchase agreement and/or sale order.

7494326

| Promise Hospital of Phoenix, Inc.; Promise Hospital of Overland Park, Inc.; Promise Skilled Nursing Facility of Overland Park, Inc.; Promise Hospital of Ascension, Inc., dba Promise Hospital Baton Rouge; Promise Hospital of Baton Rouge, Inc.; Promise Hospital of Vicksburg, Inc.; Promise Hospital of Wichita Falls, Inc.; Promise Skilled Nursing Facility of Wichita Falls, Inc.; Promise Hospital of Salt Lake, Inc.; Promise Hospital of Dallas, Inc. | Strategic Global Management, Inc. | Phoenix, AZ, Salt Lake City, UT, Baton Rouge, LA, Vicksburg, MS, Overland Park, KS, the Wichita Falls, TX facilities and Dallas, TX | $7.00 |
| Bossier Land Acquisition Corp.; Promise Properties of Shreveport, LLC; Promise Hospital of Louisiana, Inc. | Lexmark Holdings LLC | Shreveport and Bossier City facilities in Louisiana | $24,500,000 |

62.     The range of values of the various sales of the separate Debtor entities reflects the vastly different economic performance of each entity.

63.     As such, certain Debtors clearly outperformed other Debtor entities and, as set forth further below, subsidized such weaker performing Debtors without any reasonable prospect of repayment.

64.     On July 30, 2020, the Debtors filed the Plan and disclosure statement in support thereof (the "Disclosure Statement").

65.     The Disclosure Statement included the following explanation in support of post-petition substantive consolidation of the Debtors' estates for voting, confirmation and distribution purposes:

> The following facts show that on a pre-petition basis, the Debtors often disregarded corporate separateness such that the assets and liabilities of each Debtor entity were often intertwined:

- PHG and its subsidiaries maintained and filed financial statements on a consolidated basis only and all the accounting and auditing work for the Debtors was handled by a single firm. None of the subsidiary entities created or maintained separate financial statements. Each subsidiary maintained a "trial balance," which would then be incorporated into the consolidated financials.

- **The Debtors shared overhead, accounting, and other related expenses.  For instance, all of the accounting personnel utilized by the Debtors were employed by PHI.**  Moreover, the subsidiaries did not have their own employee benefit or 401-k plans for employees.  Rather, those employees participated in plans administered at the corporate level.  In addition, all of the company's insurance policies were issued through PHG.

- **The Debtors operated an integrated cash management system where funds from the Debtors' secured loans were funded into a single master disbursement account owned by PHI that was then transferred into various operating and related accounts based on need, not contribution**.

- Debtor, facility-level contracts with vendors were often drafted and executed with "Promise Healthcare" or PHI as the debtor contracting party.  Further, many contracts and leases that provided for equipment and services at the various subsidiary facilities were negotiated and entered into by PHI at the corporate parent level.

- All of the Debtors generally used a single letterhead form that stated either "Promise Healthcare" or "Success Healthcare" at the top, with the Boca Raton, Florida corporate address at the bottom.

Disclosure Statement, Article IV.A.1(b) (emphasis added).

66.     On August 5, 2020, the Bankruptcy Court entered an order (the "Disclosure Statement Order") approving the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code and authorized the Debtors to solicit votes to accept or reject the Plan.

67.     On September 17, 2020, the Bankruptcy Court entered an order confirming the Plan.

68.     Robert Michaelson of Advisory Trust Group was appointed as the Debtor Representative and Liquidating Trustee under the Plan, which granted him standing to pursue the causes of action asserted by the Debtor Representative and Liquidating Trustee in this Complaint.

69.     The Plan became effective on October 1, 2020.

7494326

## FACTS

I.      **The Settlement Agreement Benefited the Principals Rather than the Companies**

      A.  The Principals Used the Companies as Currency to Settle with the Receiver and Consenting Investors

70.     Sun Capital was a factoring company owned by the Principals.

71.     Sun Capital made certain loans to, entered into financing arrangements with, and made working capital advances to (collectively, the "Sun Capital Contributions") PHI and its subsidiaries, Success and its subsidiaries, and an affiliate, "HLP" and its subsidiaries (the "HLP Entities").

72.     Success and HLP were wholly owned by the Principals and their spouses (each a "Spouse") as tenants by the entirety, each Principal and Spouse with a 33.33% ownership interest.

73.     PHI was owned 84% by the Principals and their Spouses as tenants by the entirety, each Principal and Spouse with a 28% ownership interest.  PHI was also owned by Dawson with a 16% ownership interest.

74.     The Sun Capital Contributions were the primary source of funding for the Companies and HLP Entities.

75.     To fund the Sun Capital Contributions, Sun Capital received loans from Stable-Value, aggregating approximately $550 million.

76.     In turn, Stable-Value received investments from the Investors.

77.     The flow of funds from the Investors, to Stable-Value, to Sun Capital to the Companies and HLP Entities is represented on the chart below:



78.     In April 2009, the SEC initiated a compliant (the "SEC Action") against Stable-Value, among others, alleging that Stable-Value solicited funds from the Investors based upon misrepresentations regarding the nature of Sun Capital's use of the loans from Stable-Value—uses which hindered Sun Capital's ability to repay the Stable-Value loans.

79.     For example, the SEC Action alleged that beginning in 2004, Stable-Value permitted Sun Capital to purchase longer-term receivables that were less liquid and much riskier, and to use loan proceeds to make working capital advances to financially troubled hospitals affiliated with Sun Capital.

80.     Upon information and belief, the "financially troubled hospitals" were owned and operated by PHI, Success and HLP.

81.     As a result of the SEC Action, Sun Capital no longer had access to funds from Stable-Value.

82.     Without access to funds from Stable-Value, Sun Capital did not have adequate funds to finance the operations of PHI, Success, HLP, or their subsidiaries.

7494326

83.     As such, PHI's audit for the year ended December 31, 2009 (the "PHI 2009 Audit") provided that "there are factors that raise substantial doubts about the Company's ability to continue as a going concern . . . and concerns surrounding the ability of the Company to obtain continued financing to fund operations."  PHI 2009 Audit, page 24.

84.     In May 2009, the court in the SEC Action appointed the Receiver for Stable-Value.

85.     On July 14, 2009, the Receiver initiated the Sun Capital Litigation seeking recovery of the $550 million allegedly owed to Stable-Value from Sun Capital.

86.     In an attempt to resolve the Sun Capital Litigation, the parties entered the Settlement Agreement which was approved by the United States District Court for the Middle District of Florida (the "Florida District Court") on August 28, 2012 (the "Settlement Order"). The Settlement Agreement was executed on January 9, 2013 and became effective on March 17, 2014.

87.     The parties to the Settlement Agreement include (i) the Receiver, (ii) the Consenting Investors, (iii) the Principals, and (iv) Sun Capital, and (v) the Companies and the HLP Entities (which HLP Entities became subsidiaries of PHI pursuant to the Settlement Agreement, as set forth below).

88.     As elected by the Principals, the Companies utilized the same counsel as the Principals in negotiating the Settlement Agreement and as such, had no independent counsel or independent decision-makers to review the Settlement Agreement from the perspective of the Companies and the creditors thereof.

89.     Further, the Florida District Court did not consider the Settlement Agreement from the perspective of the Companies.  Rather, the Florida District Court viewed the interests of

the Companies and Principals collectively, as one side of the transaction, and the interests of the

Receiver and his representatives on the other side.

90.     As such, the Settlement Order states:  "On one side of the Settlement Agreement

are the Affiliated Companies, the Principals, the Spouses, and Dawson . . . On the other side of

the Settlement Agreement are the Receiver; FP Designee; and Founding Partners Stable-Value

Fund, Ltd (Stable-Value), Founding Partners Global Fund, Ltd (Global), Founding Partners

Stable Value Fund II, L.P. (Stable Value II), and Founding Partners Hybrid-Value Fund, L.P.

(Hybrid-Value) (collectively, Founding Partners)."

91.     Under the Settlement Agreement, however, the interests of the Companies and

Principals were diverse, as the Principals used the Companies for their own benefit without

contributing value to the Companies in return.

92.     The terms of the Settlement Agreement resulted in, among other things, a multi-

step ownership transfer process whereby the Principals transferred the majority of their

ownership interests in Sun Capital, the Companies, and the HLP Entities to a newly created

entity—Founding Partners Designee, LLC ("FP Designee") n/k/a PHG—which would ultimately

be owned by the Consenting Investors.  The Principals, Spouses and Dawson retained a four (4)

percent ownership interest in PHI.

93.     The Principals, however, were not transferring ownership interests in profitable

hospitals.  Rather, the audits for the Companies leading up to the Settlement Agreement, in the

years ending 2009, 2010, 2011, 2012 and 2013, all contained language expressing doubt about

the Companies' ability to continue as a going concern and/or stating that the Companies were

experiencing recurring losses from operations and negative working capital.

94.     Specifically, PHI's audit for the year ended December 31, 2013 provided:  "the Company has suffered recurring losses from operations and has negative working capital."

95.     Success's audit for the year ended December 31, 2013 provided:  "the Company had a members' deficiency of approximately $66,617,000 and a working capital deficiency of approximately $128,780,000. These conditions raise substantial doubt about the Company's ability to continue as a going concern."

96.     On January 18, 2018, Hopwood, the Companies' CFO, explained the cash flow situation of the Companies from 2009 through 2014 in an email to Michael Young ("Young"), the Companies' Interim Chief Executive Officer, as follows (emphasis added) (the "Financial Overview Email"):

> **From early 2009 through March 2014, the Promise and Success entities suffered from a series of cash flow shock waves**.  First, from disputes with its lender Founding Partners Stable Value Fund, operational funding was completely and permanently shut off.  **The Partners at that time needed to find creative, entrepreneurial and unconventional solutions to funding turnarounds at recently acquired Silver Lake Medical Center and St Alexius.**  The Partners at that time also had the same funding challenges to greenfield new LTCH operations in The Villages, Miami Lakes and Ft Myers.  **All significant cash flow requirements that forced late payments on payroll taxes, stretched supply vendors and administrative chaos.  All of this accomplished with a capital structure that would be described as zero-days-in cash.**
>
> In October of 2012, a payroll tax defalcation occurred that resulted in a protracted negotiation with Federal and State taxing authorities.  Another cash flow shockwave as taxing authorities filed liens, recouped funds from Medicare and Medicaid payments and ultimately negotiated settlements for payment plans. **Again, the Partners found creative, entrepreneur and unconventional solutions to keeping their business in place and growing.  All of this was accomplished with a capital structure that would be described as zero-days-in cash.**

B.  The Principals Caused the Companies to Incur $200 Million in Secured Indebtedness
    Without the Companies Receiving Actual Loan Proceeds

97.     Since the Companies were struggling financially at the time of the Settlement

Agreement, the Consenting Investors could not rely exclusively on their new ownership interests

in the Companies as their form of settlement compensation.  Instead, the Principals offered that

the Consenting Investors could be the beneficiaries of the following three intercompany notes as

a form of economic protection:

(a)     Promise Healthcare Holdings, Inc. ("PHH"), as lender, PHI, as borrower, and
        certain subsidiaries of PHI, as guarantors (the "Intercompany Loan Guarantors"),
        executed a senior loan and security agreement evidencing a purported $75 million
        senior secured term loan that was deemed fully funded upon the closing date from
        alleged existing indebtedness (the "75M Term Loan").

(b)     PHI, as borrower, and the Intercompany Loan Guarantors executed a subordinated
        term note in favor of PHH, as lender, evidencing a purported $125 million
        subordinated term loan that was deemed fully funded upon the issuance date from
        alleged existing indebtedness (the "125M Term Loan," and together with the
        $75M Term Loan, the "PHI Intercompany Loans").

(c)     PHH executed a promissory note in favor of PHG, evidencing an alleged $75
        million unsecured loan ("the PHH Intercompany Loan" and together with the
        PHI Intercompany Loans, the "Settlement Intercompany Loans").

C.  The Principals Extracted Significant Monetary Benefits from the Struggling
    Companies

98.     Although the Companies were struggling to survive as a going concern prior to

execution of the Settlement Agreement, the Principals still extracted substantial monetary

benefits from the Companies under the Settlement Agreement, including:

(a)     entry into the Employment Agreement pursuant to which Baronoff was appointed
        as President and CEO with, among other things, (i) an annual salary of $750,000,
        (ii) a deferred annual bonus of $600,000 in respect to calendar years 2010, 2011
        and 2012, and (iii) additional bonus opportunities;

(b)     forgiveness of loans made by Sun Capital, Success, PHI and their affiliates to the
        Principals and Spouses aggregating approximately $1.7 million;

(c)     causing PHI to assume certain of the Principals' guaranty obligations and liabilities aggregating not less than $1.78 million;

(d)     upon information and belief, the cost of the Settlement Agreement to be borne by the Companies, including any costs of the Principals and Spouses;

(e)     alleged indemnifications for the Principals, Spouses, and Dawson from PHI, Success, SCHI, SCI and FP Designee;

(f)     broad releases of claims against the Principals, Spouses, and Dawson related in any way to Stable-Value and the Stable-Value loans; and

(g)     retention of, collectively, 4% ownership interest in the common stock of PHI, on account of which the Principals, Spouses and Dawson received the Disguised Equity Payments (*i.e.*, payments under the Secured Notes, the Alleged Koslow Consulting Agreement and the Alleged Leder Consulting Agreement and the Sun Capital Consultancy Payments) and Annual Equity Payments, described further below.

D.  The PHI Directors Caused PHI to Make the Disguised Equity Payments and Annual Equity Payments in an Amount Not Less than $10 Million to the Principals, Spouses and Dawson on Account of their Ownership Interests in PHI

99.     Despite referring to the Disguised Equity Payments by other names—*i.e.*, promissory notes and consultancy fees—such payments were simply a means for the Companies to make distributions to the Principals, Spouses and Dawson on account of their ownership interest in PHI.

100.    Upon information and belief, as set forth below, the Companies received no benefits in exchange for the Disguised Equity Payments and/or Annual Equity Payments.

a.  The Alleged Koslow Consulting Agreement

101.    On March 17, 2014 (the "Koslow Effective Date"), PHI and Koslow entered into an alleged consulting agreement, (the "Alleged Koslow Consulting Agreement"), pursuant to which, for the period of three years from the Koslow Effective Date (*i.e.*, March 17, 2014 through March 17, 2017), Koslow only had to "make himself available to the Company at reasonable times and places and shall provide to the Company such information, knowledge,

26

experience, expertise, guidance and advice as the Company may from time to time request, and shall perform such other services which the Company and Consultant may from time to time agree upon."

102.    Upon information and belief, neither the PHI Directors nor Koslow ever contemplated that Koslow would provide material services.

103.    Upon information and belief, Koslow in fact provided no consulting services to PHI.

104.    In exchange for such nonexistent "services", the Alleged Koslow Consulting Agreement provided the following payment terms, aggregating $1.8 million:  "The Company shall pay Consultant in consideration of the Services to be rendered during the [three year] Service Period $50,000 a month (the "Service Fees"). The first monthly installment shall be paid on the Effective Date and each payment thereafter shall be paid on the first business day of each month (each such date, a "Payment Date")."

105.    Further, the Alleged Koslow Consulting Agreement provided that upon the occurrence of certain acceleration events, including PHI's failure to make payments under the Secured Notes or the Alleged Leder Consulting Agreement, all remaining unpaid amounts allegedly due under the Alleged Koslow Consulting Agreement shall become immediately payable and paid to Koslow within three (3) business days.

106.    These acceleration events are in no way related to any alleged consulting services.

107.    The PHI Directors caused PHI to make all payments to Koslow under the Alleged Koslow Consulting Agreement.

108.    The payments by PHI, at the direction of the PHI Directors, of $1.8 million to Koslow under the Alleged Koslow Consulting Agreement (which required no actual provision of

27

services by Koslow) were simply a means of distributing funds from PHI to Koslow on account of his ownership interest of PHI.

109.    As set forth herein, PHI was unable to pay its debts in the ordinary course during the relevant time period in which the PHI Directors caused PHI to make such payments to Koslow.

> b.   The Alleged Leder Consulting Agreement

110.    On March 17, 2014, and effective as of December 1, 2012 (the "Leder Retroactive Effective Date"), PHI and Leder entered into an alleged consulting agreement, (the "Alleged Leder Consulting Agreement").

111.    The Alleged Leder Consulting Agreement provided that Leder "now serves as a consultant to the Company **beginning on December 1, 2012"** (emphasis added).

112.     Leder could not provide consulting services to PHI for any period of time prior to the closing of the Settlement Agreement on March 17, 2014—during which time, upon information and belief, Leder was a manager of PHI and receiving a salary in connection therewith.

113.    The Alleged Leder Consulting Agreement provided that for the period of the Leder Retroactive Effective Date through November 30, 2015 (*i.e.*, approximately 19 months not including the retroactive period for which consulting services could not be provided), Leder only had to "make himself available to the Company at reasonable times and places and shall provide to the Company such information, knowledge, experience, expertise, guidance and advice as the Company may from time to time request, and shall perform such other services which the Company and Consultant may from time to time agree upon."

28

114. Upon information and belief, neither the PHI Directors nor Leder ever contemplated that Leder would provide material services.

115. Upon information and belief, Leder in fact provided no consulting services to PHI.

116. In exchange for such nonexistent "services," the Alleged Leder Consulting Agreement provided the following payment terms, aggregating $1.75 million:  "The Company shall pay Consultant in consideration of the Services to be rendered during the Service Period [19 months excluding the retroactive period] $50,000 a month (the "Service Fees"). The first monthly installment shall be paid on the Effective Date and each payment thereafter shall be paid on the first business day of each month (each such date, a "Payment Date")."

117. Further, the Alleged Leder Consulting Agreement provided that upon the occurrence of certain acceleration events, including PHI's failure to make payments under the Secured Notes or the Alleged Koslow Consulting Agreement (reference in agreement is to the Alleged Leder Consulting Agreement, but is misstated), all remaining unpaid amounts allegedly due under the Alleged Leder Consulting Agreement shall become immediately payable and paid to Leder within three (3) business days.

118. These acceleration events are in no way related to any alleged consulting services.

119. The PHI Directors caused PHI to make all payments to Leder under the Alleged Leder Consulting Agreement.

120. The payments by PHI, at the direction of the PHI Directors, of $1.75 million to Leder under the Alleged Leder Consulting Agreement (which required no actual provision of services by Leder) were simply a means of distributing funds from PHI to Leder on account of his ownership interest of PHI.

7494326

121.    As set forth herein, PHI was unable to pay its debts in the ordinary course during the relevant time period in which the PHI Directors caused PHI to make such payments to Leder.

c.   The Secured Notes

122.    On March 17, 2014, PHI and Baronoff entered into a secured promissory note, whereby PHI promised to pay Baronoff the principal sum of $882,600.00 (the "Peter Baronoff Secured Note").

123.    The Peter Baronoff Secured Note provided as follows:  "The principal balance shall be payable in immediately available funds in three installments as follows: (i) $241,500 shall be payable to the Payee on the first anniversary of this Note; (ii) $280,650 shall be payable on the second anniversary of this Note; and (iii) $360,450 shall be payable on the third anniversary of this Note."

124.    On March 17, 2014, PHI and Malinda Baronoff entered into a secured promissory note, whereby PHI promised to pay Malinda Baronoff the principal sum of $882,600.00 (the "Malinda Baronoff Secured Note").

125.    The Malinda Baronoff Secured Note provided as follows:  "The principal balance shall be payable in immediately available funds in three installments as follows: (i) $241,500 shall be payable to the Payee on the first anniversary of this Note; (ii) $280,650 shall be payable on the second anniversary of this Note; and (iii) $360,450 shall be payable on the third anniversary of this Note."

126.    On March 17, 2014, PHI and Howard Koslow and Jane Koslow entered into a secured promissory note, whereby PHI promised to pay Howard and Jane Koslow the principal sum of $1,765,200 (the "Koslow Secured Note").

7494326

127.    The Koslow Secured Note provided as follows:  "The principal balance shall be payable in immediately available funds in three installments as follows: (i) $483,000 shall be payable to the Payee on the first anniversary of this Note; (ii) $561,300 shall be payable on the second anniversary of this Note; and (iii) $720,900 shall be payable on the third anniversary of this Note."

128.    On March 17, 2014, PHI and Lawrence Leder entered into a secured promissory note, whereby PHI promised to pay Leder the principal sum of $1,765,200 (the "Leder Secured Note").

129.    The Leder Secured Note provided as follows:  "The principal balance shall be payable in immediately available funds in three installments as follows: (i) $483,000 shall be payable to the Payee on the first anniversary of this Note; (ii) $561,300 shall be payable on the second anniversary of this Note; and (iii) $720,900 shall be payable on the third anniversary of this Note."

130.    On March 17, 2014, PHI and Mark Dawson entered into a secured promissory note, whereby PHI promised to pay Leder the principal sum of $588,400 (the "Dawson Secured Note," and together with the Peter Baronoff Secured Note, the Malinda Baronoff Secured Note, the Koslow Secured Note and the Leder Secured Note, the "Secured Notes").

131.    The Dawson Secured Note provided as follows:  "The principal balance shall be payable in immediately available funds in three installments as follows: (i) $161,000.00 shall be payable to the Payee on the first anniversary of this Note; (ii) $187,100.00 shall be payable on the second anniversary of this Note; and (iii) $240,300.00 shall be payable on the third anniversary of this Note."

132.    The PHI Directors caused PHI to make all payments to the Principals, Spouses and Dawson under the Secured Notes.

133.    PHI received no benefits in exchange for making any payments under the Secured Notes.

134.    As such, PHI's payments to the Principals, Spouses and Dawson under the Secured Notes at the direction of the PHI Directors was merely a means of distributing funds to the Principals and Spouses on account of their equity interest in PHI.

135.    In fact, as set forth in the Settlement Order, "[t]he secured notes [were] issued in proportion to [the Principals and Spouses] ownership interests in Promise following the closing."

136.    As set forth herein, PHI was unable to pay its debts in the ordinary course during the relevant time period in which the PHI Directors caused PHI to make such payments to the Principals, Spouses and Dawson under the Secured Notes.

                    d.   Baronoff Sun Capital Consultancy Payments

137.    In addition to Baronoff's annual salary and various other bonuses and incentives, Baronoff's Employment Agreement contained "Sun Capital Consultancy Payments" aggregating $1.8 million.

138.    Specifically, the Employment Agreement provides as follows:

> Consideration for Sun Capital Consultancy.  Employer shall pay Employee additional amounts aggregating $360,000 per year for each of five (5) years (the "Sun Capital Consultancy Payments"), totaling $1,800,000.  The Sun Capital Consultancy Payments shall be delivered by the Company to Employee . . . as of the first business day of each consecutive month of Employee's employment hereunder, in amounts equal to one-twelfth of $360,000, commencing with the first day of the month coincident with or next following the Effective Date.

139.    Aside from referencing Sun Capital in the defined term, the Employment Agreement includes no description of any services to be provided by Baronoff on account of the Sun Capital Consultancy Payments.

140.    Upon information and belief, Baronoff performed no services in exchange for the Sun Capital Consultancy Payments aggregating $1.8 million.

141.    As such, PHI's payments of each of the Sun Capital Consultancy Payments to Baronoff at the direction of the PHI Directors (including Baronoff) was merely a means of distributing funds to Baronoff on account of his equity interest in PHI.

142.    As set forth herein, PHI was unable to pay its debts in the ordinary course during the relevant time period in which the PHI Directors caused PHI to make the Sun Capital Consultancy Payments to Baronoff.

e.  <u>Annual Equity Payments</u>

143.    Upon information and belief, at the direction of the PHI Directors, PHI made equity payments to Malinda Baronoff on account of her equity interests in PHI three times per year.

144.    For example, on June 1, 2015, Malinda Baronoff emailed Armstrong asking "when is the second equity payment[,]" to which Armstrong replied "[t]here are only three equity payments that are paid out annually.  The next will be due March 2016."

E.  The Companies Received No Material Benefits in Exchange for the Payments to and <u>Obligations Incurred on Behalf of the Principals</u>

145.    In exchange for the Principal Benefits, the Principals, Spouses and Dawson gave mutual releases to the Companies with respect to events related to the Sun Capital Litigation, although upon information and belief, neither the Principals, Spouses nor Dawson had any claims against the Companies related to the Sun Capital Litigation.  Rather, the Principals and

Dawson were responsible for the actions of the Companies with respect to the Sun Capital Litigation, as they owned and operated the Companies prior to entry of the Settlement Agreement.

146.     The Investors, in determining whether to opt-in to the Settlement Agreement, recognized the disproportionate perks for the Principals at the expense of the Companies under the Settlement Agreement.

147.     In the Settlement Order, the Florida District Court noted that the Settlement Agreement "has drawn significant opposition for a material number of investors," including because of the continued participation by the Principals.  The Settlement Order noted the following objections, among others:

- "The objectors take exception to the consulting agreements with the Principals and the continued employment of Baronoff as CEO.  Essentially, the objectors assert this simply continues to keep the fox in the hen house[;]" and

- "The investors object to the magnitude of related party transactions orchestrated by the Principals since the date of the Security Agreements."

148.     The Florida District Court did not disagree with these concerns.  Rather, the Florida District Court explained that the Settlement Agreement was designed so that Investors who disapproved of the terms of the Settlement Agreement could opt-out—thereby maintaining all claims and causes of action in the Sun Capital Litigation, but not receiving an ownership interest in PHG.

149.     Unlike the Investors who could opt-out of the Settlement Agreement, the Companies were dragged into the Settlement Agreement by the Principals and used as their bargaining chip.

150.     Put simply, the Companies had no ability not to participate in the Settlement Agreement (despite that it provided them with no material benefits and saddled them with

material debt and other obligations which caused further stress on an already weak financial footing).

151.    In fact, the Companies had no independent counsel or management to review the Settlement Agreement—(i) the Companies used the same counsel as the Principals and (ii) Koslow executed the Settlement Agreement on behalf of himself and the Companies.

152.    Further, as set forth above, the Florida District Court considered the Principals and Companies to be on the same side of the transaction and did not consider the inherent and inexorable conflicts that existed between the Companies and Principals.

153.    In light of the significant Principal Benefits, the Principals had a clear incentive to cause the Companies to enter into the Settlement Agreement, despite the obvious harm it imposed on the Companies from which they could not financially recover.

## II.    Post-Settlement Organizational Structure

154.    After the reorganization instituted pursuant to the Settlement Agreement, PHG served as the ultimate parent entity of the Debtors through its 100 percent equity ownership of PHH and Success.  PHH, in turn, owns 96% of PHI with the remaining 4% owned by the Principals, Spouses and Dawson.  PHI and Success each separately own the operating entities.

155.    PHI owns subsidiaries that operate LTACHs and SNFs.

156.    Success owns subsidiaries that that operate inner-city hospitals in St. Louis, Missouri and Los Angeles, California.  Success' subsidiaries purchased the Silver Lake facility in November 2008 and St. Alexius in December 2008.

157.    Both Silver Lake and St. Alexius performed poorly, and, as early as 2015, the Company D&Os sought buyers for these facilities.  However, despite assuring the Boards a

buyer could be found which would improve the financial condition of the PHG enterprise, the

Company D&Os did not find a buyer for either facility prior to the Petition Date.

### III.     The PHI and Success Board Composition

158.     Upon information and belief, the directors of the PHI Board from March 17, 2014

through May 11, 2018—the date Baronoff resigned from the PHI Board—were as follows:

(a)     The Receiver:  board member from March 17, 2014 through January 27, 2015

(b)     Peter Baronoff:  board member from March 17, 2014 through May 11, 2018 (simultaneously Principal of PHI, minority shareholder in PHI, and President and CEO of PHI until March 13, 2018)

(c)     Keith Reuben:  board member from March 17, 2014 through no later than April 26, 2016

159.     As such, upon information and belief, from January 27, 2015 through May 11,

2018 there was never a majority of disinterested directors at PHI with respect to any decisions

implicating Baronoff or Baronoff's reporting, including financial reporting shared with the

Boards prepared or approved by Baronoff.

160.     Upon information and belief, the directors of the Success Board from March 17,

2014 through May 11, 2018—the date Baronoff resigned from the Success Board—were as

follows:

(a)     The Receiver:  board member from March 17, 2014 through January 27, 2015

(b)     Peter Baronoff:  board member from March 17, 2014 through May 11, 2018 (simultaneously Principal of Success and President and CEO of Success until March 13, 2018)

(c)     Keith Reuben:  board member from March 17, 2014 through no later than April 26, 2016

(d)     Brian Dunn: board member from March 17, 2014  through no later than April 26, 2016

36

161.     As such, from at least April 26, 2016 through May 11, 2018 there was never a majority of disinterested directors at Success with respect to any decisions implicating Baronoff or Baronoff's reporting, including financial reporting shared with the Boards prepared or approved by Baronoff.

162.     Upon information and belief, from no later than April 26, 2016 through May 11, 2018, Baronoff was the sole member of the PHI Board and Success Board.

**IV.     Board Meetings for PHI, Success and PHG Were Not Conducted Separately, Despite the Varying Interests of Each of the Entities**

163.     The PHG, PHI and Success boards never conducted separate board meetings.

164.     The board presentations prepared by the Company Officers for the PHG, PHI and Success Boards were the same presentation.

165.     Upon insolvency, the fiduciary duties of the PHI Board and Success Board were not aligned with the fiduciary duties of the PHG Board.

166.     Upon information and belief, the Company D&Os never requested the PHI Board and/or Success Board hold independent board meetings.

167.     Upon information and belief, when directors voted on issues at board meetings or otherwise approved corporate management decisions, it was not clear in what capacity they were voting (*i.e.*, as directors of PHI, Success or PHG).

168.     For example, it is unclear in which capacity—as members of the PHI Board or the Success Board—Baronoff, Newman, Reuben and/or Dunn approved the decision to maintain a consolidated cash management system for the Companies whereby the better performing PHI hospitals subsidized the weaker performing Success hospitals (described further below).

**V.     The Better Performing Hospitals Subsidized the Weaker Performing Hospitals Without Any Reasonable Prospect of Repayment**

7494326

169.     Upon information and belief, since at least 2014, the better performing hospitals subsidized the weaker performing hospitals without any reasonable prospect of repayment, to the detriment of the creditors of the better performing hospitals.

170.     As set forth in the Cash Management Motion, "the Promise Master Disbursement Account receive[d] proceeds of the Debtors' prepetition revolver and distribute[d] the cash to various other disbursement accounts, including petty cash accounts held by its subsidiaries." Cash Management Motion, 17.

171.     Such cash distributions from the master disbursement account to the operating subsidiaries were based on need, not contribution towards repayment of the revolving credit facility.

172.     Further, the Debtors shared overhead, accounting and other related expenses (the "Shared Expenses").

173.     The better performing hospitals paid more, if not all, of the Shared Expenses for the benefit of the weaker performing hospitals, without any reasonable probability of repayment from the weaker performing hospitals.

174.     For instance, all of the accounting personnel utilized by the Debtors were employed by PHI.

175.     Upon information and belief, PHI never received reimbursement from Success or its subsidiaries for Success's use of PHI's accounting personnel.

176.     Moreover, the operating entities did not have their own employee benefit or 401-k plans for employees.  Rather, those employees participated in plans administered at the corporate level.

7494326

177.    The better performing hospitals contributed more funds to the corporate parent than the funds contributed by the weaker performing hospitals, which funds were contributed to the employee benefit or 401-k plans for employees at the weaker performing hospital, without any reasonable probability of repayment.

178.    Additionally, Baronoff's Employment Agreement entered into with PHI and Success did not provide for any allocation or division as between PHI and Success regarding which amounts of Baronoff's salary and bonuses would be paid by each entity.

179.    Upon information and belief, PHI made all salary and bonus payments to Baronoff under the Employment Agreement without any reasonable prospect of repayment from Success on account of the work Baronoff performed as CEO and President of Success.

180.    Similarly, Baronoff's Separation Agreement did not provide for any allocation or division as between PHI and Success regarding which amounts of Baronoff's severance payments would be paid by each entity.

181.    Upon information and belief, PHI made all payments to Baronoff under the Separation Agreement without any reasonable prospect of repayment from Success on account of Success' alleged severance obligations thereunder.

182.    Upon information and belief, receipts from the operating subsidiaries were also collected in one master account and then distributed to operating entities based on need, not contribution.

183.    Baronoff was incentivized to allow the better performing hospitals to subsidize the weaker performing hospitals, as this allowed him to maintain his position as director, President and CEO of both PHI and Success, even though Success and its subsidiaries would not have survived without such subsidies.

39

VI.    **The Company D&Os Provided Misleading Information to MidCap in Connection with the MidCap Revolver**

184.    To fund operations after the closing of the Settlement Agreement in 2014, PHI and Success and their subsidiaries, as borrowers, entered into the MidCap Revolver.

185.    Upon information and belief, to ensure entry into the MidCap Revolver, the Company D&Os provided MidCap misleading financial information regarding the quality and collectability of accounts receivable.

186.    The Companies therefore were unable to collect on their receivables to the degree projected to MidCap, decreasing the availability under the MidCap Revolver.  This, coupled with the Companies' exorbitant Settlement Agreement costs and inability to adjust to changes in reimbursement rates, resulted in the MidCap Revolver being insufficient to meet the Companies' liquidity needs.

187.    As described by Hopwood in the Financial Overview Email:

The new [MidCap] revolver provided excess liquidity but you can imagine that it quickly evaporated as receivable balances grew during the tie-in notice period . . . In reviewing early Board Meeting notes, it is clear the low days cash on hand continued after the revolver and acquisition.  Both the low days of cash on hand, large vendor/doctor balances and a need to borrow PHG funds to pay certain critical needs were identified in every Board Meeting nearly two years prior to the Board approving the $3.0 million investment in iCare [in February 2017].

188.    One of the financial reporting covenants under the MidCap Revolver required the borrowers to report their annual audit for 2014 within 180 days of year end (the "Audit Covenant").

189.    The Company D&Os failed to hire an auditor to conduct the 2014 audit of the Companies until approximately four months after the year ended, despite knowing that the MidCap Revolver required PHG 2014 Audit be delivered no later than June 9, 2015.

40

190.     The Company D&Os hired Crowe to conduct the PHG 2014 Audit on April 10, 2015—two months before the audit was due under the Audit Covenant.

191.     The Company D&Os had to receive a waiver from MidCap in relation to the Audit Covenant extending the deadline to report the PHG 2014 Audit to March 31, 2016.

192.     The PHG 2014 Audit was not delivered by Crowe until March 15, 2016.

193.     As set forth below, the Company D&Os refinanced the MidCap Revolver on March 21, 2016.

194.     As such, none of the financial reporting delivered to MidCap by the Company D&Os on account of the Companies was audited.

**VII.    The Company D&Os Provided Wells With Misleading Information Prior to and After Executing the Wells Revolver**

195.     On March 21, 2016 (six days after the delivery of the PHG 2014 Audit), PHI and certain of its subsidiaries and Success and certain of its subsidiaries (the "Wells Borrowers") entered into the Wells Revolver in the original principal amount of $75 million.  The Company D&Os used the Wells Revolver to refinance the MidCap Revolver.

196.     Upon information and belief, the Company D&Os presented misleading information to Wells prior to and after executing the Wells Revolver.

197.     For example, on December 8, 2015, a vice president at Wells emailed Hopwood to inquire about the "2019 A/R increases by $10MM in year 5 of the financial model." Hopwood replied as follows:

> The total annual revenue in Promise 1 is up 7% between 2018 and 2019 mostly as a result of the growth in VOW Healthcare increasing from $23 million in 2018 to $45 million in 2019.  The twelve month averages for accounts receivable are increasing 6.9% between 2018 and 2019 so there is a slight productivity gain between the two years.  I believe the VOW wellness business will likely be a cash, credit card and small insurance balance business, so to forecast growth in

7494326

A/R based on growth in VOW is likely an ultra-conservative assumption but that is what we assumed.

198.    However, in an email exchange in May 2016 between Baronoff and Rand McClain, with whom Baronoff worked on the VOW venture, Baronoff explained that "[i]n early February [2016] during a board meeting as discussed, our board agreed to postpone our investment in the antiaging and wellness platform due to regulatory changes and other business priorities."

199.    The February 2016 board meeting where the Boards decided not to pursue the VOW transaction as currently contemplated occurred approximately two months after the December 2015 email to Wells stating that VOW would account for an increase in revenue of $22 million in one year.

200.    The Boards made the decision not to pursue the VOW transaction prior to the closing of the Wells transaction, but upon information and belief, the Company D&Os did not update the 5 year projections provided to Wells prior to March 21, 2016—the closing date of the Wells Revolver.

201.    Further, on March 12, 2016—approximately one week before the Wells Revolver closed—Trevor Klein ("Klein"), SVP and Chief Accounting Officer of the Companies, emailed Helland stating (emphasis added):  "I took a look at the open item list for the lender [Wells]. You have requested 2015 financials from me.  As discussed with you previously in my opinion **the 2015 financials as they stand do not fairly present the financial position of the company and I am not comfortable distributing these financials to the lenders.**  Please call me if you would like to discuss further."

202.    Helland replied to Klein on March 14, 2016, stating (emphasis added):  "I hear you, yet we do note that the financials are unaudited and subject to audit adjustment.  That

7494326

should be sufficient disclosure. **Bottom line, we need the 2015 financials to close the Wells transaction**[.]"

203.    Klein resigned as Chief Accounting Officer no later than April 2, 2016—two weeks after the Company D&Os sent the 2015 financials to Wells.

204.    In the 2015 income statement provided to Wells by the Company D&Os in connection with closing the Wells transaction, the Company D&Os included, among other things, net operating revenues of $497,737,000 and net income of $3,963,000.

205.    Yet, in the PHG 2015 Audit—which Wells did not receive until August 1, 2017 (two weeks before the Companies defaulted on August 15, 2017)—the net operating revenues for 2015 were only $489,463,000 and the net income was negative $8,570,000.

206.    As such, the net operating revenues and the net income in the PHG 2015 Audit was $8,274,000 and $12,533,000 *less*, respectively, than the net operating revenues and the net income provided by the Company D&Os to Wells in connection with closing the Wells transaction.

207.    The Company D&Os thus sent Wells misleading financial information for the year 2015.

208.    Upon information and belief, had the Company D&Os not provided Wells misleading information regarding the Companies' 2015 financials, Wells would not have entered the Wells Revolver, and the Companies would have been in default under the MidCap Revolver. This would have caused the Companies to take actions to protect the interests of the Companies and their creditors, including filing for chapter 11, on or before March 2016, preventing the incurrence of payables, accrued expenses and/or other liabilities from March 2016 through the Petition Date.

7494326

209.   After executing the Wells Revolver, the Company D&Os continued to provide Wells with misleading financial information.

210.   For example, in the 2017 income statement provided to Wells by the Company D&Os, the Company D&Os included, among other things, net operating revenues of $497,737,000 and net income of negative $25,057,000.

211.   Yet, in the PHG 2016/2017 Audit—which Wells did not receive until June 28, 2018 (after the Company defaulted on August 15, 2017)—the net operating revenues in 2017 were only $462,457,000 and the net income was negative $344,596,000.

212.   As such, the net operating revenues and the net income in the PHG 2016/2017 Audit for 2017 was $5,489,000 and $9,539,000 *less*, respectively, than the net operating revenues and the net income provided by the Company D&Os to Wells.

213.   Upon information and belief, had the Company D&Os not provided Wells misleading information regarding the Companies' 2017 financials, the Companies would have been in default prior to August 15, 2017, causing the Companies to take actions to protect their interests and the interests of their creditors, including filing for chapter 11 protection, prior to November 5, 2018, preventing the incurrence of additional payables, accrued expenses and/or other liabilities.

214.   The Company D&Os therefore continuously presented misleading financial information to Wells to present a more positive financial picture of the Companies than was accurate.

215.   Upon information and belief, the Companny D&Os mislead Wells regarding compliance with financial covenants by including the cash held at PHG and/or transferring cash from PHG to PHI and/or Success in the financial reporting to Wells.

216.    For example, in an email between Keller and Hopwood, dated August 10, 2017, discussing the June 30, 2017 borrowing base certificate for the Wells Revolver, Keller asks: "Does this calculation somehow contain the $5.9 million in holdco cash?  The $8.9 million of availability seems high?  Was this calculated at a low point in balance?  The cash flow forecast that I have shows balance hovering around $60 million for the foreseeable future.  What am I missing?"

217.    Further, in an email between Hopwood and Keller, dated June 2017 discussing the Wells Revolver, Hopwood states that "Over the course of the week, we adjusted down disbursements from the forecast **and transferred funds from Promise Healthcare Group** to hit a required $7.5 million excess availability on Thursday" (emphasis added).

218.    Upon information and belief, had the Company D&Os not included the financial information of PHG and/or transferred funds from PHG, the Companies would have defaulted under the Wells Revolver prior to August 15, 2017 and would have had to take actions to protect their interests and the interests of their creditors, including by filing for chapter 11 protection, prior to November 5, 2018, therefore not incurring additional payables, accrued expenses and/or other liabilities.

219.    The Wells Borrowers defaulted under certain financial covenants under the Wells Revolver as of August 15, 2017.

220.    The Wells Borrowers, Wells and the other lenders under the Wells Revolver entered into that certain Forbearance Agreement, First Amendment to Credit Agreement and Joinder, dated as of March 14, 2018 (the "First Forbearance Agreement") which provided that Wells and the lenders would forbear from exercising their rights and remedies through April 6, 2018.

7494326

221.    Upon information and belief, in light of Wells' apparent distrust, Wells was unwilling to lend additional funds to the Wells Borrowers.

222.    As such, to receive the necessary financing to enter into chapter 11, the Debtors required a $15 million loan from affiliates of a shareholder (the "Shareholder Loan"), which was rolled into the Wells Revolver and which amounts would be repaid last.

223.    The Shareholder Loan closed on March 14, 2018.

224.    On October 26, 2018, the Wells Borrowers, Wells, and the lenders entered into that certain Second Forbearance Agreement, Second Amendment to Credit Agreement (the "Second Forbearance Agreement"), which provided that Wells would forbear from exercising its rights and remedies through November 4, 2018.

**VIII.    The Company D&Os Provided Misleading and/or Untimely Financial Information to the Auditors**

225.    Upon information and belief, the Company D&Os presented misleading information to Crowe in relation to the PHG 2014 Audit and PHG 2015 Audit.

226.    For example, in preparing the PHG 2014 Audit and the PHG 2015 Audit, on January 26, 2016, a partner at Crowe emailed Klein with a list of going concern questions.  One of the going concern questions was "How did the company's forecasts and budgets align with actual results for 2014 and 2015?"

227.    Klein forwarded the going concern questions to Hopwood, asking him to address and respond.

228.    Hopwood responded to Crowe's going concern question as follows (emphasis added):

> Management prepares two levels of budgets: 1.) an aggressive budget prepared by operating management for the purpose of driving facility performance.  100% achievement of this budget expectation is not likely nor expected; 2.) a

conservative budget prepared for bank covenant setting purposes and other third party discussions. **Given the historical compliance with Midcap loan covenants, we believe our actual results have aligned reasonably well with forecasts and budgets prepared for third parties**.

229.    As such, to answer whether the Company's forecasts and budgets aligned with actual results for 2014 and 2015, the Company D&Os stated that the Companies were historically in compliance with the MidCap covenants—this does not accurately answer the questions.

230.    The MidCap covenants did not require that the Companies' forecasts and budgets align with actual results.

231.    Further, in 2015, for example, the Companies' forecasts and budgets did not align with actual results.  The 2015 PHI budget prepared by the PHI Officers included a projected adjusted EBITDA of $40.8 million, yet PHI's preliminary adjusted EBITDA results were only $31 million and its 2015 audit reflected an EBITDA of $22.4 million.  The 2015 Success budget prepared by the Success Officers included a projected adjusted EBITDA of $7.3 million, yet Success's preliminary adjusted EBITDA results were only $5.3 million and its 2015 audit reflected an EBITDA of $1.4 million.

232.    Upon information and belief, the Company D&Os mislead Crowe in response to the going concern question regarding compliance with budgets to avoid Crowe including a going concern qualification in the PHG 2014 Audit and PHG 2015 Audit.

233.    Upon information and belief, Klein felt he was unable to sign the management representation letter in connection with the PHG 2014 Audit.

234.    Klein resigned from the Companies no later than April 2, 2016—two weeks after the PHG 2014 Audit was delivered.

235.    Upon information and belief, had the Company D&Os provided accurate answers to the going concern questions from Crowe, Crowe would have included a going concern qualification in the PHG 2014 Audit and/or PHG 2015 Audit and vendors, lenders (including MidCap and Wells) and/or the Boards would have caused the Companies to take actions to protect the Companies and their creditors, including by filing for chapter 11 protection, prior to November 5, 2018, therefore not incurring additional payables, accrued expenses and/or other liabilities.

236.    Additionally, the Company D&Os caused the delivery of the audits for the years ending 2014, 2015, 2016 and 2017 to be delayed, as set forth in the chart below:

| Years Covered | Date Delivered |
|---|---|
| March 8, 2014 (date of inception) to December 31, 2014 | March 15, 2016 [approximately 15 months after year-end] |
| Year ended December 31, 2015 | August 1, 2016 [approximately 7 months after year-end] |
| Years ended December 31, 2017 and 2016 | June 28, 2018 [approximately 18 months after year-end 2016 and 6 months after year-end 2017] |

237.    With respect to the PHG 2014 Audit, the Company D&Os hired Crowe to conduct the audit on April 10, 2015—four months after the year end.

238.    On April 20, 2016, the Company D&Os had not yet hired an auditor to conduct the PHG 2015 Audit.

239.    Upon information and belief, the Company D&Os delayed providing the financial information for the PHG 2016/2017 Audit to Crowe to (i) try to avoid the inclusion of going concern language, (ii) prevent audited financial statements from timely reaching the Companies'

48

vendors, (iii) prevent audited financial statements from timely reaching the Companies' lenders (such as Wells), and/or (iii) prevent audited financial statements from timely reaching the Boards.

240.    In the Financial Overview Email, Hopwood states:

> We have spoken to Keith Kennedy and Crowe Horwath to discuss the feasibility of publishing our 2017 audit with Going Concern language included.  As you know, **we had delayed our original April 30, 2018 target publish date for the purpose of resolving a longer term forbearance or agreement with Wells Fargo after a Silver Lake Sale.**  That process has been delayed for several reasons and we are now at a decision point where we need to deliver audited financial statements to the States of Florida and Arizona for each of our hospitals.  **We risk increasing penalties from Florida and Arizona if we don't deliver audited financial statements with our annual filings.**  We also need to file audited financial statements with the Department of Education by June 30th for purposes of maintaining federal student loan eligibility at our St Alexius Lutheran School of Nursing (which should assist in maintaining any remaining value at St Alexius Hospital).  Given all of these requirements, we believe it is reasonable to move ahead with publishing 2017 audited financials **even with the Going Concern language included**.

(emphasis added).

241.    Upon information and belief, had the Company D&Os timely delivered financial information regarding the PHG 2016/2017 Audit, creditors and other interested parties would have been aware of the going concern language in the audits earlier and ceased doing business or altered their relationships with the Companies, reducing the growth of payables, accrued expenses and/or other liabilities.

242.    For example, in March 2018, Ally Corporate Finance ("Ally") was trying to understand the financial situation of Success and requested information regarding Success's financial statements.  After receiving unsatisfactory answers from George Watkins, a Silver Lake employee, an employee at Ally emailed George Watkins stating "[m]aybe it's just easier, if you could provide us the most recent set of audited financial statements for the combined entity[.]"

49

243.    In March 2018, neither the 2016 nor 2017 PHG audits had been delivered.

244.    As such, George Watkins emailed Hopwood on March 23, 2018 asking "[i]s there anything I can send them?"

245.    Hopwood replied on March 28, 2018 stating "we received a clean audit if that's what they are trying to determine."

246.    This is incorrect as neither the 2016 nor 2017 audits had been delivered—as a result of the Company D&Os' attempts to keep going concern language out of the audits.

247.    Further, Hopwood was aware that such audits would likely contain a going concern qualification, as the Company Officers prepared a going concern memo regarding the year ended 2016 in April 2017 prior to the emails from Ally.

248.    As such, without timely audited financial statements, the Company D&Os could not provide accurate financial information to creditors or other third parties and inaccurately conveyed the financial position of the Companies without such third parties having the means to check such information.

249.    Also, upon information and belief, had the Company D&Os timely delivered financial information regarding the PHG 2016/2017 Audit, the PHG Board and/or Company Boards would have caused the Companies to take actions to protect the interests of the Companies and their creditors, including by filing for chapter 11 protection, prior to November 5, 2018, reducing the growth of payables, accrued expenses and/or other liabilities.

250.    Upon information and belief, the delay in delivery of the 2014, 2015, 2016, and/or 2017 audits caused the Companies to incur penalties from various states as a result of not being able to file audited financial statements with the Companies' annual filings.

7494326

## IX.    The Company Officers Provided Misleading Information to the Boards

251.    Upon information and belief, the Company Officers, and specifically Baronoff and Hopwood, presented misleading forecasts and budgets to the Boards from March 17, 2014 through October 2017—when FTI was hired—preventing the Boards from understanding the true financial position of the Companies until the delivery of the audits, many months after the year end.

252.    As demonstrated in the charts below, the PHI Officers, and specifically Baronoff and Hopwood, presenting the following misleading budgets to the Boards regarding PHI:

1.   The 2015 PHI budget, presented by the PHI Officers on March 4, 2015, included a projected adjusted EBITDA of $40.8 million—yet the audit, delivered on August 1, 2016 (8 months after year end) reflected an EBITDA of $22.4 million.

2.   The 2016 PHI budget, presented by the PHI Officers on February 2, 2016, included a projected adjusted EBITDA of $45.3 million—yet the audit, delivered on June 28, 2018 (18 months after year end) reflected an EBITDA of $21.0 million.

3.   The 2017 PHI budget, presented by the PHI Officers on February 7, 2017, included a projected adjusted EBITDA of $42.9 million—yet the audit, delivered on June 28, 2018 (6 months after year end) reflected an EBITDA of $200,000.

## BOARD EBITDA TIMELINE COMPARISON

**PHI** ($ in Millions)







253.    Similarly, the Success Officers, and specifically Baronoff and Hopwood,

consistently presented misleading budgets regarding Success to the Boards, as follows:

1.  The 2015 Success budget, presented by the Success Officers on March 4, 2015, included a projected adjusted EBITDA of $7.3 million—yet the audit, delivered on August 1, 2016 (8 months after year end) reflected an EBITDA of $1.4 million.

2.  The 2016 Success budget, presented by the Success Officers on February 2, 2016, included a projected adjusted EBITDA of $8.3 million—yet the audit, delivered on June 28, 2018 (18 months after year end) reflected an EBITDA of $3.9 million.

3.  The 2017 Success budget, presented by the Success Officers on April 25, 2017, included a projected adjusted EBITDA of $2.4 million—yet the audit, delivered on June 28, 2018 (6 months after year end) reflected an EBITDA of negative $1.2 million.



254.    Upon information and belief, had the Company Officers presented accurate EBITDA numbers to the Boards in the budgets of PHI and Success, the Boards would have caused the Companies to take actions to protect the interests of the Companies and their creditors, including by filing for chapter 11 protection, prior to November 5, 2018, therefore not incurring additional payables, accrued expenses and/or other liabilities.

255.    Further, upon information and belief, since the Companies' inception, the Company Officers, and specifically Baronoff and Hopwood, presented misleading information to the Boards regarding the quality and collectability of the Companies' accounts receivable in order to inflate the financial position of the Companies.

53

256.     Additionally, the Company Officers failed to adequately prepare for the changes to reimbursement rates under the new site neutral rules, despite the significant period of time to make such adjustments from the announcement of the new rules.

257.     The Company Officers failed to update and adjust budgets, projections and operations for upcoming years to reflect the new site neutral rules, misleading the Boards with respect thereto.

258.     As such, the actual performance of the Companies since the implementation of the site neutral rules was significantly worse than as reflected in the budgets prepared for the Boards.

259.     Additionally, the PHI and Success Boards lacked a majority of independent directors to adequately question and consider the Company Officers' (including Baronoff's) board presentations through May 11, 2018.

260.     As set forth above, upon information and belief, from at least April 2016 through May 11, 2018, Baronoff (who was also CEO and President) was the sole director of PHI and Success.  As such, when Baronoff presented information to the PHI and Success Boards prior to his resignation as an officer and director, there was not a disinterested majority to make decisions regarding such financial information.

261.     Further, upon information and belief, the Company Officers failed to report to the Boards major litigations against the Companies and the costs of potential damages in connection therewith, such that the Boards never understood the full financial position of the Companies.

262.     For example, upon information and belief, the PHI Officers failed to pay any premiums to PHI's commercial insurance carrier with respect to workers compensation coverage

for approximately three years, which was the subject of a lawsuit brought by the insurance carrier against PHI.

263.    Upon information and belief, the PHI Officers never informed the Boards of this lawsuit.

264.    Upon information and belief, the PHI Officers never included any potential damages in their financial presentations to the Boards.

265.    Additionally, upon information and belief, the State of Louisiana overpaid certain amounts to PHI and/or certain of its subsidiaries, as well as several other health institutions in Louisiana.

266.    Upon information and belief, the other health institutions that received overpayments repaid these funds.

267.    Upon information and belief, the PHI Officers failed to repay to Louisiana the money to which it was not entitled.

268.    Upon information and belief, the PHI Officers included the funds from Louisiana to which PHI was not entitled in its financial presentations to the Boards.

269.    Upon information and belief, the PHI Officers never disclosed to the Boards that the state of Louisiana would likely file a lawsuit against PHI to redeem the erroneously transferred funds and that PHI would likely lose the lawsuit and forfeit the funds.

270.    Upon information and belief, in 2017, the Boards became aware that the Company Officers, including Baronoff, had been presenting misleading information regarding the financial positions of the Companies.

271.    Upon learning this, the Boards hired FTI in October 2017 to act as a financial consultant and help improve the financial condition of the Companies.

272.    In a presentation to the Boards prepared by FTI dated September 20, 2017, titled

"Operational Assessment and Recommendations" (the "<u>FTI Operational Assessment</u>"), FTI

explained:

> Promise's forecasting and annual budget process is seriously deficient. In the first
> 8 months of FY 2017, Promise has adjusted its EBITDA Budget Target from
> $36.9M initially, to $29.1M as of July 26th with a further reduction to $19.6M*.
> This represents a total downward EBITDA Budget Target revision of 48.23%.
> This degree of variation calls to question the budgeting and forecasting
> methodology and stakeholder input to the process. Variations of this magnitude
> increase the risk and complexity of managing the business as well as the
> reliability of information distributed to the Board of Directors. (*Note:
> Management's Phase 1 Right-Sizing Plan includes an EBITDA target range from
> $22.6M to $24.4M.).

**X.      The Company D&Os Failed to Pay Vendors and Physicians, Which Artificially
Prolonged the Lives of the Companies**

273.    The Companies were in significant financial trouble prior to entry into the

Settlement Agreement, as demonstrated by the language in the Companies' audits from 2007

through 2013, as follows:

| Years Covered | Entity | Date Delivered | Going Concern Qualification |
|---|---|---|---|
| Years ended June 30, 2009, 2008, and 2007 | PHI and affiliates | August 17, 2010 | The accompanying consolidated and combined financial statements have been prepared assuming that the Company will continue as a going concern. As more fully discussed in Note 2 to the consolidated and combined financial statements, the Company has suffered losses from operations, has a net owners' deficiency and is subject to liquidity considerations that raise substantial doubt about its ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 2. The consolidated and combined financial statements do not include any adjustments that might result from the outcome of this uncertainty. |
| Year ended December 31, 2010 and 6 months ended December 31, 2009 | PHI and affiliates | March 23, 2012 | The accompanying consolidated and combined financial statements have been prepared assuming that the Company will continue as a going concern. As more fully discussed in Note 2 to the consolidated and combined financial statements, the Company has suffered losses from operations, has a net owners' deficiency and is subject to liquidity considerations that raise substantial doubt about its ability to continue as a going concern. Management's plans in regard to these matters are also described in Notes 2 and 3. The consolidated and combined financial statements do not include any adjustments that might result from the outcome of this uncertainty. |

| Years ended December 31, 2011 and 2010 | PHI and affiliates | August 26, 2013 | The accompanying consolidated and combined financial statements have been prepared assuming that the Company will continue as a going concern. As more fully discussed in Note 2 to the consolidated and combined financial statements, the Company has suffered losses from operations, has a net owners' deficiency and is subject to liquidity considerations that raise substantial doubt about its ability to continue as a going concern. Management's plans in regard to these matters are also described in Notes 2 and 3. The consolidated and combined financial statements do not include any adjustments that might result from the outcome of this uncertainty. |
| Years ended December 31, 2012 and 2011 | PHI and affiliates | December 16, 2014 | As discussed in Note 2 to the consolidated financial statements, the Company has suffered recurring losses from operations and has negative working capital. Management's plans in regard to these profitability and liquidity matters are also described in Note 2. Our opinion is not modified with respect to this matter. |
| Years ended December 31, 2013 and 2012 | PHI and affiliates | March 13, 2015 | As discussed in Note 2 to the consolidated financial statements, the Company has suffered recurring losses from operations and has negative working capital. Management's plans in regard to these profitability and liquidity matters are also described in Note 2. Our opinion is not modified with respect to this matter. |
| Year ended December 31, 2013 | Success Healthcare, LLC and subsidiaries | June 27, 2014 | The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 2 to the accompanying consolidated financial statement at December 31, 2013, the Company had a members' deficiency of approximately $66,617,000 and a working capital deficiency of approximately $128,780,000. These conditions raise substantial doubt about the Company's ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 2. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty. |
| Year ended December 31, 2013 | St. Alexius Hospital Corporation #1 | June 27, 2014 | The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 3 to the accompanying financial statements at December 31, 2013, the Company had a stockholder's deficiency of approximately $21,282,000 and a working capital deficiency of approximately $41,053,000. This condition raises substantial doubt about the Company's ability to continue as a going concern. Management's plans in regard to this matter are also described in Note 3. The financial statements do not include any adjustments that might result from the outcome of this uncertainty. |

274.    The Companies continued to be unable to pay their debts as they came due after entry into the Settlement Agreement.

275.     In fact, although the Companies were reorganized as a result of the Settlement

Agreement, the reorganized Companies (i) retained all their outstanding trade payables, (ii)

incurred over $10 million in financial obligations to the Principals under the Settlement

Agreement (not including Baronoff's salary and bonuses), and (iii) incurred $200 million in

secured debt obligations under the PHI Intercompany Loan without receiving any actual loans or

additional sources of repayment.

276.     In light of the significant debt held by the Companies on March 17, 2014, the PHI

Intercompany Loans did not include representations that PHI was solvent when aggregating its

financial obligations.

277.     Section 4.14 of the $75M Term Loan provides (emphasis added):

> After giving effect to the loan advance made by the W/C Lender [MidCap] under
> the W/C Loan Documents [MidCap Revolver] and the liabilities and obligations
> of each Loan Party under the W/C Loan Documents and the Transaction
> Documents (as defined in the Settlement Agreement), **but excluding the
> liabilities and obligations of each Loan Party under the Subordinated Debt
> Documents and the Loan Documents** subject to W/C Lender Intercreditor
> Agreement, the Loan Parties and their consolidated Subsidiaries are Solvent.

278.     Section 4.14 of the $125M Term Loan provides a nearly identical solvency

representation, excluding consideration of the totality of the PHI Intercompany Loans when

alleging that PHI and its subsidiaries were solvent.

279.     Section 3.20 of the MidCap Revolver provided (emphasis added):

> After giving effect to the Loan advance and the liabilities and obligations
> of each Borrower under the Operative Documents, **but excluding the
> liabilities and obligations of each Borrower under the FPD
> Subordinated Note Debt and the FPD Term Loan Debt subject to
> Subordination Agreements,** Borrowers and their consolidated
> Subsidiaries are Solvent.

280.     As such, when considering the aggregate debt owed by the Companies on March

17, 2014, the Companies were insolvent on that date and at all times thereafter.

281.    Hopwood explained the financial situation of the Companies since 2009 in the

Financial Overview Email as follows (emphasis added):

From early 2009 through March 2014, the Promise and Success entities suffered from a series of cash flow shock waves. First, from disputes with its lender Founding Partners Stable Value Fund, operational funding was completely and permanently shut off. The Partners at that time needed to find creative, entrepreneurial and unconventional solutions to funding turnarounds at recently acquired Silver Lake Medical Center and St Alexius. The Partners at that time also had the same funding challenges to greenfield new LTCH operations in The Villages, Miami Lakes and Ft Myers. **All significant cash flow requirements that forced late payments on payroll taxes, stretched supply vendors and administrative chaos. All of this accomplished with a capital structure that would be described as zero-days-in cash.**

In October of 2012, a payroll tax defalcation occurred that resulted in a protracted negotiation with Federal and State taxing authorities. Another cash flow shockwave as taxing authorities filed liens, recouped funds from Medicare and Medicaid payments and ultimately negotiated settlements for payment plans**. Again, the Partners found creative, entrepreneur and unconventional solutions to keeping their business in place and growing. All of this was accomplished with a capital structure that would be described as zero-days-in cash.**

In March of 2014, a revolving credit agreement was finally reached wherein Payroll Tax liens were subordinated to the new Lender under less than perfect credit terms. The day after closing this financing, the acquisition of the Ruby Schron facilities was completed. The new revolver provided excess liquidity but you can imagine that it quickly evaporated as receivable balances grew during the tie-in notice period.

In May of 2014, I was hired as a full-time employee under a written employment agreement ratified by the Board of Directors and signed by Peter Baronoff. I am confident you have already reviewed the agreement. It defines my direct supervisor as the CEO of Promise. This reporting relationship has never been modified under a revised agreement. Certainly, the current organizational structure where we now have two executives in charge is confusing as best and troubling as worst.

**In reviewing early Board Meeting notes, it is clear the low days cash on hand continued after the revolver and acquisition. Both the low days of cash on hand, large vendor/doctor balances and a need to borrow PHG funds to pay certain critical needs were identified in every Board Meeting nearly two years prior to the Board approving the $3.0 million investment in iCare [in 2017].**

**Clearly, Peter is an entrepreneur with a stomach for an over-leveraged balance sheet as he works to grow the business model with limited resources.**

The iCare investment plan was approved by the Board with minimal cash on the books, heavily negotiated with the help of McDermott Will & Emory and executed in early 2017.  As you know the contract required monthly payments from February 2017 through November 2017.  To fund the project, payments were due by the 15th of the month.  **The final payments for November were made late as the company stretches its payments with virtually all vendors.**

282.    Additionally, the PHG 2016/2017 Audit contained language expressing

significant doubt about the Companies' abilities to continue as going concerns.

283.    By August 15, 2017, the Debtors were in default under the Wells Revolver.

284.    In the FTI Operational Assessment, dated September 20, 2017, FTI stated as

follows:

[F]ailure to pay key revenue cycle vendors on a timely basis is significantly impacting revenue cycle operations (i.e., billing and collections).

Major revenue cycle vendors have been on "support hold" intermittently due to unpaid invoices. Vendors include Meditech, HCS, Relay, and My Ability) which impedes system improvements to gain efficiency necessary to optimize revenue cycle performance.

. . . .

Promise is not current on its payments to its physicians which is among one of the highest payment priorities (approximately $3M outstanding). Strong physician relationships and trust are key to building volume and market share as well as minimizing turnover so as to maintain a high level of patient care quality and experience.

285.    On January 20, 2018, Keller emailed Hopwood requesting the "latest 13 week

cash budget[.] The one that shows float."  After receiving the cash budget, Keller emailed

Hopwood stating "managing to loan balance and making this work via float…..difficult way to

live."

286.    Hopwood replied to Keller on January 21, 2018 stating:

I was telling Mike Young last week that this Company was trained by Peter and circumstance to fund everything on the edge of disaster since early 2009.  It's a complete reprogramming of the team that's necessary.  More bottom line on the P&L and better capitalization are the best ways I see to improve the float

7494326

problem.  Also, we're in a downward revenue trend with the recent closings and recent site-neutral Reimbursement changes - this feature results in less current collections to cover aged AP.

287.    The claims by vendors against the Companies grew from 2014 through the Petition Date.

## XI.    The Company Directors Distributed Funds from PHI and/or Success to PHH and PHG, Despite PHI and Success's Inability to Timely Pay Creditors

288.    Despite PHI's and Success's inability to timely pay creditors, including vendors and physicians, upon information and belief, the Company Directors were distributing funds from PHI and/or Success and to PHH and PHG.

289.    For example, on or about July 18, 2017, the PHI Directors caused PHI to transfer $1.75 million to PHH, which amount was then transferred to PHG.

290.    Upon information and belief, PHH and PHG were holding companies with no ability to make money aside from receiving distributions from the Companies.

291.    At the beginning of 2017, PHH's cash balance was $5.8 million, nearly all of which was transferred to PHG over the course of 22 months.

292.    Upon information and belief, PHG also received distributions directly from other subsidiaries of the Companies.

293.     None of the cash distributions from PHI and/or Success to PHH and/or PHG were on account of the Settlement Intercompany Loans, as the full balances of the Settlement Intercompany Loans remained outstanding as of the Petition Date.

294.    As such, upon information and belief, at a time when PHI and Success could not pay debts as they became due, the Company Directors distributed funds from the Companies to PHH and/or PHG.

61

295.    Upon information and belief, the Company Directors understood that any distributions from PHI and/or Success to PHH and/or PHG were to be held at PHH and/or PHG, rather than used as part of the intercompany cash management system and subsequently disbursed to PHI and/or Success for the customary payment of their vendors and employees.

296.    For example, the central cash management account out of which disbursements were made was held at PHI.

297.    Requests by the Company D&Os to use the funds held at PHG were labelled as loans which would be repaid by the Companies—despite that any funds held at PHG originated from PHI and its subsidiaries and/or Success and its subsidiaries.

298.    For example, on December 25, 2017, Hopwood circulated to Keller a memo summarizing a request to use $4.0 million of PHG funds on a short term basis.  The memo provided as follows (emphasis added):

> Management believes the Company has limited resources to push vendors further out on the aging spectrum.  Certain vendor categories are critical to the operation of our facilities over the next 60 days . . . . To support the Company's operating activities over the next 60 days and to support steep discount negotiations before year end, Management is requesting the Board's approval to use approximately $4.0 million held by Promise Healthcare Group, LLC.  **Repayment of these funds** will occur at the earlier of the shareholder loan funding or the sale of Silver Lake Medical Center.

299.    Further, on January 28, 2018, Hopwood emailed Keller, among others, regarding outstanding balances owed to FTI and Waller Lansden Dortch & Davis, LLP—the Companies' professionals—in the amount of $1.2 million.  He stated as follows (emphasis added):

> Given the current situation with the company's cash flows, I am proposing that we seek Board approval for the Company to pay these outstanding balances with PHG, LLC funds.  Once a final determination is made as to whether the professional fees and costs relate to Board matters or Company operating matters, **the intent would be to refund Company operating matters back to PHG, LLC** with the pending shareholder loan or improved operating cash flows.

300.    Upon information and belief, on or around January 30, 2018, the PHG account had approximately $3.4 million.

301.    Keller replied by asking for more specifics regarding how the PHG funds would be used:  "To be clear….the only reason you would need to utilize PHG cash is to cover checks. This occurs when availability is insufficient to cover checks that have been written.  As discussed, this is one of the risks with utilizing float.  For example, last week you needed to use this cash to cover ~$225K in checks."

302.    Hopwood relied by stating (emphasis added):  "We need PHG funds to cover collection shortfalls for all disbursements, not just checks.  That's exactly what we have discussed with the board at each board meeting.  Upon conclusion of those discussions, the board consistently granted the Company **short term lending capacity** for the possibility that collections would be insufficient to fund short term needs."

303.    On February 1, 2018, Hopwood emailed Keller as follows:  "I told you about it [obtaining funds from PHG] to make the point that this company needs capital every day to support its operations.  Yes, it came under the $650 [from PHG].  At this point, we rely solely on collections to fund every disbursement including payroll and payroll taxes.  Collections have trended significantly down.  We know why.   I'm sorry if I haven't been clear enough to everyone about our daily cash flow challenges."

304.    Keller replied to Hopwood on the same day stating, "I clearly understand the challenges…I am the one jumping up and down regarding the insolvency of this place . . . Peter claims that neither of you were familiar with EMR – I cannot believe that is the case.  That along with the large level of A/P in unacceptable ranges is a huge, huge concern."

305.     As such, despite the inability to pay vendors and physicians in the ordinary course from at least 2014, the Company Directors distributed funds from the Companies to PHH and/or PHG in the aggregate amount of at least approximately $4 million.

## XII.     The Company D&Os Caused PHI and Success to Enter Agreements with iCare—a Start-Up EHR Company With No Detailed Business Plan—During the Time PHI and Success Were Unable to Pay Their Debts as They Became Due

306.     iCare was founded by Jim Riley ("Riley") in 2012 and was a cloud-based EHR vendor—*i.e.*, non-traditional.

307.     Baronoff and Hopwood developed a relationship with Riley several years prior to 2016.

308.     Upon information and belief, by at least December 2016, Baronoff believed that upon the Companies' execution of the iCare Transaction Documents (defined below), Baronoff would become an iCare board member and receive compensation for such role in the form of a one (1) percent equity interest in iCare.

309.     Prior to the Companies' decision to implement iCare, PHI and Success utilized Meditech Magic and HCS in the LTACHs and SNFs and Paragon HIS in the two STACHs.

310.     In or around December 2016, PHI and Success completed an EHR vendor evaluation.

311.     Baronoff, believing he was to become an iCare board member and would own one percent (1%) of iCare, pushed for PHI and Success to partner with iCare for EHR services.

312.     As explained in an "iCare Q and A" presentation prepared for the Boards, dated December 9, 2016 (the "iCare Q&A"), iCare "is an entirely new system . . . [and] Promise will be the first clinical customer."

64

313.     Under the iCare Transaction, PHI and Success would be development partners with iCare, which had not completed its creation of the EHR platform, and would pay a monthly subscription rate in exchange for a percentage of iCare profits if iCare became successful and was used by hospitals other than PHI and Success.

314.     Rather than purchasing an electronic medical record system from an established EHR vendor, as PHI and Success had done in the past, the iCare Transaction required that PHI and Success pursue a joint-venture with iCare in the development of a start-up cloud-based EHR company—an industry in which PHI and Success were not previously involved.

315.     Baronoff, in his capacity as an officer of PHI and Success, as well as other Company Officers, presented information on iCare to the Boards.

316.     Upon information and belief, in December 2016, when Baronoff presented the iCare Transaction to the Boards, Baronoff was the sole member of the PHI and Success Boards.

317.     The information presented to the Boards by the Company Officers regarding iCare was overly optimistic and failed to adequately convey the consequences of a hospital entering into an agreement with a startup.

318.     For example, in 2016 the Company D&Os were actively trying to sell Success' subsidiaries—Silver Lake and St. Alexius. Yet, as part of the iCare Transaction, the Companies were required to implement iCare at Success, which implementation would cost Success up to $2 million plus the dedication of internal resources.

319.     To make the implementation of iCare at Success appear reasonable, the iCare Q&A stated "We will continue to make our main priority to sell Success.  A buyer of Success should see the value in this EHR solution.  We will be protecting our revenues and investment in Success **by implementing an EHR that meets meaningful use stage 3**" (emphasis added).

320.    However, a presentation titled "EHR Implementation Presentation", dated December 7, 2016, stated that "iCare is currently deemed MU2 complaint" and that "Success would commit to work closely with iCare **to get the product fully interfaced to meet MU3 criteria**" (emphasis added).

321.    The iCare Q&A was thus misleading when it suggested that iCare met the MU3 criteria and that a potential buyer would find this compliance valuable.  In fact, iCare was only deemed MU2 compliant.

322.    On February 18, 2017, Armstrong emailed Hopwood that "we have agreed to execute final definitive agreements early this week" and attached a list of Riley's responses to the Company's diligence requests.  Hopwood replied that "I'm concerned with the majority of Riley's responses since they tend to represent a disregard for our concerns as we are contemplating a significant investment of time, expertise, capital and partnership regarding this venture."  Armstrong echoed Hopwood's concern, stating "We should schedule a meeting with this James Proctor and grill him because I have my doubts about Riley's ability to answer the questions anyway."

323.    In or around late February 2017, the Company D&Os caused the Companies to execute the iCare transaction documents (the "iCare Transaction Documents").

324.    Upon the Companies' execution of the iCare Transaction Documents, Baronoff became a member of the iCare board, effective as of February 1, 2017.

325.    Upon information and belief, at the time the Companies executed the iCare Transaction Documents, the Companies still had significant outstanding iCare diligence requests.

326.    Upon information and belief, at the time the Companies executed the iCare Transaction Documents, Baronoff was the sole board member at PHI and Success.

7494326

327.    Upon information and belief, at the time the Companies executed the iCare Transaction Documents, the Company Officers had been providing the Boards misleading information regarding the financial condition of the Companies, such that the PHG Board did not adequately understand the Companies' financial troubles.

328.    Upon information and belief, pursuant to the iCare Transaction Documents, PHI and/or Success would pay up to $3 million to iCare for implementation of the EHR platform in the form of subscription fees at $300,000 per month starting on February 1, 2017 and ending on November 1, 2017, not including any future ongoing subscription fees or implementation fees for additional hospitals.

329.    The implementation "go-live" date agreed to by the Companies and iCare was November 2017.

330.    The November 2017 implementation date was pushed to early 2018 because the system was determined not ready in November 2017 as projected.

331.    By December 2017, PHI and/or Success had invested approximately $4.5 million into iCare in the form of development funding and internal resources, for which it had received nothing in return from iCare.

332.    On December 13, 2017, HealthNet prepared an "iCare Readiness Assessment," which contained the following information (emphasis added):

> *Vendor Development*-At HealthNET's request, iCare provided us with a high-level plan which outlines the major components of the three phase Promise Implementation. The plan reflects the timeline for the functionality development-on a high level, **but does not include specific functional specifications that would be necessary to meet the detailed build requirements**.
>
> On 12/12/17, HealthNET requested the specific functional requirements to support the high level plan, but to date it has not been received.  Additionally, HealthNET requested the development timeline for other modules that are not necessarily required for Promise, but would be required for a comprehensive

EHR, such as, Emergency Department, Surgical Services, Cardiology, Ambulatory EHR and Practice Management, etc. **Again, at the time of the writing of this report, the development timeline has not been received from iCare**.

*R&D Orientation*- **It seems like iCare may have started from the wrong direction.** As an investment, it would make more sense to take an acute care EHR product and adapt it to LTAC and SNF (i.e. water it down) as opposed to the reverse. This is the approach Meditech took for their long term care system (actually it has all the acute care within the delivered – just not turned on), as well as Epic's Sonnet. To some extent, Cerner uses a similar strategy with its Community Works being a stripped down and shared version of Millennium.

*Vendor Marketing Strategy*-**There is not a clearly defined marketing plan/strategy for the iCare product.** When questioned, Jim Riley stated that he is the primary sales person, with the goal to hire more as the sales pick up. **Jim does not have a documented marketing plan for the software.** He articulates word of mouth and vendor conferences as his main marketing tools. He has alluded to the fact that several health systems are "watching iCare" and could be prepared to purchase the product once Promise is live and successful using iCare.

***They are LATE to Market-*** iCare references Athena's strategy, which in fact is a good one. However they do not address that Athena bought an India-based product called Proxify, and this, blended with RazorInsight, would make up the inpatient EHR. This places iCare behind Athena, for why would a customer, e.g. a small IDN or critical access hospital purchase iCare, when, (1) Athena is already there; and (2) Athena has a good "bank shot" using their physician base?

*Technology & Infrastructure Readiness*-iCare appears to have a very interesting infrastructure and are proud of it. There were no gaps or areas of concern that HealthNET could identify from a technology perspective (HealthNET conducted a call with iCare technology and security team). However, **HealthNET is concerned with iCare's ability to handle many clients and heavy loads as their perspective is fairly theoretical.** Although it is anticipated to work, it is truly be impossible to stress test the system until there are thousands of users banging on it concurrently; it is virtually impossible to predict.

**iCare is banking on their cloud technology as their niche in the EHR market. The problem we see is that hospitals are not going to buy an EHR based on *cutting edge* technology.** In most system selections, feature functionality is the primary decision point where technology is usually the last decision point to be considered. (Detailed notes related to iCare technology can be found in Attachment B).

. . . .

68

*Product Readiness-* Portions of the system are built for Phase I including the clinical documentation, flowsheets and assessments, as well as some components of the Admissions and Medical Records applications. **There is a foundation (minimal) of functionality for Phase II and III, however, most of the detailed functionality is still to be built. It was reported that the majority of the clinical content is being developed by Promise including, nursing flow sheets, assessments, care plans, orders sets and provider documentation templates.**

Since iCare is using Vista technology, it is important to note that, to our knowledge, the Revenue Cycle did not exist in a form that an acute care hospital would use because it was not needed for the Veterans Administration; it would have to be built from scratch.   As for the Ambulatory EHR market, there is lots of competition in the industry. **The notion of marketing an EHR is a tough road with a slim likelihood of success. Since iCare does not have an ambulatory EHR at this time, the majority of provider organizations will likely not consider iCare.** Again, they will have to develop one as well as the practice management components.

**It was reported by the vendor that modules such as Laboratory, Radiology, CPOE and Case Management still require further development.** HealthNET has requested an iCare timeline for future development of the product, including Emergency Department, Oncology, Surgical Services, etc., and have not received that at the time of this report.

There is mixed feedback from those interviewed in the confidence level of the system being ready for implementation at the Miami facility according to the timeline identified above

*Reports* – **There is currently no defined reporting strategy or partner.** No standard reports exist within the system however iCare is developing custom reports to meet Promise requirements. **It was reported that the Meaningful Use reports are inaccurate.** For example, the report shows results for percentage of patients with bar coded meds, however no bar coding is being done in the UAT system.

*Dashboard* – iCare does have a daily census dashboard, however **no financial or operating executive dashboards have been defined or developed at this time.**

. . . .
## Summary

**The iCare EHR requires a significant amount of development before it can be implemented successfully at the Promise facilities and even further development before going to market.** Although the system appears to have some potential, **the project is a significant risk for Promise Healthcare. The system may take several years of more development, while incurring**

**significant costs for Promise before it is ready for general release, only to face a very competitive market of EHR vendors.**

**Promise Healthcare's investment in software is outside the scope of its core business.** We raise this only in the context of purpose - developing software for its own use, defraying costs by commercialization, or as an investor in the high-risk software industry. Now that the initial pilot stage is starting to gel, we believe that a more comprehensive business plan needs to be developed as a requirement for further investment. Although it is virtually impossible to predict the long term success of iCare, **HealthNET cautions Promise on moving forward with the project in that it has inherent risks and can be a diversion from running and optimizing their core business of LTAC's.**

333.    On January 22, 2018, after the Companies' incurred over $4.5 million in costs related to the implementation of iCare, the Companies provided notice of termination of the iCare Transaction Documents.

334.    iCare never went "live" at PHI or Success and neither PHI or Success received any benefit from the iCare Transaction.

335.    Upon information and belief, the Companies were able to pay iCare not less than $4.5 million by failing to make payments to vendors and physicians. In the Financial Overview Email, Hopwood described the iCare Transaction as follows:

Both the low days of cash on hand, large vendor/doctor balances and a need to borrow PHG funds to pay certain critical needs were identified in every Board Meeting nearly two years prior to the Board approving the $3.0 million investment in iCare.

Clearly, Peter is an entrepreneur with a stomach for an over-leveraged balance sheet as he works to grow the business model with limited resources. The iCare investment plan was approved by the Board with minimal cash on the books, heavily negotiated with the help of McDermott Will & Emory and executed in early 2017. As you know the contract required monthly payments from February 2017 through November 2017. To fund the project, payments were due by the 15th of the month. The final payments for November were made late as the company stretches its payments with virtually all vendors. I believe there was a disconnect in communication given our current process. These payments were made under the directive that has been consistent from the beginning of the project, to expedite the completion of the project and go-live to maximize value. At this point [in 2018] no further payments will be made to iCare since we have

completed to initial contract phase and the companies are currently at an impasse as to how to proceed.

336.    Baronoff's Employment Agreement, executed on March 17, 2014, provided, among other things, as follows (the "Exclusive Service Provision") (emphasis added):

> Employee is entitled to serve on such boards of directors of such entities (including certain hospitals) upon which he presently serves as of the Effective Date and to serve on such additional or other boards or analogous management bodies **so long as such service shall not materially interference with his employment obligations hereunder**.

337.    As set forth above, Baronoff's role as an iCare board member materially interfered with his employment obligations under the Employment Agreement, as Baronoff used his role as President and CEO of the Companies to cause the Companies to enter into and continue making payments under the iCare Transaction Documents, pursuant to which the Companies spent over $4.5 million and revived nothing in return from iCare.

338.    On or around March 13, 2018, Baronoff resigned from the iCare board.

## XIII.    Baronoff's Separation Agreement Contained Falsifications and the Alleged Release Represented a Fraudulent Transfer

339.    On or around March 13, 2018 (the "Separation Date"), Baronoff and the Companies executed the Separation Agreement, pursuant to which Baronoff agreed to resign as President and CEO of the Companies and from the board of iCare.

340.    The Separation Agreement provided that Baronoff would receive from the Companies:

(i)     severance payments commencing on the Separation Date and ending on April 30, 2019 totaling approximately $950,307.40;

(ii)    continued payment of the Sun Capital Consultancy Payments totaling approximately  $720,000 to be paid after the Separation Date;

(iii)   "Recovery Payments" under section 5 of the Employment Agreement; and

(iv)   a conditional release (the "Baronoff Release") (subject to nullification) from all claims and causes of action, including, but not limited to those arising from or relating to employment with the Company and/or Baronoff's separation from the Company ((i) through (iv) collectively, the "Separation Benefits").

341.   The Baronoff Release was conditional because it must be "nullified if any of Executive's representations in Subparagraph 7(a) or 7(b) below, or in the signed sworn statement contemplated in Subparagraph 7(c) below, were untruthful as of the date of signature of this Separation Agreement and the signed sworn statement, respectively."

342.   In section 7(a) and (b) of the Separation Agreement, and as sworn to in Baronoff's sworn statement executed therewith on March 9, 2018 (the "Affidavit"), Baronoff covenanted and agreed that, among other things:

> [H]e (i) has not knowingly committed or condoned any acts of fraud against the Company or its affiliates; (ii) has not knowingly committed or condoned fraud against any other person or entity, including the government; (iii) has not knowingly participated in or knowingly permitted others to engage in any conduct prohibited by the Company's compliance and ethics programs; (iv) understands that he is under a preexisting and ongoing duty to notify the Company's designated Corporate Compliance/Ethics Officer of any knowledge of a violation of the Company's compliance or ethics programs; and (v) he is not aware of any such violation by himself or anyone else employed by the Company or its affiliates, other than violations that he may have properly reported to the Company prior to the Separation Date.

343.   In exchange for the Separation Benefits, Baronoff agreed to release the Companies and its affiliates from all claims and causes of action through the Separation Date.

344.   Upon information and belief, at the time of the Separation Date, Baronoff did not possess any material, non-contingent claims against the Companies.

345.   Rather, as of the Separation Date, Baronoff, in his capacity as director and officer of PHI and Success, and director of PHG, had presented misleading financial information to the Boards, MidCap, Wells and Crowe and received not less than $2 million in payments in addition to his salary and bonuses while the Companies were insolvent.

7494326

346.    Section 11 of the Separation Agreement provided that "Executive acknowledges and agrees that the consideration provided by Company pursuant to this Separation Agreement is greater than and in addition to anything of value to which he otherwise would be entitled from Company."

347.    Upon information and belief, PHI and/or Success received less than reasonably equivalent value in exchange for Baronoff Release.

348.    Upon information and belief, no later than execution of the Baronoff Release under the Separation Agreement:  (i) the Companies were insolvent or became insolvent as a result of the Baronoff Release, (ii) the Companies were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with the Companies was an unreasonably small capital; and/or (iii) the Companies intended to incur, believed that they would incur, or reasonably should have believed that they would incur, debts that would be beyond the Companies' ability to pay as such debts matured.

349.    On May 16, 2018, the Companies and Baronoff executed an amendment to the Separation Agreement pursuant to which Baronoff resigned from the Company's Board of Directors effective May 11, 2018.

## XIV.    The Company D&Os Caused the Companies to Engage in Several Fraudulent Transfers

350.    Baronoff used his position as Officer of PHI and Success and director of PHI, Success and PHG to make transfers to himself and/or his family members from the accounts of the Debtors without the Debtors receiving reasonably equivalent value.

351.    For example, on April 24, 2015, Shanna Baronoff (Peter Baronoff's daughter), as Landlord, and PHI, as Tenant, entered into a residential lease agreement (the "Residential Lease Agreement") whereby PHI rented property from Shanna Baronoff located at 233 South Federal

Highway, #711, Boca Raton, Florida "for the purpose of providing short term VIP accommodations by those temporary guests or short term residents approved by Tenant [PHI] from time to time."

352.    The Residential Lease Agreement had an initial term of May 1, 2015 through April 30, 2016 and required PHI pay Shanna Baronoff c/o Peter Baronoff monthly rent payments of $2,750 (totaling $33,000) plus a security deposit of $2,750.

353.    The term of the Residential Lease Agreement was extended through at least November 13, 2017.

354.    The monthly rent payments increased to $2,850 per month beginning on December 2, 2016.

355.    Upon information and belief, PHI paid the rent payments and security deposit to Shanna Baronoff from May 4, 2015 through March 3, 2017, aggregating not less than $66,400 (the "Shanna Rent Payments").

356.    Thereafter, PHI paid the rent payments directly to Baronoff from March 23, 2017 through November 13, 2017, totaling not less than $25,650 (the "Peter Rent Payments").

357.    Upon information and belief, PHI received less than reasonably equivalent value in exchange for the Shanna Rent Payments and Peter Rent Payments under the Residential Lease Agreement.

358.    Upon information and belief, no later than the time of each payment of rent under the Residential Lease Agreement:  (i) PHI was insolvent or became insolvent as a result of such rent payment, (ii) PHI was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with PHI was an unreasonably small capital; and/or (iii) PHI intended to incur, believed that it would incur or reasonably should have

74

believed that it would incur, debts that would be beyond PHI's ability to pay as such debts matured.

359.    Upon information and belief, the Company D&Os used the Companies' corporate credit cards, including the Companies' American Express card(s), for improper personal reasons for which the Companies received no benefit (each a "Personal Card Payment" and together, the "Personal Card Payments").

360.    Upon information and belief, PHI and/or Success received less than reasonably equivalent value in exchange for each Personal Card Payment.

361.    Upon information and belief, no later than the time of each Personal Card Payment:  (i) the Companies were insolvent or became insolvent as a result of such payment, (ii) the Companies were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with the Companies was an unreasonably small capital; and/or (iii) the Companies intended to incur, believed that they would incur or reasonably should have believed that they would incur, debts that would be beyond the Companies' ability to pay as such debts matured.

362.    Upon information and belief, the Company D&Os caused the Companies to make alleged consulting payments to Malinda Baronoff in the monthly amount of approximately $15,000 from December 1, 2014 through at least December 7, 2017, aggregating not less than $520,000 (the "Alleged Malinda Consulting Payments").

363.    Upon information and belief, Malinda Baronoff was not a consultant for the Companies.

364.    Upon information and belief, PHI and/or Success received less than reasonably equivalent value in exchange for each of the Alleged Malinda Consulting Payment, as Malinda Baronoff provided no consulting services to the Companies.

365.    Upon information and belief, no later than the time of each Alleged Malinda Consulting Payment to Malinda Baronoff:  (i) the Companies were insolvent or became insolvent as a result of such payment, (ii) the Companies were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with the Companies was an unreasonably small capital; and/or (iii) the Companies intended to incur, believed that they would incur or reasonably should have believed that they would incur, debts that would be beyond the Companies' ability to pay as such debts matured.

366.    Upon information and belief, the Company D&Os (including Baronoff) caused the Companies to make payments to Peter Baronoff from December 14, 2014 through June 1, 2015 in addition to the payments Baronoff received as salary and board fees, aggregating an amount not less than $57,500 (each a "Baronoff Non-Salary Payment," and together with the Peter Rent Payments, the "Baronoff Fraudulent Transfers").

367.    Upon information and belief, PHI and/or Success received less than reasonably equivalent value in exchange for each Baronoff Non-Salary Payment.

368.    Upon information and belief, no later than the time of each Baronoff Non-Salary Payment:  (i) the Companies were insolvent or became insolvent as a result of such payment, (ii) the Companies were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with the Companies was an unreasonably small capital; and/or (iii) the Companies intended to incur, believed that they would incur or

reasonably should have believed that they would incur, debts that would be beyond the Companies' ability to pay as such debts matured.

369.    Upon information and belief, the Company D&Os caused the Companies to make payments to Reuben from November 7, 2014 through March 8, 2018 in addition to the payments Reuben received as salary and/or board fees, aggregating an amount not less than $348,366 (each a "Reuben Non-Salary Payment").

370.    Upon information and belief, PHI and/or Success received less than reasonably equivalent value in exchange for each of the Reuben Non-Salary Payment.

371.    Upon information and belief, no later than the time of each Reuben Non-Salary Payment:  (i) the Companies were insolvent or became insolvent as a result of such payment, (ii) the Companies were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with the Companies was an unreasonably small capital; and/or (iii) the Companies intended to incur, believed that they would incur or reasonably should have believed that they would incur, debts that would be beyond the Companies' ability to pay as such debts matured.

## XV.    Preferential Payments to Insiders

372.    To the extent that any of the Alleged Malinda Consulting Payments, Personal Card Payments, Baronoff Fraudulent Transfers, Reuben Non-Salary Payment and/or Sun Capital Consultancy Payments are determined not to be fraudulent transfers and/or payments on account of equity, then such payments made within the relevant time periods are preferential and the Plaintiff seeks to avoid and recovery such payments as set forth below.

## COUNT I
## BREACH OF DUTIES OF GOOD FAITH AND CARE
### (AS TO COMPANY D&Os)

373.    Plaintiff repeats and realleges the allegations set forth in each of the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

374.    At all relevant times, the Company D&Os owed the Companies and their estates fiduciary obligations, including, among others, the duties of good faith and care, pursuant to, *inter alia* (i) California common law, (ii) Florida common law, (iii) the California Revised Uniform Limited Liability Company Act, and/or (iv) the Florida Business Corporations Act, as a result of, *inter alia*:

    a.    Their positions as directors, officers, managers and/or individuals with executive control over operations at the Companies,

    b.    Their positions of special trust and confidence with the Companies,

    c.    Their authority, control, influence and/or responsibility for the Companies' operations and management vested in them under applicable law and/or the Companies' operating agreements, articles of incorporation and/or bylaws (as amended), and/or

    d.    Their actual course of conduct.

A.    Breach of Duties to Companies Related to MidCap Revolver

375.    Each of the Company D&Os breached their fiduciary duties of good faith and care and demonstrated a conscious disregard for the best interests of the Companies and their estates and/or engaged in negligent, grossly negligent, reckless, willful and/or intentional misconduct by providing misleading information to MidCap prior to and after entry into the MidCap Revolver.  For example, during the duration of the MidCap Revolver, the Company D&Os provided misleading information regarding the quality and collectability of the Companies' accounts receivable.

376.     Had the Company D&Os not provided misleading information to MidCap prior to entry into the MidCap Revolver, upon information and belief, MidCap would not have entered the facility.  Further, had the Company D&Os not provided misleading information to MidCap over the duration of the MidCap Revolver, the Companies would have been in default under the MidCap Revolver as early as November 5, 2014 (four years prior to the Petition Date)—prior to the MidCap Revolver being refinanced in March 2016.  If the Companies were in default under the MidCap Revolver prior to its being refinanced, the Companies would have taken actions to protect their interests and the interests of their creditors from at least November 5, 2014, including by filing for chapter 11 protection, reducing the growth of payables, accrued expenses and/or other liabilities since that date.

B.   Breach of Duties to Companies Related to Wells Revolver

377.     Each of the Company D&Os breached their fiduciary duties of good faith and care and demonstrated a conscious disregard for the best interest of the Companies and their estates and/or engaged in negligent, grossly negligent, reckless, willful and/or intentional misconduct by providing misleading information to Wells prior to and after entry into the Wells Revolver.

378.     In connection with entering the Wells Revolver, the Company D&Os provided Wells with misleading 2015 financial information.  PHI's Senior Vice President and Chief Accounting Officer stated that the 2015 financial statements provided to Wells "do not fairly present the financial position of the company and I am not comfortable distributing these financials to the lenders."

379.     Had the Company D&Os provided accurate 2015 financial information to Wells, upon information and belief, Wells would not have entered into the Wells Revolver,

79

necessitating that the Companies take actions to protect their interests and the interests of their

creditors as early as March 2016, including by filing for chapter 11 protection, and avoiding the

incurrence of additional payables, accrued expenses and/or other liabilities.

380.    The Company D&Os continued to provide Wells with misleading financial

information after entry into the Wells Revolver.  Upon information and belief, had Wells

received accurate financial information from the Company D&Os, the Companies would have

defaulted under the Wells Revolver prior to August 2017, necessitating that the Companies take

actions to protect their interests and the interests of their creditors prior to the Petition Date,

including by filing for chapter 11 protection, and avoiding the incurrence of additional payables,

accrued expenses and/or other liabilities.

C.    Breach of Duties to Companies Related to Audits

381.    Each of the Company D&Os breached their fiduciary duties of good faith and

care and demonstrated a conscious disregard for the best interest of the Companies and their

estates and/or engaged in negligent, grossly negligent, reckless, willful and/or intentional

misconduct by providing delayed and/or misleading information to Crowe in connection with the

2014, 2015, 2016 and 2017 audits.

382.    Had Crowe received accurate financial information from the Company D&Os

regarding the PHG 2014 Audit and PHG 2015 Audit, upon information and belief, Crowe would

have included going concern qualifications in such audits.  If the PHG 2014 Audit and PHG

2015 Audit contained a going concern qualification, creditors and other parties in interest would

have been aware of the Companies' financial difficulties earlier, causing creditors to cease doing

business with the Companies or do business on terms that better protect such creditors' interests.

The Companies would then have taken actions to protect the interests of the Companies and their

creditors as early as March 15, 2016 (the date the PHG 2014 Audit was delivered), including

filing for chapter 11 protection.

383.    Had Crowe received timely financial information regarding the PHG 2016/2017

Audit, which contained a going concern qualification, creditors and other parties in interest

would have seen the going concern qualifications in such audits on an earlier basis and would

have ceased doing business with the Companies or done business on terms that better protected

such creditors' interests.  The Companies would then have taken actions to protect the interests

of the Companies and their creditors as prior to the Petition Date, including filing for chapter 11

protection, thus reducing the Companies' incurrence of payables, accrued expenses and/or other

liabilities through the Petition Date.

D.   Breach of Duties to Companies Related to Failure to Observe Corporate Separateness

384.    Each of the Company D&Os breached their fiduciary duties of good faith and

care and demonstrated a conscious disregard for the best interest of the Companies and their

estates and/or engaged in negligent, grossly negligent, reckless, willful and/or intentional

misconduct by disregarding the corporate separateness between and among PHI and its

subsidiaries, Success and its subsidiaries, PHH and PHG—despite the Company D&Os

awareness of the vastly different economic position of each entity.

385.    For example, the Company D&Os established and maintained a consolidated cash

management system whereby the better performing hospitals subsidized the weaker performing

hospitals without any reasonable prospect of repayment.  Further, the Company D&Os failed to

hold separate board meetings for each of the Debtor entities.

386.    Had the Company D&Os respected the corporate separateness of each of the

Companies, (a) the weaker performing hospitals would have been required to take actions to

protect their interests and the interests of their creditors (including by selling their assets), prior to the Petition Date, preventing the incurrence of additional payables, accrued expenses and/or other liabilities, and (b) the assets of the better performing hospitals would not have been depleted by the weaker performing hospitals, allowing for a potentially greater distribution to creditors of the better performing hospitals.

E.   Breach of Duties to Companies Related to $4.5 Million Investment in iCare

387.   Each of the Company D&Os breached their fiduciary duties of good faith and care and demonstrated a conscious disregard for the best interest of the Companies and their estates and/or engaged in negligent, grossly negligent, reckless, willful and/or intentional misconduct by causing the Companies to invest over $4.5 million in iCare—an EHR startup with no other customers and no established business plan—at a time when the Companies were unable to pay their debts as they became due.

388.   Had the Company D&Os not caused the Companies to invest in a risky start-up with no proven track record, such funds would not have been unnecessarily depleted and the Companies instead could have implemented an EHR program with an industry-recognized EHR provider.

F.   Breach of Duties to Companies Related to Failure to Timely Pay Critical Vendors and Physicians

389.   Each of the Company D&Os breached their fiduciary duties of good faith and care and demonstrated a conscious disregard for the best interest of the Companies and their estates and/or engaged in negligent, grossly negligent, reckless, willful and/or intentional misconduct by failing to timely pay key vendors and physicians.

7494326

390.     Doing so harmed the Companies as vendors refused to provide critical services without payment and physicians were disinclined to refer patients to the Companies.  This prevented the Companies from generating revenue and collecting receivables.

391.     As set forth in the FTI Operational Report, "failure to pay key revenue cycle vendors on a timely basis is significantly impacting revenue cycle operations (i.e., billing and collections)."  Further, failure to timely pay physicians was detrimental to "building volume and market share as well as minimizing turnover so as to maintain a high level of patient care quality and experience."

G.    Breach of Duties to Companies Related to Fraudulent Transfers

392.     Each of the Company D&Os breached their fiduciary duties of good faith and care and demonstrated a conscious disregard for the best interest of the Companies and their estates and/or engaged in negligent, grossly negligent, reckless, willful and/or intentional misconduct by causing the Companies to undertake the fraudulent transfers to the Avoidance Parties—all of whom were insiders.

393.     Making such fraudulent transfers caused the Companies to have fewer funds available to timely pay creditors without personal relations to Baronoff and/or the Companies, including critical vendors and physicians which, as discussed above, hindered the Companies' ability to generate revenue and collect receivables.

H.    The Above Referenced Breaches Demonstrate that the Company D&Os Did Not Act Prudently Causing Damages to the Companies in an Amount to be Determined at Trial

394.     For the reasons set forth in this Complaint, including the reasons in subsections A through G above regarding the Company D&Os' breaches of their fiduciary duties and the harms

caused thereby, the Company D&Os' failed to exercise the required degree of diligence, care and skill that a reasonably prudent person would exercise under similar circumstances.

395.    The actions described in this Complaint, including the above-referenced actions in subjections A through G, resulted in the diversion, dissipation and/or unduly risking assets of the Companies that might otherwise have been used to pay creditors' claims.

396.    This allowed the Debtors to operate and continue operating at a substantial loss and caused the Debtors to accrue liabilities they were unable to satisfy, resulting in the Debtors' insolvency and deepening insolvency.

397.    By reason of the foregoing, the Company D&Os breached their fiduciary duties and, as a result, the Debtors and their estates have been damaged in an amount to be determined at trial.

**COUNT II**
**BREACH OF FIDUCIARY DUTY**
**(AS TO THE COMPANY OFFICERS)**

398.    Plaintiff repeats and realleges the allegations set forth in each of the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

399.    At all relevant times, the Company Officers owed the Companies and their estates fiduciary obligations, including, among others, the duties of good faith and care, pursuant to, *inter alia* (i) California common law, (ii) Florida common law, (iii) the California Revised Uniform Limited Liability Company Act, and/or (iv) the Florida Business Corporations Act, as a result of, *inter alia*:

      a.   Their positions as officers, managers and/or individuals with executive control over operations at the Companies,

      b.   Their positions of special trust and confidence with the Companies,

      c.   Their authority, control, influence and/or responsibility for the Companies' operations and management vested in them under applicable law and/or the

84

Companies' operating agreements, articles of incorporation and/or bylaws (as amended), and/or

d.   Their actual course of conduct.

A.   Breach of Duties to Companies Related to Misrepresentations to Boards

400.   Each of the Company Officers breached their fiduciary duties of good faith and care and demonstrated a conscious disregard for the best interest of the Companies and their estates and/or engaged in negligent, grossly negligent, reckless, willful and/or intentional misconduct by, among other things, providing misleading information to the Boards from 2014 through at least October 2017—when FTI was hired—including with respect to, among other things, budgets and projections (including as related to EBITDA numbers and site neutrality reimbursement rates), the ability to collect aged accounts receivable, and litigations involving the Companies.

401.   Had the Company Officers provided accurate information to the Boards, upon information and belief, one or more of the Boards would have prevented the Companies from entering into the iCare Transaction, thus saving the Companies at least $4.5 million.

402.   Had the Company Officers provided accurate information to the Boards, one or more of the Boards would have taken actions prior to the Petition Date to protect the interests of the Companies and their creditors, including by filing for chapter 11 protection, thus avoiding the incurrence of additional payables, accrued expenses and/or other liabilities.

B.   Breach of Duties to Companies Related to Failure to Prepare for Reimbursement Rate Changes

403.   Each of the Company Officers breached their fiduciary duties of good faith and care and demonstrated a conscious disregard for the best interest of the Companies and their estates and/or engaged in negligent, grossly negligent, reckless, willful and/or intentional misconduct by failing to adequately prepare for the changes in reimbursement rates as a result of

site neutrality—which changes the Company Officers were aware of well in advance of such changes becoming effective.

404.    This harmed the Companies as they did not have adequate operational changes in place to best position the Companies for the new reimbursement rates and as such, the revenues of the Companies materially declined.

C.   The Above Referenced Breaches Demonstrate that the Company Officers Did Not Act Prudently Causing Damages to the Companies in an Amount to be Determined at Trial

405.    For the reasons set forth in this Complaint, including for the reasons in subsections A through B above regarding the Company Officers' breaches of their fiduciary duties and the harms caused thereby, the Company Officers failed to exercise the required degree of diligence, care and skill that a reasonably prudent person would exercise under similar circumstances.

406.    The actions described in this Complaint, including the above-referenced actions in subjections A through B, resulted in the diversion, dissipation and/or unduly risking assets of the Companies that might otherwise have been used to pay creditors' claims.

407.    This allowed the Debtors to operate and continue operating at a substantial loss and caused the Debtors to accrue liabilities they were unable to satisfy, resulting in the Debtors' insolvency and deepening insolvency.

408.    By reason of the foregoing, the Company Officers breached their fiduciary duties and, as a result, the Debtors and their estates have been damaged in an amount to be determined at trial.

## COUNT III
## BREACH OF FIDUCIARY DUTY
## (AS TO JOHN DOES 1-100)

409.     Plaintiff repeats and realleges the allegations set forth in each of the foregoing

paragraphs, which are incorporated by reference as if set forth fully herein.

410.     To the extent there are any John Does 1-100 who become known to Plaintiff as a

result of such additional discovery, at all relevant times, such John Does 1-100 owed the

Companies and their estates fiduciary obligations, including, among others, the duties of good

faith and care, pursuant to, *inter alia* (i) California common law, (ii) Florida common law, (iii)

the California Revised Uniform Limited Liability Company Act, and/or (iv) the Florida Business

Corporations Act, as a result of, *inter alia*:

      a.   Their positions as directors, officers, managers and/or individuals with
          executive control over operations at the Companies,

      b.   Their positions of special trust and confidence with the Companies,

      c.   Their authority, control, influence and/or responsibility for the Companies'
          operations and management vested in them under applicable law and/or the
          Companies' operating agreements, articles of incorporation and/or bylaws (as
          amended), and/or

      d.   Their actual course of conduct.

411.     To the extent any John Does 1-100 breached such fiduciary duties of good faith

and care and demonstrated a conscious disregard for the best interest of the Companies and their

estates and/or engaged in negligent, grossly negligent, reckless, willful and/or intentional

misconduct, Plaintiff reserves the right to amend this Complaint and include such John Does 1-

100 in a cause of action for breach of such fiduciary duty.

## COUNT IV
## BREACH OF DUTY OF LOYALTY
## (AS TO BARONOFF)

412.     Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

413.     At all relevant times, Baronoff owed the Companies and their estates fiduciary obligations, including, among others, the duty of loyalty, pursuant to, *inter alia* (i) California common law, (ii) Florida common law, (iii) the California Revised Uniform Limited Liability Company Act, and/or (iv) the Florida Business Corporations Act, as a result of, *inter alia*:

> a.     His position as director, officer, manager, and/or individual with executive control over operations at the Companies,

> b.     His position of special trust and confidence with the Companies,

> c.     His authority, control, influence and/or responsibility for the Companies' operations and management vested in him under applicable law and/or the Employment Agreement, the Companies' operating agreements, articles of incorporation and/or bylaws (as amended), and/or

> d.     His actual course of conduct.

A.  Breaches Related to Payments to Himself and Malinda Baronoff

414.     Baronoff breached his duty of loyalty, and acted in bad faith, deriving an improper personal benefit and acting with an interest adverse the Companies when he caused the Companies (while he was an officer and director) to make (i) the Annual Equity Payments, (ii) the Disguised Equity Payments, (iii) the Personal Card Payments, (iv) the Baronoff Fraudulent Transfers, and (v) the Alleged Malinda Consulting Payments to himself and his prior wife, Malinda Baronoff, including causing PHI to make payments under the Peter Baronoff Secured Note and Malinda Baronoff Secured Note and paying himself the Sun Capital Consultancy Payments (collectively, the "Baronoff Self Payments").

415.     At all relevant times that Baronoff caused the Companies to make the Baronoff Self Payments to himself and prior wife, Baronoff was aware that the Companies could not pay their debts as they became due in the ordinary course of business.

416.     As such, Baronoff's own interests were advanced by the Companies' payment of the Baronoff Self Payments to himself and Malinda Baronoff, despite causing harm to the

Companies, who could have otherwise used those funds to advance and protect the interests of the Companies and their creditors.

      B.  <u>Breach Related to iCare Transaction</u>

      417.    Baronoff breached his duty of loyalty, and acted in bad faith, deriving an improper personal benefit and acting with an interest adverse to the Companies when he caused the Companies (while he was an officer and director) to enter into the iCare Transaction.

      418.    In December 2016, Baronoff, in his dual capacity as an officer and director of PHI and Success, presented the iCare Transaction to the Boards, including sharing the iCare Q&A presentation.

      419.    In December 2016, Baronoff was aware that he would become a member of the iCare board upon execution of the iCare Transaction Documents.

      420.    In December 2016, upon information and belief, Baronoff believed that he would receive one percent (1%) of the shares in iCare as compensation for serving as a board member of iCare.

      421.    As such, Baronoff's own interests were advanced by the Companies' entering into the iCare Transaction Documents—despite that such interests were adverse to the Companies' interests as the Companies (who could not pay their debts as they became due) should not have entered into a risky transaction with a start-up EHR company with no viable business plan.

      422.    Yet, despite Baronoff advancing his own interest and causing the Companies to spend approximately $4.5 million in connection with iCare, iCare never went live and the Companies received no benefit from investing in iCare.

423.     Upon information and belief, at the time of executing the iCare Transaction Documents in February 2017, the PHI and Success Boards did not have a majority of disinterested directors to approve the iCare Transaction.

424.     Upon information and belief, at the time of executing the iCare Transaction Documents in February 2017, Baronoff did not disclosure his potential ownership interest in iCare to the Boards.

425.     Further, Baronoff, in his dual capacity as officer and director of PHI and Success, presented the Boards inaccurate financial information regarding the Companies, causing the Boards to be unable to accurately determine if the Companies were in a financial position to invest over $4.5 million in a cloud-based start-up.

C.     Breach Related to Residential Lease Agreement

426.     Baronoff breached his duty of loyalty, and acted in bad faith, deriving an improper personal benefit and acting with an interest adverse to PHI when he caused PHI (while he was an officer and director) to enter into the Residential Lease Agreement.

427.     On April 24, 2015, in his dual role as director and officer of PHI, Baronoff caused the Companies to enter into the Residential Lease Agreement pursuant to which his daughter, Shanna Baronoff, rented property to PHI for $2,750 per month "for the purpose of providing short term VIP accommodations by those temporary guests or short term residents approved by Tenant from time to time."

428.     The Residential Lease Agreement had an initial term of May 1, 2015 through April 30, 2016 and required PHI pay Shanna Baronoff c/o Peter Baronoff monthly rent payments of $2,750 (totaling $33,000) plus a security deposit of $2,750.

7494326

429.     The term of the Residential Lease Agreement was extended through at least November 13, 2017.

430.     The monthly rent payments increased to $2,850 per month beginning on December 2, 2016.

431.     Upon information and belief, PHI paid the rent payments and security deposit to Shanna Baronoff from May 4, 2015 through March 3, 2017, aggregating not less than $66,400.

432.     Thereafter, PHI paid the rent payments directly to Baronoff from March 23, 2017 through November 13, 2017, totaling not less than $25,650.

433.     Entry into the Residential Lease Agreement directly benefited Baronoff, yet PHI received no material benefit and in fact was harmed by each payment made by PHI under the Residential Lease Agreement.

434.     Upon information and belief, Baronoff never requested approval of the Residential Lease Agreement from the Boards and, as such, this conflicted transaction could not have been ratified by a majority of disinterestedness directors.

D.    Baronoff Breached His Duty of Loyalty through Each of the Above Actions Causing Damages in an Amount to be Determined at Trial

435.     The actions described in this Complaint, including the above-referenced actions in subjections A through C, resulted in the diversion, dissipation and/or unduly risking assets of the Companies that might otherwise have been used to pay creditors' claims.

436.     By reason of each of foregoing in subsections A through C above, Baronoff breached his fiduciary duty of loyalty and, as a result, the Debtors and their estates have been damaged in an amount to be determined at trial.

## COUNT V
## BREACH OF CONTRACT
### (AS TO BARONOFF)

437.     Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

438.     On March 17, 2014, the Companies and Baronoff entered into the Employment Agreement, which contained the Exclusive Services Provision.

439.     At all relevant times, the Debtors were performing under the Employment Agreement.

440.     Baronoff martially breached the Employment Agreement by failing to comply with the Exclusive Services Provision—a material provision designed to prevent Baronoff from acting as a board member for a separate company in a manner that would interfere with his obligations under the Employment Agreement.

441.     Baronoff's role as an iCare board member materially interfered with his employment obligations under the Employment Agreement, as Baronoff used his role as President and CEO of the Companies to cause the Companies to enter into the iCare Transaction, pursuant to which the Companies spent over $4.5 million and received nothing in return from iCare.

442.     As such, Baronoff breached the material Exclusive Services Provision of the Employment Agreement.

443.     The Debtors and their estates suffered damages as a result of Baronoff's breach in an amount to be determined at trial.

## COUNT VI
## LIABILITY FOR PHH/PHG EQUITY DISTRIBUTIONS –
## FLA. STAT. §§ 607.06401 AND 607.0834 AND
## CAL CORP CODE §§ 17704.05 AND 17704.06
### (AS TO COMPANY DIRECTORS)

444.     Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

445.     The Company Directors authorized the Companies to make distributions to PHH and/or PHG on account of PHH's and/or PHG's respective ownership interests in the Companies.

446.     PHH is the majority shareholder of PHI.

447.     PHG is the sole shareholder and/or member of PHH and Success.

448.     At the time of each distribution from the Companies to PHH and/or PHG, the Companies were unable to pay their debts as they became due in the usual course of the Companies' activities and affairs.

449.     As such, the Success Directors are personally liable to Success for any and all distributions made from Success to PHH and/or PHG within four years prior to the Petition Date (*i.e.*, any and all distributions from November 5, 2014 through the Petition Date).

450.      The PHI Directors are personally liable to PHI for any and all distributions made from PHI to PHH and/or PHG within two years prior to the Petition Date (*i.e.*, any and all distributions from November 5, 2016 through the Petition Date), including, among others, the $1.75 million distribution from PHI to PHH on or around July 18, 2017.

451.     Upon information and belief, the total distributions from PHI and/or Success to PHH and/or PHG are not less than $4 million.

## COUNT VII
### LIABILITY FOR ANNUAL EQUITY PAYMENTS AND DISGUISED EQUITY PAYMENTS – FLA. STAT. §§ 607.06401 AND 607.0834 AND (AS TO PHI DIRECTORS)

452.     Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

453.     The PHI Directors authorized PHI to make the Annual Equity Payments and Disguised Equity Payments to the Principals, Spouses and Dawson on account of their ownership interests in PHI.

454.     The Principals, Spouses and Dawson collectively have a 4% ownership interest in PHI.

455.     At the time of each Annual Equity Payment and Disguised Equity Payment, PHI was unable to pay its debts as they became due in the usual course of PHI's activities and affairs.

456.     As such, the PHI Directors are personally liable to PHI for any and all Annual Equity Payments and Disguised Equity Payments within two years prior to the Petition Date (*i.e.*, any and all distributions from November 5, 2016 through the Petition Date), including, among others, all payments on or after November 5, 2016 to the Principals, Spouses and Dawson under the Secured Notes, the Alleged Koslow Consulting Agreement, the Alleged Leder Consulting Agreement and with respect to the Sun Capital Consultancy Payments.

457.     Upon information and belief, the total Annual Equity Payments and Disguised Equity Payments made between November 5, 2016 and the Petition Date are not less than $3.3 million.

**COUNT VIII**
**AVOIDANCE OF FRAUDULENT TRANSFERS – 11 U.S.C. § 548**
**(AS TO DEFENDANT BARONOFF)**

458.     Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

459.     On or around March 13, 2018, Baronoff and the Companies executed the Separation Agreement.

460.     The Separation Agreement provided that Baronoff would receive from the Companies, among other things, the Baronoff Release.

461.     As such, the Company incurred the obligation to provide the Baronoff Release on or around March 13, 2018.

462.     Section 11 of the Separation Agreement provided that "Executive acknowledges and agrees that the consideration provided by Company pursuant to this Separation Agreement is

greater than and in addition to anything of value to which he otherwise would be entitled from Company."

463.    PHI and/or Success received less than a reasonably equivalent value in exchange for Baronoff Release.

464.    Upon information and belief, no later than execution of the Baronoff Release under the Separation Agreement:  (i) the Companies were insolvent or became insolvent as a result of the Baronoff Release, (ii) the Companies were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with the Companies was an unreasonably small capital; and/or (iii) the Companies intended to incur, or believed that they would incur, debts that would be beyond the Companies' ability to pay as such debts matured.

465.    Any obligations incurred by the Companies under the Baronoff Release within two years before the petition date—November 5, 2016, are voidable pursuant to 11 U.S.C. § 548(a).

### COUNT IX
**AVOIDANCE OF FRAUDULENT TRANSFERS – 11 U.S.C. §§ 548, 544, AND 550 AND FLA. STAT. §§ 726.105 AND 726.106(1) (AS TO DEFENDANT SHANNA BARONOFF AND/OR PETER BARONOFF)**

466.    Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

467.    On April 24, 2015, Shanna Baronoff, as Landlord, and PHI, as Tenant, entered into the Residential Lease Agreement "for the purpose of providing short term VIP accommodations by those temporary guests or short term residents approved by Tenant from time to time."

468.     Upon information and belief, PHI paid the rent payments and security deposit to Shanna Baronoff from May 4, 2015 through March 3, 2017, aggregating not less than $66,400, as set forth on Exhibit A attached hereto.

469.     Thereafter, PHI paid the rent payments directly to Baronoff from March 23, 2017 through November 13, 2017, totaling not less than $25,650, as set forth on Exhibit B attached hereto.

470.     Upon information and belief, PHI received less than reasonably equivalent value in exchange for each Shanna Rent Payment and Peter Rent Payment under the Residential Lease Agreement.

471.     Upon information and belief, no later than the time of each Shanna Rent Payment and Peter Rent Payment:  (i) PHI was insolvent or became insolvent as a result of such rent payment, (ii) PHI was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with PHI was an unreasonably small capital; and/or (iii) PHI intended to incur, believed that it would incur or reasonably should have believed that it would incur, debts that would be beyond PHI's ability to pay as such debts matured.

472.     Any Shanna Rent Payment and/or Peter Rent Payment made within two years before the petition date—November 5, 2016, are voidable pursuant to 11 U.S.C. § 548(a).

473.     Any Shanna Rent Payment and/or Peter Rent Payment made within four years before the petition date—November 5, 2014, are voidable pursuant to 11 U.S.C. § 544 and Fla. Stat. §§ 726.105 and 726.106(1).

474.     Based upon the foregoing, Plaintiff is entitled to recover each voidable Shanna Rent Payment and Peter Rent Payment, or the value thereof, from Shanna Baronoff and/or Peter

Baronoff under 11 U.S.C. § 550(a), together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action.

**COUNT X**
**AVOIDANCE OF FRAUDULENT TRANSFERS – 11 U.S.C. §§ 544 AND 550, FLA. STAT. §§ 726.105, 726.106(1), AND/OR CAL. CIV. CODE §§ 3439.04, 3439.055 (AS TO BARONOFF)**

475.     Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

476.     Upon information and belief, the Companies made the Baronoff Non-Salary Payments to Baronoff between December 17, 2014 and June 1, 2015, as set forth on Exhibit B attached hereto.

477.     Upon information and belief, PHI and/or Success received less than reasonably equivalent value in exchange for each Baronoff Non-Salary Payment.

478.     Upon information and belief, no later than the time of each Baronoff Non-Salary Payment:  (i) the Companies were insolvent or became insolvent as a result of such payment, (ii) the Companies were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with the Companies was an unreasonably small capital; and/or (iii) the Companies intended to incur, believed that they would incur or reasonably should have believed that they would incur, debts that would be beyond the Companies' ability to pay as such debts matured.

479.     Any Baronoff Non-Salary Payment made within four years before the petition date—November 5, 2014, are voidable pursuant to 11 U.S.C. § 544 and Fla. Stat. §§ 726.105 and 726.106(1) and/or Cal. Civ. Code §§ 3439.04 and 3439.055.

480.     Based upon the foregoing, Plaintiff is entitled to recover any voidable Baronoff Non-Salary Payment, or the value thereof, from Baronoff under 11 U.S.C. § 550(a), together

97

with an award of pre- and post-judgment interest thereon from the date of demand to the date of

payment and the costs of this action.

## COUNT XI
### AVOIDANCE OF FRAUDULENT TRANSFERS – 11 U.S.C. §§ 548, 544 AND 550, FLA. STAT. §§ 726.105, 726.106(1), AND/OR CAL. CIV. CODE §§ 3439.04, 3439.055 (AS TO REUBEN)

481.     Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

482.     Upon information and belief, the Companies made the Reuben Non-Salary

Payments to Reuben between November 7, 2014 and March 8, 2018, as set forth on Exhibit C

attached hereto.

483.     Upon information and belief, PHI and/or Success received less than reasonably

equivalent value in exchange for each Reuben Non-Salary Payment.

484.     Upon information and belief, no later than the time of each Reuben Non-Salary

Payment:  (i) the Companies were insolvent or became insolvent as a result of such payment, (ii)

the Companies were engaged in business or a transaction, or were about to engage in business or

a transaction, for which any property remaining with the Companies was an unreasonably small

capital; and/or (iii) the Companies intended to incur, believed that they would incur or

reasonably should have believed that they would incur, debts that would be beyond the

Companies' ability to pay as such debts matured.

485.     Any Reuben Non-Salary Payment made within two years before the petition

date—November 5, 2016, are voidable pursuant to 11 U.S.C. § 548(a).

486.     Any Reuben Non-Salary Payment made within four years before the petition

date—November 5, 2014, are voidable pursuant to 11 U.S.C. § 544 and Fla. Stat. §§ 726.105 and

726.106(1) and/or Cal. Civ. Code §§ 3439.04 and 3439.055.

487.     Based upon the foregoing, Plaintiff is entitled to recover any voidable Reuben Non-Salary Payment, or the value thereof, from Reuben under 11 U.S.C. § 550(a), together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action.

**COUNT XII**
**AVOIDANCE OF FRAUDULENT TRANSFERS – 11 U.S.C. §§ 548, 544 AND 550, FLA.
STAT. §§ 726.105, 726.106(1), AND/OR CAL. CIV. CODE §§ 3439.04, 3439.055
(AS TO MALINDA BARONOFF)**

488.     Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

489.     Upon information and belief, the Companies made the Alleged Malinda Consulting Payments from December 1, 2014 through December 7, 2017 as set forth on Exhibit D attached hereto.

490.     Upon information and belief, the Companies received less than reasonably equivalent value in exchange for each Alleged Malinda Consulting Payment.

491.     Upon information and belief, no later than the time of each Alleged Malinda Consulting Payment:  (i) the Companies were insolvent or became insolvent as a result of such payment, (ii) the Companies were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with the Companies was an unreasonably small capital; and/or (iii) the Companies intended to incur, believed that they would incur or reasonably should have believed that they would incur, debts that would be beyond the Companies' ability to pay as such debts matured.

492.     Any Alleged Malinda Consulting Payment paid to Malinda Baronoff made within two years before the petition date—November 5, 2016, are voidable pursuant to 11 U.S.C. § 548(a).

493.     Any Alleged Malinda Consulting Payment paid to Malinda Baronoff made within four years before the petition date—November 5, 2014, are voidable pursuant to 11 U.S.C. § 544 and Fla. Stat. §§ 726.105 and 726.106(1) and/or Cal. Civ. Code §§ 3439.04 and 3439.055.

494.     Based upon the foregoing, Plaintiff is entitled to recover any voidable Alleged Malinda Consulting Payment paid to Malinda Baronoff, or the value thereof, from Malinda Baronoff under 11 U.S.C. § 550(a), together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action.

**COUNT XIII**
**AVOIDANCE OF FRAUDULENT TRANSFERS – 11 U.S.C. §§ 548, 544 AND 550, FLA. STAT. §§ 726.105, 726.106(1), AND/OR CAL. CIV. CODE §§ 3439.04, 3439.055 (AS TO THE COMPANY D&Os)**

495.     Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

496.     Upon information and belief, the Company D&Os used the Companies' corporate credit cards, including the Companies' American Express card(s), for improper personal reasons for which the Companies received no benefit.

497.     Upon information and belief, the Companies received less than reasonably equivalent value in exchange for each Personal Card Payment.

498.     Upon information and belief, no later than the time of each Personal Card Payment:  (i) the Companies were insolvent or became insolvent as a result of such payment, (ii) the Companies were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with the Companies was an unreasonably small capital; and/or (iii) the Companies intended to incur, believed that they would incur or reasonably should have believed that they would incur, debts that would be beyond the Companies' ability to pay as such debts matured.

499.     Any Personal Card Payment made within two years before the petition date—November 5, 2016, are voidable pursuant to 11 U.S.C. § 548(a).

500.     Any Personal Card Payment made within four years before the petition date—November 5, 2014, are voidable pursuant to 11 U.S.C. § 544 and Fla. Stat. §§ 726.105 and 726.106(1) and/or Cal. Civ. Code §§ 3439.04 and 3439.055.

501.     Based upon the foregoing, Plaintiff is entitled to recover any voidable Personal Card Payment, or the value thereof, from the relevant Company D&Os under 11 U.S.C. § 550(a), together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action.

## COUNT XIV
## AVOIDANCE OF FRAUDULENT TRANSFERS – 11 U.S.C. §§ 544 AND 550, FLA. STAT. §726.106(2)
## (AS TO THE COMPANY D&Os)

502.     Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

503.     This Count XIV is pled in the alternative, to the extent that the Personal Card Payments are not avoided as fraudulent under Count XIII.

504.     Each Personal Card Payment was made while the respective Company D&O was an insider of PHI.

505.     To the extent the Company D&Os provided services or incurred obligations for which they were entitled to reimbursement, each Personal Card Payment was made on account of antecedent debt.

506.     PHI was insolvent at the time of each Personal Card Payment.

507.     Upon information and belief, each Company D&O had a reasonable cause to believe that PHI was insolvent at the time of each Personal Card Payment as a result of each Company D&O's position as an officer or director of PHI.

7494326

508.     Any Personal Card Payment made within one year before the petition date (*i.e.*, November 5, 2017) are voidable pursuant to 11 U.S.C. § 544 and Fla. Stat. § 726.106(2).

509.     Based upon the foregoing, Plaintiff is entitled to recover any Personal Card Payment paid after November 5, 2017, or the value thereof, from the relevant Company D&O under 11 U.S.C. § 550(a), together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action.

**COUNT XV**
**AVOIDANCE OF FRAUDULENT TRANSFERS – 11 U.S.C. §§ 548, 544 AND 550, FLA. STAT. §§ 726.105, 726.106(1)**
**(AS TO MALINDA BARONOFF)**

510.     Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

511.     This Count XV is pled in the alternative, to the extent it is determined that the Annual Equity Payments were not made to Malinda Baronoff on account of her ownership interests in PHI pursuant to Count VII.

512.     Upon information and belief, PHI made the Annual Equity Payments to Malinda Baronoff from at least 2015.

513.     Upon information and belief, PHI received less than reasonably equivalent value in exchange for each Annual Equity Payment.

514.     Upon information and belief, no later than the time of each Annual Equity Payment:  (i) PHI was insolvent or became insolvent as a result of such payment, (ii) PHI was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with PHI was an unreasonably small capital; and/or (iii) PHI intended to incur, believed that it would incur or reasonably should have believed that it would incur, debts that would be beyond PHI's ability to pay as such debts matured.

7494326

515.     Any Annual Equity Payment made within two years before the petition date—November 5, 2016, are voidable pursuant to 11 U.S.C. § 548(a).

516.     Any Annual Equity Payment made within four years before the petition date—November 5, 2014, are voidable pursuant to 11 U.S.C. § 544 and Fla. Stat. §§ 726.105 and 726.106(1).

517.     Based upon the foregoing, Plaintiff is entitled to recover any voidable Annual Equity Payment, or the value thereof, from Malinda Baronoff under 11 U.S.C. § 550(a), together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action.

## COUNT XVI
## AVOIDANCE OF FRAUDULENT TRANSFERS – 11 U.S.C. §§ 548 AND 550
## (AS TO BARONOFF)

518.     Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

519.     This Count XVI is pled in the alternative, to the extent that the Sun Capital Consultancy Payments were not distributions on account of Baronoff's ownership interest in PHI pursuant to Count VII.

520.     Section 2(f) of the Separation Agreements provides that Baronoff shall remain eligible for the Sun Capital Consultancy Payments, despite that, upon information and belief, Baronoff performed no such Sun Capital consultancy services.

521.     Section 2(f) provides as follows:

> Executive will notwithstanding this Agreement remain eligible for the payments and other benefits described in Section 4(c) ("Consideration for Sun capital Consultancy") . . . Executive further agrees that the payments described throughout this Separation Agreement are more than the Company is required to make under its normal policies and procedures[.]

522.     As such, on or around March 13, 2018, the Company incurred the obligation to provide the Sun Capital Consultancy Payments after Baronoff's termination as CEO and President.

523.     PHI and/or Success received less than a reasonably equivalent value in exchange for the obligation to make the Sun Capital Consultancy Payments to Baronoff post-termination.

524.     Upon information and belief, no later than the time of incurring the obligation to pay the Sun Capital Consultancy Payments under the Separation Agreement: (i) the Companies were insolvent or became insolvent as a result thereof, (ii) the Companies were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with the Companies was an unreasonably small capital; and/or (iii) the Companies intended to incur, or believed that they would incur, debts that would be beyond the Companies' ability to pay as such debts matured.

525.     The obligation to make the Sun Capital Consultancy Payments incurred on or around March 13, 2018 is voidable pursuant to 11 U.S.C. § 548(a).

526.     As the Companies' obligation to make the Sun Capital Consultancy Payments to Baronoff under the Separation Agreement is voidable as fraudulent, so too are the Sun Capital Consultancy Payments made pursuant to such voidable obligation.

527.     PHI and/or Success received less than a reasonably equivalent value in exchange for making the Sun Capital Consultancy Payments pursuant to the obligation in the Separation Agreement.

528.     Upon information and belief, no later than the time of each Sun Capital Consultancy Payment made under the Separation Agreement: (i) the Companies were insolvent or became insolvent as a result thereof, (ii) the Companies were engaged in business or a

7494326

transaction, or were about to engage in business or a transaction, for which any property remaining with the Companies was an unreasonably small capital; and/or (iii) the Companies intended to incur, or believed that they would incur, debts that would be beyond the Companies' ability to pay as such debts matured.

529.    Any Sun Capital Consultancy Payment made within two years before the petition date of November 5, 2016, are voidable pursuant to 11 U.S.C. § 548(a).

530.    Based upon the foregoing, Plaintiff is entitled to recover any Sun Capital Consultancy Payment made under the Separation Agreement from the Separation Date though the Petition Date, or the value thereof, from Baronoff under 11 U.S.C. § 550(a), together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action.

**COUNT XVII**
**AVOIDANCE OF FRAUDULENT TRANSFERS – 11 U.S.C. §§ 544 AND 550, FLA. STAT. §726.106(2)**
**(AS TO BARONOFF)**

531.    Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

532.    This Count XVII is pled in the alternative, to the extent that the Sun Capital Consultancy Payments were not distributions on account of Baronoff's ownership interest in PHI pursuant to Count VII and/or are not avoidable as fraudulent under section 548 of the Bankruptcy Code pursuant to Count XVI.

533.    Each Sun Capital Consultancy Payment made prior to May 11, 2018 (each an "Insider Sun Capital Consultancy Payment") was made to Baronoff while he was an insider of PHI.

534.    To the extent Baronoff provided consulting services related to Sun Capital, each Insider Sun Capital Consultancy Payment was made on account of antecedent debt.

535.    PHI was insolvent at the time of each Insider Sun Capital Consultancy Payment.

536.    Upon information and belief, Baronoff had a reasonable cause to believe that PHI was insolvent at the time of each Insider Sun Capital Consultancy Payment as he was an officer and/or director of PHI at the time.

537.    Any Insider Sun Capital Consultancy Payment made within one year before the petition date—(i.e., between November 5, 2017 and May 11, 2018) are voidable pursuant to 11 U.S.C. § 544 and Fla. Stat. § 726.106(b).

538.    Based upon the foregoing, Plaintiff is entitled to recover any Insider Sun Capital Consultancy Payment, or the value thereof, from Baronoff under 11 U.S.C. § 550(a), together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action.

## COUNT XVIII
## AVOIDANCE OF PREFERENCE PERIOD TRANSFERS – 11 U.S.C. §§ 547 AND 550 (AS TO BARONOFF)

539.    Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

540.    This Count XVIII is pled in the alternative to the extent that Sun Capital Consultancy Payments were not distributions on account of Baronoff's ownership interest in PHI pursuant to Count VII and/or are not avoidable as fraudulent pursuant to section 548 of the Bankruptcy Code or Fla. Stat. § 726.106(2) under Counts XVI and XVII, respectively.

541.    As a director and officer of the Companies, Baronoff was an insider of the Companies from November 5, 2017 through May 11, 2018, the date he resigned from the Boards (the "Baronoff Insider Preference Period").

542.    Each Insider Sun Capital Consultancy Payment was made during the Baronoff Insider Preference Period.

7494326

543.     Upon information and belief, Baronoff received Sun Capital Consultancy Payments in the ninety (90) day period prior to the Petition Date (the "90 Day Sun Capital Consultancy Payments," and together with the Insider Sun Capital Consultancy Payments, the "Sun Capital Preference Payments")—*i.e.*, between August 7, 2018 and November 5, 2018 (the "90 Day Preference Period").

544.     Each Sun Capital Preference Payment constituted a transfer of an interest in property of the Debtors.

545.     To the extent Baronoff provided Sun Capital consultancy services, Baronoff was a creditor of the Debtors at the time of each Sun Capital Preference Payment.

546.     Each Sun Capital Preference Payment was to or for the benefit of Baronoff, as a creditor, within the meaning of 11 U.S.C. § 547(b)(1) because each Sun Capital Preference Payment either reduced or fully satisfied a debt or debts then owed by the Debtors to Baronoff.

547.     To the extent Baronoff provided Sun Capital consulting services, each Sun Capital Preference Payment was made for, or on account of, an antecedent debt or debts owed by the Debtors to Baronoff before such Sun Capital Preference Payments were made, each of which constituted a "debt" or "claim" (as those terms are defined in the Bankruptcy Code).

548.     Each Sun Capital Preference Payment was made while the Debtors were insolvent.  Among other things, as evidenced by the Debtors' petitions, as well as the proofs of claim that have been received to date, the Debtors' liabilities exceeded its assets on the Petition Date.

549.     As a result of each Sun Capital Preference Payment, Baronoff received more than he would receive if:  (i) these cases were under chapter 7 of the Bankruptcy Code; (ii) the Sun Capital Preference Payments had not been made; and (iii) Baronoff received payments of his

debts under the provisions of the Bankruptcy Code.  This is evidenced by the fact that unsecured creditors, under the Plan, will receive less than the full amounts they are owed.

550.     Based on the foregoing, each Insider Sun Capital Consultancy Payment during the Insider Preference Period and each 90 Day Sun Capital Consultancy Payment during the 90 Day Preference Period is voidable pursuant to 11 U.S.C. § 547(b).

551.     Based upon the foregoing, Plaintiff is entitled to recover each Sun Capital Preference Payment during the Insider Preference Period and 90 Day Preference Period, or the value thereof, from Baronoff under 11 U.S.C. § 550(a), together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action.

## COUNT XIX
## AVOIDANCE OF PREFERENCE PERIOD TRANSFERS – 11 U.S.C. §§ 547 AND 550 (AS TO MALINDA BARONOFF)

552.     Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

553.     This Count XIX is pled in the alternative, in the event the Alleged Malinda Consulting Payments are not avoidable as fraudulent under 11 U.S.C. §§ 544 and 548 and Fla. Stat. §§ 726.105 and 726.106(1) and/or Cal. Civ. Code §§ 3439.04 and 3439.055 under Count XII.

554.     Each Alleged Malinda Consulting Payment constituted a transfer of an interest in property of the Debtors.

555.     To the extent Malinda Baronoff provided consultancy services, Malinda Baronoff was a creditor of the Debtors at the time of each Alleged Malinda Consulting Payment.

556.     Each Alleged Malinda Consulting Payment was to or for the benefit of Malinda Baronoff, as a creditor, within the meaning of 11 U.S.C. § 547(b)(1) because each Alleged

Malinda Consulting Payment either reduced or fully satisfied a debt or debts then owed by the Debtors to Malinda Baronoff.

557.    To the extent Malinda Baronoff provided consulting services, each Alleged Malinda Consulting Payment was made for, or on account of, an antecedent debt or debts owed by the Debtors to Malinda Baronoff before such Alleged Malinda Consulting Payments were made, each of which constituted a "debt" or "claim" (as those terms are defined in the Bankruptcy Code).

558.    Each Alleged Malinda Consulting Payment was made while the Debtors were insolvent.  Among other things, as evidenced by the Debtors' petitions, as well as the proofs of claim that have been received to date, the Debtors' liabilities exceeded its assets on the Petition Date.

559.    As a relative of Baronoff, who was a director of the Companies through May 11, 2018, Malinda Baronoff was an insider of the Companies within the meaning of section 101(31) of the Bankruptcy Code from November 5, 2017 through May 11, 2018 (the "Malinda Insider Preference Period").

560.    As a result of each Alleged Malinda Consulting Payment, Malinda Baronoff received more than she would receive if:  (i) these cases were under chapter 7 of the Bankruptcy Code; (ii) the Alleged Malinda Consulting Payments had not been made; and (iii) Malinda Baronoff received payments of her debts under the provisions of the Bankruptcy Code.  This is evidenced by the fact that unsecured creditors, under the Plan, will receive less than the full amounts they are owed.

561.    Based on the foregoing, each Alleged Malinda Consulting Payment made during the Malinda Insider Preference Period is voidable pursuant to 11 U.S.C. § 547(b).

562.     Based upon the foregoing, Plaintiff is entitled to recover the Alleged Malinda Consulting Payments made within the Malinda Insider Preference Period, or the value thereof, from Malinda Baronoff under 11 U.S.C. § 550(a), together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action.

**COUNT XX**
**AVOIDANCE OF PREFERENCE PERIOD TRANSFERS – 11 U.S.C. §§ 547 AND 550**
**(AS TO REUBEN)**

563.     Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

564.     This Count XX is pled in the alternative, in the event the Reuben Non-Salary Payments are not avoidable as fraudulent under 11 U.S.C. §§ 544 and 548 and Fla. Stat. §§ 726.105 and 726.106(1) and/or Cal. Civ. Code §§ 3439.04 and 3439.055 under Count XI.

565.     Each Reuben Non-Salary Payment constituted a transfer of an interest in property of the Debtors.

566.     To the extent Reuben provided services in exchange for the Reuben Non-Salary Payments, Reuben was a creditor of the Debtors at the time of each Reuben Non-Salary Payment.

567.     Each Reuben Non-Salary Payment was to or for the benefit of Reuben, as a creditor, within the meaning of 11 U.S.C. § 547(b)(1) because each Reuben Non-Salary Payment either reduced or fully satisfied a debt or debts then owed by the Debtors to Reuben.

568.     To the extent Reuben provided services in exchange for the Reuben Non-Salary Payments, each Reuben Non-Salary Payment was made for, or on account of, an antecedent debt or debts owed by the Debtors to Reuben before such Reuben Non-Salary Payments were made, each of which constituted a "debt" or "claim" (as those terms are defined in the Bankruptcy Code).

110

569.    Each Reuben Non-Salary Payment was made while the Debtors were insolvent. Among other things, as evidenced by the Debtors' petitions, as well as the proofs of claim that have been received to date, the Debtors' liabilities exceeded its assets on the Petition Date.

570.    As a director of PHG until, upon information and belief, March 31, 2018, Reuben was an insider of the Companies within the meaning of section 101(31) of the Bankruptcy Code from November 5, 2017 through March 31, 2018 (the "Reuben Insider Preference Period").

571.    As a result of each Reuben Non-Salary Payment, Reuben received more than he would receive if:  (i) these cases were under chapter 7 of the Bankruptcy Code; (ii) the Reuben Non-Salary Payments had not been made; and (iii) Reuben received payments of his debts under the provisions of the Bankruptcy Code.  This is evidenced by the fact that unsecured creditors, under the Plan, will receive less than the full amounts they are owed.

572.    Based on the foregoing, each Reuben Non-Salary Payment made during the Reuben Insider Preference Period is voidable pursuant to 11 U.S.C. § 547(b).

573.    Based upon the foregoing, Plaintiff is entitled to recover the Reuben Non-Salary Payments made within the Reuben Insider Preference Period, or the value thereof, from Reuben under 11 U.S.C. § 550(a), together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action.

## COUNT XXI
## DISALLOWANCE OF ALL CLAIMS – 11 U.S.C. § 502(d)
### (AS TO EACH AVOIDANCE PARTY)

574.    Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

575.    Pursuant to section 502(d) of the Bankruptcy Code, Plaintiff objects to the allowance of any claim filed by or scheduled on behalf of any Avoidance Party (whether in their capacity as receiving a fraudulent transfer and/or preferential payment) that has been named in any of Counts VIII through XX.

7494326

576.    Pursuant to section 502(d) of the Bankruptcy Code, any and all claims of the Avoidance Parties and/or their assignee against the Debtors must be disallowed until such time as the applicable Avoidance Party pays Plaintiff the amounts and/or returned the property subject to avoidance.

## COUNT XXII
## EQUITABLE SUBORDINATION
## (AS TO DEFENDANTS)

577.    Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

578.    To the extent any Defendant has filed one or more proofs of claim, including but not limited to, any claims filed by Baronoff on account of any alleged indemnification arising under the Settlement Agreement, or to the extent the Debtors have scheduled a claim in favor of any Defendant, such claims, to the extent not otherwise disallowed, should be equitably subordinated to the claims of the Debtors' general unsecured creditors.

579.    As set forth herein, each Defendant engaged in, and benefitted from, a pattern of misconduct and inequitable conduct at the expense of the Debtors, their estates and their stakeholders, including unsecured creditors, including by, among other things, (i) misleading MidCap, Wells, Crowe, and/or the Boards such that lenders, vendors and other parties in interest were unable to determine the financial condition of the Companies and/or (ii) accepting fraudulent and/or preferential transfers from the Company on account of services for which the Defendants did not provide (*i.e.*, the Alleged Malinda Consulting Payments, the Shanna Rent Payments, the Baronoff Rent Payments, the Peter Non-Salary Payments and the Reuben Non-Salary Payments).

580.    Such misrepresentation of the Companies' financial position by the Company D&Os benefited the Company D&Os, who maintained their employment at the Companies and continued to receive their salary and bonuses despite that, but for the misdealing information

provided by the Company D&Os, the Companies would have filed for chapter 11 protection sooner and reduced the growth of payables, accrued expenses and/or other liabilities.

581.    The receipt of the fraudulent transfers described herein benefited the Avoidance Parties who received payments from the Companies—during which times the Companies were unable to pay creditors in the ordinary course of business—while failing to provide any services on account thereof.

582.    The Defendants conduct injured the Debtors' unsecured creditors and conferred an unfair advantage upon the Defendants.

583.    Under the principles of equitable subordination, any claim scheduled in favor of or filed by the Defendants are subject to subordination pursuant to section 510(c) of the Bankruptcy Code.

584.    Equitable subordination of any claims of the Defendants is consistent with the provisions and purposes of the Bankruptcy Code.

585.    Accordingly, any claim of a Defendant is subject to equitable subordination.

## COUNT XXIII
## DECLARATORY JUDGMENT
### (28 U.S.C. §§ 2201 and 2202)

586.    Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth herein.

587.    To the extent that the Baronoff Release under the Separation Agreement is not avoided as fraudulent pursuant to section 548 of the Bankruptcy Code under Count VIII, Plaintiff seeks a declaratory judgment that the Baronoff Release is nullified pursuant to the terms of the Separation Agreement.

7494326

588.    Section 3(b) of the Separation Agreement, which contained the Baronoff Release, provides that the Baronoff Release "shall be nullified if any of Executive's representations in Subparagraph 7(a) or 7(b) below, or in the signed sworn statement contemplated in Subparagraph 7(c) below, were untruthful as of the date of signature of this Separation Agreement and the signed sworn statement, respectively."

589.    Pursuant to section 7(a) and (b) of the Separation Agreement, and as sworn to in Baronoff's Affidavit, Baronoff covenanted and agreed as follows, which if untrue nullify the Baronoff Release:

> [H]he (i) has not knowingly committed or condoned any acts of fraud against the Company or its affiliates; (ii) has not knowingly committed or condoned fraud against any other person or entity, including the government; (iii) has not knowingly participated in or knowingly permitted others to engage in any conduct prohibited by the Company's compliance and ethics programs; (iv) understands that he is under a preexisting and ongoing duty to notify the Company's designated Corporate Compliance/Ethics Officer of any knowledge of a violation of the Company's compliance or ethics programs; and (v) he is not aware of any such violation by himself or anyone else employed by the Company or its affiliates, other than violations that he may have properly reported to the Company prior to the Separation Date.

590.    For the reasons set forth herein, Baronoff's representations in paragraphs 7(a) and/or 7(b) and the Affidavit were untruthful as of the date of the Separation Agreement.  As such, pursuant to the terms thereof, the Baronoff Release is nullified.

591.    Accordingly, Plaintiff is entitled to a judgment declaring that the Baronoff Release is null and void effective as of the date of the Separation Agreement.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests entry of a final judgment against the Defendants as follows:

1.      On Count I, awarding damages against the Company D&Os, in an amount to be determined at trial, for breach of duty;

2.      On Count II, awarding damages against the Company Officers, in an amount to be determined at trial, for breach of duty;

3.      On Count III, awarding damages against John Does 1-100, if any, in an amount to be determined at trial, for breach of duty;

4.      On Count IV, awarding damages against Baronoff, in an amount to be determined at trial, for breach of duty;

5.      On Count V, awarding damages against Baronoff, in an amount to be determined at trial, for breach of contract;

6.      On Count VI, awarding damages against the Company Directors, in an amount to be determined at trial, for making unlawful distributions;

7.      On Count VII, awarding damages against the PHI Directors, in an amount to be determined at trial, for making unlawful distributions;

8.      On Counts VIII through Count XX, awarding judgment in favor of Plaintiff and against the Avoidance Parties, (i) avoiding all fraudulent and/or preferential transfers (the "Avoidable Transfers") against the Avoidance Parties, (ii) directing the Avoidance Parties to return to Plaintiff the amount of the Avoidable Transfers, pursuant to 11 U.S.C. §§ 544, 547(b), 548(a), 549, and/or 550(a), and (iii) for money damages against the Avoidance Parties in the

amount of the Avoidable Transfers, together with interest from the date of demand at the maximum legal rate, to the extent allowed by law;

9.      On Count XXI, awarding judgment in favor of Plaintiff and against the Avoidance Parties disallowing any claims held or filed by the Avoidance Parties against the Plaintiff until the relevant Avoidance Party pays Plaintiff an amount equal to the Avoidable Transfers pursuant to 11 U.S.C. § 502(d);

10.      On Count XXII, equitably subordinating any proof of claim filed by or scheduled on behalf of the Defendants to the claims of general unsecured creditors;

11.      On Count XXIII, declaring that the Baronoff Release is null and void effective as of the date of the Separation Agreement;

12.      Awarding Plaintiff attorney's fees to the extent permitted by law;

13.      Awarding Plaintiff interest and cost of suit; and

14.      Awarding such other and further relief as the Court deems just and proper.

7494326

## JURY TRIAL DEMAND

Plaintiff demands a jury trial on all counts of the Complaint triable by a jury.


Dated: October 28, 2020

/s/ Colin R. Robinson
Bradford J. Sandler, Esq.
Andrew W. Caine, Esq.
Colin R. Robinson, Esq.
PACHULSKI STANG ZIEHL & JONES LLP
919 N. Market Street, 17th Floor
Wilmington, DE  19801
Telephone:  (302) 652-4100
Facsimile:   (302) 652-4400
E-mail:  bsandler@pszjlaw.com
            acaine@pszjlaw.com
            crobinson@pszjlaw.com

- and –

Andrew H. Sherman (*pro hac vice* admission to be requested)
Boris I. Mankovetskiy (*pro hac vice* admission to be requested)
Rachel E. Brennan (*pro hac vice* admission to be requested)
SILLS CUMMIS & GROSS P.C.
One Riverfront Plaza
Newark, NJ 07102
Telephone:  973-643-7000
Facsimile:  973-643-6500
Email: asherman@sillscummis.com
            bmankovetskiy@sillscummis.com
            rbrennan@sillscummis.com

*Counsel to Robert Michaelson of Advisory Trust Group, LLC, in his capacity as Debtor Representative and Liquidating Trustee*

7494326