UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
Case No. 1:21-cv-21543-GOODMAN

ROBERT MICHAELSON, of ADVISORY
TRUST GROUP, LLC, in his capacity as Debtor
Representative and Liquidating Trustee,

     Plaintiff,

vs

PETER BARONOFF, KEITH REUBEN, BRIAN DUNN,
DAVID ARMSTRONG, JAMES HOPWOOD,
RICHARD GOLD, BRYAN DAY, STAN GRABISH,
RICHARD COHEN, STEVEN HELLAND, MALINDA
BARONOFF, SHANNA BARONOFF, and JOHN DOES
1-100,

     Defendants.

..............................................................................

### PLAINTIFF'S OPPOSITION TO DEFENDANTS' APPLICATION FOR THE APPOINTMENT OF A SPECIAL MASTER

This Memorandum is submitted by Plaintiff in opposition to Defendants' application for the appointment of a Special Master for every future deposition in this case based upon the alleged, but unsubstantiated, improper conduct of Plaintiff's counsel during the deposition of the first deponent in this case, Shanna Baronoff, conducted on November 16, 2022.

**I.**    **Introduction.**

The deposition of Ms. Baronoff is reflected in a traditional transcript of 292 pages, and a video recording. The deposition was a challenge given the attitude of the witness -- what appeared to be an intentional effort to avoid answering questions. There were unwarranted assertions of the attorney/client privilege by the deponent that were not even raised by her counsel. That was in addition to counsel's objections which, when challenged, appeared to be without merit. As a result of an inordinate number of requested lengthy breaks, the deposition took nine hours to obtain only 292 pages of testimony.

Now, Defendants seeks the appointment of a Special Master for all future depositions based upon eleven specific citations. The overwhelming number of questions within those citations were not the subject of objection by any of the defense counsel. Although counsel had the opportunity to call the Court for assistance or to suspend the deposition, none of the defense counsel availed themselves of those options.

Unfortunately, the only way to get the full picture of the deposition is by either watching the entire video and/or reading the entire transcript which Defendants will be filing. Plaintiff fully understands the burden this places on the Court. However, even assuming <u>arguendo</u> that all thirty-two pages cited by Defendants contain unacceptable questioning, which is not conceded, that leaves almost 90% of the deposition as acceptable, even by Defendants' own standard. That by itself speaks volumes as to why a Special Master is not warranted.

That the deposition was challenging because of deponent's mental health and emotional issues need not be spread across the record. The foregoing notwithstanding, counsel for Plaintiff conducting the deposition acknowledges that these circumstances do not warrant frustration that impedes the deposition and will be mindful of that going forward.

That being said, a review of the record will make self-evident that there is absolutely no basis for the appointment of a Special Master.

## II.    <u>The Law.</u>

"Generally, special masters have been appointed when resolution of a case or a dispute requires resources or time in excess of what the court can reasonably provide." <u>United Surgical Assistants, LLC v. Aetna Life Ins. Co.</u>, 2015 U.S. Dist. LEXIS 162331, at *4 (M.D. Fla. Dec. 3, 2015). "As it pertains to pretrial matters, courts have appointed special masters to oversee discovery in somewhat limited situations, such as upon a finding of blatant misconduct and disregard of the rules governing discovery and ethical and professional conduct. Absent obvious misconduct, the Federal Rules of Civil Procedure sufficiently outline the process of conducting depositions." <u>Id</u>. at *5. "[T]he Court finds that a special master is not warranted to oversee the single remaining corporate deposition in this case, as the procedural rules are sufficient to guide the deposition and to preserve either party's objections." <u>Id</u>. at *6.

In <u>Payne</u>, "Plaintiff proposes that a Rule 53 Special Master be appointed by the Court to preside over the oral depositions, to hear any objections that are likely to arise on privilege grounds, and to make contemporaneous rulings thereon." <u>Payne v. Seminole Elec. Coop.</u>, 2021 U.S. Dist. LEXIS 133418, at *15 (M.D. Fla. Feb. 2, 2021). "[T]he Court is confident that the procedural rules could sufficiently guide the parties in proceeding with the oral depositions such that the appointment of Special Master does not seem necessary at this time. If some of the questions and/or answers at the depositions implicate attorney-client communications, objections based on privilege can be raised and preserved until such issues are decided on a proper motion." <u>Id</u>. at *28.

In <u>Lee</u>, "Defendants Perez and VTMI propose that a special master could be appointed to supervise the deposition to ensure that the questioning is not abusive." <u>Lee v. Perez</u>, 2017 U.S. Dist. LEXIS 231539, at *4 (S.D. Fla. Nov. 13, 2017). Without discussing the counsels' conduct, the judge stated that he was "confident that the attorneys can act professionally and ensure that Ms. Lee's deposition will not be abusive and thus find no need to appoint a special master to oversee her deposition." <u>Id</u>. at *5.

In <u>Pendlebury</u>, "Plaintiffs assert that [Defendant's] counsel engaged in abusive and unprofessional conduct during Tiffani Enyinnaya's deposition. They now move for sanctions, including the appointment of a Special Master to oversee any further deposition in this matter,

against Defendant and its counsel." <u>Pendlebury v. Starbucks Coffee Co.</u>, 2006 U.S. Dist. LEXIS 112210, at *5 (S.D. Fla. Dec. 27, 2006). The court found that "the type of misconduct alleged here was not so egregious as to be abusive or sanctionable or to warrant the appointment of a Special Master to oversee future depositions as requested. Furthermore, Plaintiffs have not suggested any matter that might arise during a future deposition that would require a Special Master's presence and could not await a Court ruling." <u>Id</u>. at *8-9. "Nonetheless, the Court notes its displeasure with the lack of courtesy displayed by Defendant's counsel here, as well as the comparable conduct alleged against Plaintiffs' counsel, and cautions that a repeat of such behavior may later warrant an imposition of sanctions. That said, the Court is confident that respective counsel -- officers of the Court -- will comport themselves professionally throughout the upcoming examinations and work in good faith to resolve any differences that may arise." <u>Id</u>. at *9.

Defendants have not sought to explain how the citations give rise to the level of conduct requiring the appointment of a Special Master, <u>to wit</u>, whether they are beyond the scope, whether they seek protected information, whether they evidence lack of courtesy, or whether they are otherwise objectionable. These snippets of the 292 page record surely are not self-evident that the appointment of a Special Master is warranted.

**III.**   <u>**Citations.**</u>

**(A)**   <u>36:14-40:25</u>

Q.   And you've had discussion with your father about your mother's competence in connection with this lawsuit?

A.   I have had many conversations with my father about everything. He is my father but not in connection to the lawsuit. He is my father.

Q.   I'm not asking you about general conversations with your father. I'm asking you if you had conversations with your father about your mother's mental competence?

A.   Well, in all fairness you are suing my mother, my father and myself in the same lawsuit and my mother has competence issues. So I don't understand the question because my mother's competence has come up in this lawsuit. So my father would know that there is issues with her competence in regards to this lawsuit.

Q.   So let me break it down. You understood what the word speak means?

A.   I think we're all speaking about my mother's competence in regards to this lawsuit.

Q.   Do you understand what the word speak means?

A.   I do.

Q.   Do you understand what the word father means?

A.   Right.

Q.   Do you understand what the word competence  means?

A.   Right.

Q.   So I'm asking you did you speak with your father about your mother's competence in connection with this lawsuit?

A.  My mother's competence is directly related to things that my father is being sued about. I don't understand the question.

Q.  What medications did you take this morning?

A.  That's very inappropriate.

Q.  No, it's not. So please tell me what medications?

A.  I'm not answering that.

Q.  Did you take medication this is morning?

A.  I'm not answering that. That's very inappropriate.

Q.  Did any of those medications affect your memory?

A.  Can I have a break, please?

Q.  No. Not until you answer the question.

A.  Can I have a break?

Q.  Not until you answer the question. You're not entitled to a break in the middle of a question.

THE WITNESS: Is he allowed to ask me that?

MS. FOTIU-WOJTOWICZ: Yes.

THE WITNESS: What medications I took this morning?

MR. NEWMAN: Excuse me. In the -- let me explain another rule. Unless your counsel tells you not to answer you're required to answer the questions.

MR. KAPLAN: I would like to have the question read back. I'm not sure she knows which question is pending.

MR. NEWMAN: Well, then she can tell me that. MR. KAPLAN: I told you that.

MR. NEWMAN: What does that mean, that you told me that?

MR. KAPLAN: That means we're entitled to have clarity on the record which precise question is pending. Do you have a problem with that, David?

MR. NEWMAN: Yes, you didn't understand the question? Did you not hear it?

MR. KAPLAN: I didn't say that.

BY MR. NEWMAN

Q.  Did you have a problem with my last question?

A.  What medications I took this morning?

Q.  No. Any of the medications affect your memory?

A.  Do any -- yes.

Q.  Which ones?

A.  None of my medications affect my memory.

Q.  Well, you just said yes and then you said no. Okay.

A.   I took -- no, it's fine. I take Levothyroxene.

Q.   What's that for?

A.   Hypothyroidism.

Q.   Anything else?

A.   I take Triamterene.

Q.   What is that for?

A.   It's for my blood pressure.

Q.   Anything else?

A.   I take Topamax. It's for migraine headaches.

Q.   Anything else?

A.   No.

Q.   Which ones of those did you take today?

A.   I take all three because I have like physical conditions.

Q.   What physical conditions?

A.   I just told you.

Q.   Okay. You take anything for ADD?

A.   I do take ADD medication.

Q.   Take it today?

A.   I did but that doesn't affect my memory.

Q.   But when you told me what medication you didn't include that; right?

A.   Okay.

Q.   What do you take for ADD?

A.   I take Vivance.

Q.   Any other medications that you haven't told me about?

A.   Let me think about this. No, those are all my medications.

MR. NEWMAN: If you would like a break now we can take a break.

THE WITNESS: Yes.

Plaintiff can only assume that Defendants take offense with the questions regarding Ms. Baronoff's medication, although no objection was made at the time and, in fact, when Ms. Baronoff asked her counsel if she had to respond, her counsel said "yes." Although it is common practice to inquire as to whether a witness is taking any medication which would affect her/his memory or ability to testify, it is even more important when it clearly appears as though the deponent is having difficulty responding to questions.

9385522 v1

There is nothing inappropriate about this line of questioning and clearly defense counsel did not think so at the time of the questioning.

**(B)**    41:10-43:17

Q.  Ms. Baronoff, during the break did you meet with your counsel?

A.  Yes.

Q.  Did you talk to your counsel?

A.  Yes.

Q.  Did you talk about your deposition testimony?

A.  I just needed to calm down.

Q.  I asked if you talked about your deposition testimony?

A.  No.

Q.  And you're under oath so I'm going to ask you one more time you discussed nothing about your deposition testimony; correct?

A.  I just needed to calm down.

Q.  That's not the question. I asked you whether you discussed anything at all about your deposition testimony with counsel during the break.

A.  No.

Q.  What did you discuss?

A.  I was just calming down.

MS. FOTIU-WOJTOWICZ: Wait.

MR. NEWMAN: I asked you what did you discuss.

THE WITNESS: That's privileged.

BY MR. NEWMAN

Q.  Please tell me what you discussed.

A.  Anything I discussed with counsel is privileged.

Q.  Ms. Baronoff, it's not. So let's get past you trying to give the directions. You have counsel who is well paid and knowledgeable who will object if she needs to. Okay. So please tell me what you discussed with counsel during the break.

A.  Okay. I have a lot of insecurities about people knowing about my health conditions so I was very embarrassed so I was calming down about that.

Q.  But that doesn't tell me what you discussed with your counsel.

A.  That's what I was doing.

Q.  Calming down?

A.  Yes. I got very upset after you asked me that question and I asked for a break.

6

Q.  I appreciate that. And my question still is what did you discuss with counsel?

A.  I wasn't discussing with counsel.

Q.  So you had no discussions with counsel during the break; is that correct?

A.  I wanted to talk to my sister.

Q.  I asked you if you had any discussion with counsel.

A.  Well, she came in the room too but my sister was there and that's what I really wanted.

Q.  What did you discuss with your sister?

A.  She told me that I was okay and not to worry so much about what people think of me.

Q.  Did you say anything?

A.  To my sister?

Q.  Your sister or to counsel during the break.

A.  I calmed -- I mean I'm calm now.

Counsel for the deponent and the deponent are not supposed to speak about the deponent's testimony during breaks in the deposition. Since Ms. Baronoff, her counsel, and Ms. Baronoff's sister were speaking together in plain sight during each break in the deposition, and given Ms. Baronoff's struggle to respond to questions, it was not inappropriate to inquire as to whether they were discussing Ms. Baronoff's testimony.

Ms. Baronoff asserted that the questions were privileged but neither her counsel nor any other defense counsel asserted the privilege or directed Ms. Baronoff not to respond to the questions.

(C)  <u>120:13-122:23</u>

Q.  Where were you living before that short period of time you were living with your parent?

A.  I lived in Savannah for a trimester and then moved into the condo.

Q.  You were living in school, then you moved to your parents for a short period of time then you moved to the condo; correct?

A.  Right.

Q.  And your parents spent $327,000 so you wouldn't have problems living with them; correct?

A.  Yes. They really did not want me to live with them.

Q  You had problems with them prior to May 2007?

A.  No. But --

Q.  You didn't have any problems with them?

A.  Well, I mean -- I think all families have like some issues.

Q.  Well, you had problems with them going back to high school; correct?

MS. FOTIU-WOJTOWICZ: Object to the form.

THE WITNESS: I mean I wouldn't say I had like problems with them but --

BY MR. NEWMAN

Q.  They didn't write you very harsh letters with regard to you cutting classes and things like that, very harsh letters?

MS. FOTIU-WOJTOWICZ: Object to the form.

BY MR. NEWMAN

Q.  You don't recall that?

A.  I mean -- I'm past that with them. But, yes, they wrote me some nice e-mails.

Q.  Nice you're being facetious; correct?

A.  I don't care. I love my parents but --

Q.  Ms. Baronoff, I'm not asking whether you love them or don't love them. Please it's a lot easier -- Ms. Baronoff, it's a lot easier if you just be responsive, okay. They wrote you harsh e-mails when you were at boarding school; correct?

A.  I gave them a hard time. So, you know, it made more sense for me to live in the condo.

Q.  What was the hard time that you gave them?

A.  I like had a learning disability. It was hard for me to attention in class. Teachers would get frustrated with me and it was hard -- my parents just had a hard time with it.

Q.  So because of your learning disability they had difficulties and bought you a condo so you wouldn't live with them; correct?

MS. FOTIU-WOJTOWICZ: Objection to the form.

BY MR. NEWMAN

Q.  Does that describe it properly?

A.  They bought me a condo so I wouldn't live with them so I would live in the condo; correct.

Q.  Is that because they were not able to deal with your learning disabilities?

MS. FOTIU-WOJTOWICZ: Object to the form.

THE WITNESS:

I wouldn't say it was because they couldn't deal with my learning disabilities. It was because they wanted to not have fighting in the house so they felt it would be better if I lived in the condo.

The claim against Ms. Baronoff arises, in part, from the rental of a condominium, allegedly owned by Ms. Baronoff, to Promise and the rental proceeds being paid to her father, Peter Baronoff. These questions were background as to how Ms. Baronoff came to own the condominium since she had absolutely no resources to purchase same. If the condominium was actually Peter Baronoff's, as it appears to be, then cajoling his daughter, the title holder but not beneficial owner, to rent it to Promise, with Peter Baronoff taking the rental proceeds, would have implication, in this case.

It should be noted that Ms. Baronoff's counsel asserted four objections to form and no other objections.  Other than form, it is not clear what the basis of Defendants' objection is.

**(D)**    156:23-160:19

Q.  Okay. Did you have a lawyer in connection with this lease agreement?

A.  Yes, David.

Q.  David Armstrong was your lawyer?

A.  I didn't have one for myself but --

Q.  I asked whether you had a lawyer in connection with this lease agreement?

A.  I personally did not have a lawyer in connection with this lease agreement but that's not uncommon for a lease agreement.

Q.  Okay. If you say so. Did --

MS. FOTIU-WOJTOWICZ: Move to strike. Move to strike the commentary. It's unnecessary and unprofessional.

MR. NEWMAN: Well, then you know that there is no motion to strike. There is nothing like a motion --

MS. FOTIU-WOJTOWICZ: I'm asking you David to behave professionally towards the witness. Making comments like "if you say so" is not appropriate.

MR. NEWMAN: Excuse me, you have remedies. The remedy is to make a motion --

MS. FOTIU-WOJTOWICZ: I'm asking you as a professional colleague to show my witness some respect. That's what I'm asking. Are you able to comply with my request that you treat the witness in this lawsuit with some respect?

MR. NEWMAN: I have treated her with respect despite the fact she has been evasive, not responsive and a whole bunch of other things, okay. I will continue to do what I believe is necessary. If you have a problem you have remedies. There is no such thing as a motion to strike at this point.  You can go to the Court once the record is complete and make a motion if you think it's appropriate.  If you want to call Judge Goodman now and get him on the phone I would be more than happy because we can repeat to him selective parts of the record. So if you want to make an objection you make it we go on. Anything else you would like to say?

MS. FOTIU-WOJTOWICZ: Yes.

MR. NEWMAN: Please.

MS. FOTIU-WOJTOWICZ: I renew my request.

MR. NEWMAN: Good.

MS. FOTIU-WOJTOWICZ: That you behave professionally.

THE WITNESS: I'm not being evasive. I'm --

MS. FOTIU-WOJTOWICZ: Just let him ask the next question. This is between me and him. You just answer his questions.

MR. KAPLAN: Before we begin I would like the record to reflect that no one in the room necessarily agrees with your characterization of the witness' testimony. I need that on the record. Now you can go on.

MR. NEWMAN: Well, since you didn't take a poll of all your colleagues that's probably not true but --

MS. FOTIU-WOJTOWICZ: We all had lunch together. Would you like to take a poll?

MR. KAPLAN: Did you want to take a vote? Don't push me, David. I was noting something for the record, you don't lodge --

MR. NEWMAN: Mr. Kaplan, don't push you. You have no reason to say anything on the record other than object if you have an objection. So please after buttoning your jacket go sit down and if you have an objection make an objection. Otherwise I am going to move forward. You want to talk more go ahead.

MR. KAPLAN: You weren't listening.

MR. NEWMAN: That wasn't an objection.

MR. KAPLAN: Sir, you are not the arbiter.

MR. NEWMAN: Excuse me, that's not an appropriate --

MR. KAPLAN: You are not the arbiter.

MR. NEWMAN: You want to make it a little louder Mr. Kaplan because the record is being recorded.

MR. KAPLAN: When you start listening I'll lower my voice.

MR. NEWMAN: Okay, thank you Mr. Kaplan. Are you going to sit down or are you going to stand up?

MR. KAPLAN: I am going to stand up.

MR. NEWMAN: It's very daunting when you try to be physical and stand up close to me when you've been three seats down from where you were seating.

MR. KAPLAN: I thought you were joking or withdraw the comment that I'm trying to be physical when I'm ten feet from you.

MR. NEWMAN: I was not joking at all. Because when you made your prior --

MR. KAPLAN: Go on with your examination.

MR. NEWMAN: Thank you, Mr. Kaplan.

MR. KAPLAN: You're welcome, sir.

MR. NEWMAN: I appreciate you addressing me like that.

This is nothing more than extended colloquy amongst counsel arising because Ms. Baronoff's attorney believed her client was not being treated respectfully. There is nothing in the citation which would demonstrate that Ms. Baronoff was treated in any manner other than with respect, understanding, and patience. A review of the complete record makes that self-evident.

**(E)**    <u>181:21-183:19</u>

Plaintiff's Exhibit No. 7 was marked for identification.

BY MR. NEWMAN

Q.   Have you ever seen this document before?

A.   It was sent to me.

Q.   And you forwarded it to your father; correct?

A.   I guess so.

Q.   Well, you guess so. On top --

A.   I don't remember doing it.

Q.   Okay. Do you have an understanding of what your mother was writing to you in the bottom e-mail? Can you read it, please?

A.   If I am the pig -- this is so embarrassing.  "If I am the pig you are the piglet and your father is the hog. Have good day."

Q.   Do you have any understanding what your mother meant by that?

A.   No.

Q.   Did you ask her?

A.   Yes. Of course.

Q.   What did she say?

A.   I don't remember.

Q.   You don't have any recollection of what she said in response when you asked her? Is that your testimony?

A.   Well, she says a lot of things that don't make sense and her responses don't make sense so I don't know what this specifically would have been.

Q.   Whether it made sense or not I'm not asking you. I'm asking what did you discuss with your mother about this e-mail?

A.   I don't -- I have no idea what she would have said about something like this. This is not abnormal for her to say something crazy.

Q.   Again, whether it's abnormal or not I'm asking you what you discussed with her about this e-mail.

A.   I mean --

Q.   Ms. Baronoff, it's not a hard question. My question is very simple. Did you say in words in effect mom, I got this e-mail, what does it mean?

A.   I said mom, this is what I would think I would have said.

Q.   No, I don't want to know you would have said.

A.   I don't remember.

Q.  Excuse me?

A.  I don't remember.

Q.  Fine. That's a good answer. Did you discuss it with your father?

A.  I don't remember.

Neither Ms. Baronoff's counsel nor any other defense counsel objected to any of the questions in this citation. The document referenced was produced in response to Defendants' document requests and the questions relate to that document. Since there are other emails in which Ms. Baronoff's mother accuses her then husband, Peter Baronoff, of criminal activities in connection with his operating Promise, this very short inquiry was seeking any information that might have been related.

**(F)**   <u>186:5-188:21</u>

Q.  Showing you Plaintiff's Exhibit No. 5. That lease agreement, was that ever renewed?

A.  Yes.

Q.  How long was it renewed for?

A.  I don't know the exact amount of time that the next lease agreement was made for.

Q.  Did you prepare an extension of lease agreement?

A.  I believe so.

Q.  Where did you get the extension?

A.  I don't remember.

Q.  How did you find out that Promise wanted to renew the lease?

A.  I don't remember.

Q.  Did your dad tell you?

A.  I don't remember.

Q.  Did Mr. Armstrong tell you?

A.  I don't remember.

Q.  Did you speak to anyone else at Promise about the lease of your co-op by Promise other than Mr. Armstrong and your dad?

A.  I don't remember.

Q.  During the break that we just took did your attorney tell you to say "I don't remember" more often?

A.  During.

Q.  Excuse me --

A.  No, during the break I expressed frustration that I feel like you're picking on me even though you know I have a learning disability.

12

Q.   Okay. You're entitled to your feelings. Did your counsel tell you to say, "I don't recall" more often?

A.   My counsel said that we can leave if I feel this upset and that is what we discussed.

Q.   That's not what I asked you though. I asked you --

A.   Because I'm not feeling that great. I feel exploited because you've read all my e-mails. You already knew I was on medication. You know my parents pick on me for that. You know what type of boarding school I went to that specialized in learning disabilities. You mentioned my boarding school. You know all these things about me. So I feel exploited.

Q.   Sorry you feel exploited.

A.   Okay.

Q.   Did your counsel tell you to say with greater regularity that you don't recall?

A.   She did not.

Q.   Okay.

A.   We did not discuss anything regarding the case.

Q.   Okay. If you feel as though you cannot go on any further at any time we can surely discuss that because you should not --

A.   I want to go on further, thank you.

Q.   Then you should do less complaining about feeling bad.

MS. FOTIU-WOJTOWICZ:  Enough.

MR. NEWMAN: Are you done? Are you done?

MS. FOTIU-WOJTOWICZ:  Ask your questions. Don't lecture the witness. Please ask your next question. She said she's prepared to go on. Ask her a question. Don't ask her to stop complaining. You asked her what was discussed during the break and she told you. I don't know why you're complaining about the answer now. Ask the next question. Stop being -- stop picking on her.

The question in this citation probes whether Ms. Baronoff was coached to respond, "I don't remember." This was shortly after a break requested by Ms. Baronoff during which she spoke with her counsel. Thereafter, she changed her cadence and went into an "I don't remember" mode. Ms. Baronoff stated that she felt "exploited" and she was, once again, offered the opportunity to suspend the deposition if she felt the need to; Ms. Baronoff declined the offer.

   **(G)**   204:12-207:13

Q.   What was your monthly payment at the Icon in 2016?

A.   My monthly payment at the Icon 2016, what range of 2016? We're talking about this year?

Q.   I'm talking about in November 2016 when this first amendment was executed.

A.   Oh, okay. For unit 512?

Q.   That's the unit you told me you lived in.

13

A.   $2,200.

Q.   $2,200. So the delta between what you were receiving on the co-op and what you had to pay in rent was about $650; correct?

A.   Yes.

Q.   If you multiply that times 12 that's approximately $7,200, $7,300; correct?

A.   I'm -- I don't know the exact number. That sounds about right.

Q.   And the taxes on the co-op exceeded $7,200 a year, did they not?

A.   Yes.

Q.   Who paid the difference that you couldn't pay for from the rent from the co-op?

A.   I was still receiving help.

Q.   From whom?

A.   My father.

Q.   Did anyone tell you who was going to -- withdrawn. Did anyone from Promise tell you why they needed to extend -- why they wanted to extend the lease?

A.   Actually -- can I actually go back? I don't know that I received help on my taxes from my father that year. I may have used my other resources. I don't know that I actually did. I may have had to do like a payment plan. I don't think -- I don't know for a fact. I would have to look. We have to check to see. I really don't know.

Q.   What other resources did you have in 2016 to pay for the difference, the delta that we talked about?

A.   I had like a savings account. So -- that I really did not want the spend money. I may have been forced to. I don't remember exactly what happened but I don't know for a fact that he gave me money for that. I don't know.

Q.   What was the source of the funds in the savings account?

A.   Bat Mitzvah money.

Q.   And your Bat Mitzvah was how many years prior to 2000 --

A.   I didn't have access to it for a very long time.

Q.   Excuse me. Your Bat Mitzvah was how many years prior to 2016?

A.   The exact number?

Q.   Yes.

A.   15 maybe. Approximately 15.

Q.   15 years? I'm trying to find the number of years between your Bat Mitzvah and 2016 when this document was executed?

A.   So 2000 -- it was 12 years prior.

Q.   So you're saying you were 25 years old in 2016?

14

A.   No. No, I was -- I was 30. So 30 minus like --

Q.   13 is 17 years?

A.   17, okay.

Q.   So between when you were 13 years old and 30 years old you did not have access to your Bat Mitzvah funds; is that true?

A.   I didn't have access to it until I was 29.

Q.   And why didn't you have access from 13 to 29?

A.   I don't know.

Q.   Why didn't you have access when you reached the age of majority? Did someone -- you're shrugging your shoulders.

A.   I don't know.

Q.   Did someone tell you you couldn't get to those funds?

A.   I don't know.

There are no objections reflected in this citation. Since it was not at all clear who was receiving the rent proceeds from the condominium rented by Promise, where those proceeds were going and whether Ms. Baronoff was paying the maintenance costs while she was living at a difference venue, these questions were designed to determine how Ms. Baronoff, who had no employment, was paying the condominium maintenance costs and taxes.

**(H)**   217:20-221:21

Q.   It says in part quote "my dad is not involved with this apartment and my checks cannot be on his desk" period closed quote. See that?

A.   Maybe that was what was happening. Maybe they were landing on his desk.

Q.   You say your dad is not involved with this apartment. That's not true, is it?

MS. FOTIU-WOJTOWICZ: Object to the form.

MR. NEWMAN: You can answer.

THE WITNESS: Well, he wasn't involved in the apartment. It was my apartment.

BY MR. NEWMAN

Q.   So when he got the rent checks even though it was your apartment he still wasn't involved; correct? MS. FOTIU-WOJTOWICZ: Object to the form. BY MR. NEWMAN

Q.   Is that your testimony?

A.   I was paying him back and then at that stage I was collecting my rent. I have said that.

Q.   How were you paying him back?

A.   I owed him a lot of money.

Q.   How did you pay him back?

9385522 v1

A.   Well, I was giving him my rent checks as a form of paying back.

Q.   What were you paying him back for?

A.   My rent. My car. I mean a lot of things. My --

Q    So if you were paying him back –

MS. FOTIU-WOJTOWICZ: The witness wasn't done answering.

BY MR. NEWMAN

Q.   If you were paying him back --

MS. FOTIU-WOJTOWICZ: No. You asked a question and she was answering it and then you interrupted her.

BY MR. NEWMAN

Q.   If you were paying him back -- if you were paying him back --

MS. FOTIU-WOJTOWICZ: Let the witness --

MR. NEWMAN: Is there a problem?

MS. FOTIU-WOJTOWICZ: Let the witness finish her answer. You interrupted her. When she's interrupted you and pointed it out she's apologized and let you finish. Please let her finish her answer.

THE WITNESS: I was paying him back for my health insurance, my condo insurance, my taxes for my condo every year. The total sum of my yearly bills that I was paying him back were approximately $50,000.

BY MR. NEWMAN

Q.   You were paying him back $50,000 a year is what you're saying?

A.   Approximately.

Q.   Where did you get $50,000 a year?

A.   It was very difficult. My condo wasn't coming close to $50,000.

Q.   You said you were paying him back --

A.   I was trying to.

Q.   You said you were paying him back $50,000 a year?

A.   I was trying to.

Q.   I didn't ask if you were trying to

A.   I never did it. I never did it. I was trying to.

Q.   Were you still paying the taxes for your co-op in 2017?

MS. FOTIU-WOJTOWICZ: Object to the form.

MR. NEWMAN: What's your objection?

MS. FOTIU-WOJTOWICZ: Compound.

MR. NEWMAN: That's a compound question?

MS. FOTIU-WOJTOWICZ: Yes.

MR. NEWMAN: You can answer.

THE WITNESS: No, he was paying the taxes for my condo.

BY MR. NEWMAN

Q.   So how were you paying him back if you didn't have enough money to even pay for the taxes of the condo?

A.   That's why we rented out my condo. That's why I was always renting out my condo.

Q.   You said even with the rent if you were paying the rent on the Icon building there wasn't enough money to even cover the taxes on the condo; correct?

A.   I didn't say I paid him back. I said I was trying to pay him back.

Q.   What I'm saying if you didn't even have enough money to cover the taxes there was no money you had to pay him back; right?

A.   Isn't it better I try to pay him back than I don't pay him back at all?

Q.   Ms. Baronoff, it's not for me to make any judgments. All I'm saying when you net out the payments that you needed for the Icon as opposed to the rent you were getting from the condo you said there wasn't even enough money to cover the taxes for the condo; correct?

A.   Right. So at some point I had to stop owing him money and I eventually just sold the condo and I accepted that he had given me a really generous gift and I knew it was time for me to just stop taking advantage of a really generous dad.

Again, it is difficult to discern what objections in this citation would warrant the appointment of a Special Master. Ms. Fotiu-Wojtowicz objected because she felt Ms. Baronoff was not allowed a full opportunity to respond, which she was. The only other objection is that one question was "compound," which it clearly was not.

**(I)**   <u>240:17-243:2</u>

Q.   Let me ask you before you read it. You've mentioned your learning disabilities multiple times. Can you tell us what your learning disabilities are.

A.   Auditory processing order, ADHD. I receive extended time for testing because I require it but I have like full competency to understand documents and I am very capable of understanding documents.

Q.   When is the last you asked for more time on a test, 15 years ago?

A.   Sure. That doesn't mean I wouldn't need time to go over a document.

Q.   Ma'am, I'm not asking you anything other than was the last time you asked for additional time on a test about 15 years ago?

A.   That doesn't mean I do not need a minute to read a document.

Q.   Can you please answer my question?

A.   Maybe closer to -- more like 13 years ago.

Q.   Now, the documents that you've seen that have been put in front of you have you had an opportunity to read them before you answered?

A.   I was looking for a lot of documents in the last few days so I didn't really read anything too thoroughly because I had a lot of things I needed to do.

Q.   That wasn't my question, ma'am. My question is when I put these documents in the front of you you've had the opportunity to read them; correct?

A.   I would have needed more time to thoroughly read them.

Q.   Did you ever ask me until now for additional time to read them?

A.   I probably should have.

Q.   But did you ask me for additional time?

A.   I didn't.

Q.   Did I deny you an opportunity to read them to the fullest extent you wanted to?

A.   You didn't but I feel like the way you're speaking to me is making me very nervous because I feel like you're making me feel like very stupid.

Q.   Well, I appreciate that feeling. I'm sorry.  You feel that way but my question to you is have I stopped you --

A.   I'm sure you do appreciate by the way.

Q.   My question is have you been stopped by me from taking as much time as you wanted to read the document?

A.   No, but I've been rushed.

Q.   Did you tell anyone in this room that you were rushed in reading the documents?

A.   Not allowed to talk about the case when I leave this room.

Q.   So you haven't even mentioned it to your counsel; correct?

A.   I have not mentioned it to my counsel but I have said that I feel exploited.

Q.   I understand that. Unfortunately that's -- this is a deposition and it's a necessary evil so to speak. So you want to go back and look at any of the documents to change any of your answers or see if you want to revise any of your answers?

A.   Not right now. I would like to finish.

     Once again, this citation contains no objections. These questions seek clarification as to whether Ms. Baronoff was deprived of a full opportunity to review the deposition exhibits after she suggested that her disabilities necessitate providing her additional time. Ms. Baronoff was offered the opportunity to go back and review any deposition exhibits; she declined.

     **(J)**   <u>267:11-270:12</u>

Q.   Have you ever seen this document before?

A.  Okay.

Q.  Have you seen this document before?

A.  Sure.

Q.  This is an e-mail your dad sent you on July 6,2016; correct?

A.  Right.

Q.  Do you have any idea why your father sent this to you?

A.  I wanted to go to nursing school.

Q.  When did you decide you wanted to go to nursing school?

A.  Actually don't know if I ever saw this. Now that I'm thinking about it because I thought I sent this to him when you said it. I probably would have done --    I honestly don't think I ever saw this.

Q.  Is the e-mail address on the to line the top e-mail your correct e-mail address?

A.  Yes.

Q.  Did you find this document when you searched through your e-mails?

A.  Well, you asked me to specifically look for things that were conversations between Shanna and Peter that related to Boca Grande. This is a one year nursing degree.

Q.  Ms. Baronoff --

A.  I wouldn't have -- this has no relevance to what I was asked to look for. Maybe it was there but I        would not have paid attention it to because this would have been a big waste of my time.

Q.  Ms. Baronoff, all I'm asking you is if you saw this document when you reviewed your e-mails.

A.  It probably was there but based on the forwarding title I would never have opened it in the last few days. What does it say, are more nurses needed in the U.S.A. looking for Boca Grande. Conversations between Shanna and Peter.

Q.  So what you're saying when you looked at e-mails you only looked for documents that had a re: or a subject –

A.  I looked for what you wanted.

MS. FOTIU-WOJTOWICZ: Let him finish his question.

BY MR. NEWMAN

Q.  So you're saying when you reviewed your e-mails you only pulled out documents that said in the re: or subject matter Boca Grande?

MS. FOTIU-WOJTOWICZ: Objection, mischaracterization.

THE WITNESS: I looked for what I was I thought I was supposed to look for.

BY MR. NEWMAN

Q. Other than putting in the name Peter Baronoff or his e-mail address how did you know whether a document was relevant to this case without looking at it?

A. There was a specific realm of what I was told that you wanted me to provide.

Q. I understand. I'm asking you in terms of searching for documents you told me you put in the name Peter Baronoff?

A. I did.

Q. And you put in his e-mail address; correct?

A. I --

Q. Is that correct?

A. This is a father/daughter thing. This is not relevant as far as I'm concerned. If my father knows that I want to go to nursing school and he's supporting my dream to do so that's relevant to my father and I. I think that's invasive. It's not relevant to the case.  He is supporting me in the fact that I wanted to do something.

Q. Ms. Baronoff, all I'm trying

A. No, you're not.

Q. Ms. Baronoff, the question is did you see this document when you searched for your e-mails?

A. I don't know.

   This citation reflects one objection for "mischaracterization." The questioning started with a document that was produced in response to Defendants' request. It then broadened to the more general issue of document production because it became apparent that Ms. Baronoff did not conduct a full search months earlier in response to Plaintiff's document requests, but rather searched only days before her deposition and those documents were produced the day prior to the deposition.

   **(K)**   <u>282:4-284:23</u>

Q. The question is did you speak with your father about the issues in the lawsuit not whether we agree or disagree?

A. Father/daughter stuff but not really.

Q. Again, not asking about father/daughter stuff --

A. I don't --

Q. Excuse me. Asking about the issues in the lawsuit.

A. I don't think so.

Q. So you understand why you're being sued; correct?

A. Yes.

Q. What's your understanding?

9385522 v1

A.  Of why I'm here?

Q.  Yes.

A.  Can I take a break?

Q.  No.

MS. FOTIU-WOJTOWICZ: After you answer this question you can.

MR. NEWMAN: No, you can't. We have to finish.

MS. FOTIU-WOJTOWICZ: Okay, so you -- I want to get this on the record the witness says she is tired and needs to take a break and you're denying her the request to take a break even after she answers the pending question?

MR. NEWMAN: We can't take a break every 20 minutes.

THE WITNESS: Just a very heavy question and I'm falling asleep.

MR. NEWMAN: I offered her the opportunity to terminate earlier. You declined. Even though your client said she wanted to. So I gave her that opportunity. We just took a long break --

MS. FOTIU-WOJTOWICZ: She never said she wanted to finish earlier. Never said --

MR. NEWMAN: You're right, she didn't say that.

MS. FOTIU-WOJTOWICZ: Thank you. Please let's try to speak truths.

MR. NEWMAN: It was my imagination that you said that but the record will reflect whatever the record will reflect.

THE WITNESS: I never said I wanted to finish early.

MR. NEWMAN: Okay, you didn't say it. My mistake. I heard it wrong.

THE WITNESS: I insisted on staying. I'm just getting very tired.

MR. NEWMAN: We're going to move forward. I can't twist your arm to stay if you want to take a break but I'm saying the last break was only not too long ago. I would like to move forward.

MS. FOTIU-WOJTOWICZ: 30 minutes ago.

MR. NEWMAN:  That's not a long time but we don't have to argue over it. Would you like to move on?

THE WITNESS: My gosh. I really --

MS. FOTIU-WOJTOWICZ: Can we read back the last question?

THE WITNESS: Can you read the question again?

BY MR. NEWMAN

Q.  I'm going to withdraw the question. What is your understanding of the claim against you in this lawsuit?

A.  The claim against me in this lawsuit is for the total sum of rent payments for the term that Promise rented my apartment and there is -- it's a layered complicated claim but essentially.

21

This citation reflects a discussion as to whether Ms. Baronoff could take yet another break. Approximately twenty minutes earlier (twenty deposition pages), a fourteen minute break was taken at Ms. Baronoff's request. A little more than an hour prior to that, a twenty two minute break was taken at Ms. Baronoff's request. Less than an hour prior to that, Ms. Baronoff requested a break which lasted seventeen minutes. Prior to that there was a lunch break which took an hour and eighteen minutes because of Ms. Baronoff's late return.

At multiple times, both on the record and off, Plaintiff offered Ms. Baronoff the opportunity to adjourn and reschedule the deposition if she was not feeling well. Ms. Baronoff declined. Rather, she took an inordinate number of long breaks which impeded the deposition and were, to Plaintiff's belief, an opportunity for Ms. Baronoff's counsel to provide guidance.

    **(L)**   <u>291:9-22</u>

Q.  Thank you. Want me to ask your questions for you? You ever meet Jim Hopwood?

A.  Maybe. I don't know.

Q.  Do you know what Jim Hopwood did at Promise?

A.  Maybe. I don't know. If I have to think about it that much not like someone I know. I can tell you that.

Q.  Do you know what he looks like?

A.  Potentially. I don't know.

Q.  Do you know what he did at Promise?

A.  I don't know who he is.

Q.  I'm just asking you. Do you know whether he was good, bad or indifferent at his job?

A.  No idea. I don't know who he is.

While Mr. Hopwood's counsel was preparing to ask his questions, Plaintiff's counsel asked some additional questions to save Mr. Hopwood's counsel some time. And, it was successful since Mr. Hopwood's counsel only had one question thereafter.

## IV.    <u>Conclusion.</u>

Defendants have failed to demonstrate the kind of conduct at Ms. Baronoff's deposition which would warrant the appointment of a Special Master for the multitude of depositions which will follow. Therefore, Plaintiff respectfully requests that Defendant's application be denied in all respects.

Dated:  January 3, 2023

By:_____*/s/ David B. Newman*_____
David B. Newman, Esq.
Florida Bar No. 75377
SILLS CUMMIS & GROSS P.C.
*Counsel for Plaintiff*
101 Park Avenue, 28th Floor
New York, New York 10178
Tel:  212-500-1532
Fax:  212-643-6500

By:_____*/s/ Paul S. Singerman*_____
Paul S. Singerman, Esq.
Florida Bar No. 378860
BERGER SINGERMAN LLP
*Counsel for Plaintiff*
1450 Brickell Avenue, Suite 1900
Miami, Florida 33131
Tel:  305-755-9500
Fax:  305-714-4340

9385522 v1