**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 21-21543-CIV-GOODMAN**

**[CONSENT CASE]**

ROBERT MICHAELSON OF ADVISORY
TRUST GROUP, LLC, in his capacity as
Debtor Representative and Liquidating Trustee,

     Plaintiff,

v.

PETER BARONOFF, et al.,

     Defendants.

_____/

## ORDER ON MYRIAD MOTIONS TO DISMISS AMENDED COMPLAINT

"Less is more."

-   (Architect Ludwig Mies van der Rohe, (1886 – 1969))

Many different people have been credited with the well-known saying, "If I had more time, I would have written a shorter letter": Mark Twain, George Bernard Shaw, Voltaire, Blaise Pascal, Winston Churchill, Cicero, John Locke and Ben Franklin, to name but a few.

Regardless of who actually originated the comment, the reality is that it is often more difficult to write succinctly and cogently -- and easier to submit a longer and more-

unwieldy written communication.

Which brings us to Plaintiff's Amended Complaint [ECF No. 60].

The pleading is 227 pages long, and it asserts 1,120 numbered paragraphs of allegations against 12 named defendants and 100 John Doe Defendants. It alleges 33 Counts, including a final one for declaratory judgment.

All named Defendants have filed motions to dismiss the Amended Complaint. Many of them filed joint motions, so there are five separate motions [ECF Nos. 95; 99; 102-04]. The motions raise many of the same arguments, though some motions assert unique arguments applicable to only a specific defendant (or defendants) or focus only on arguments which a particular defendant (or group of defendants) chose to raise.

At bottom, though, all five motions contend that the 227-page Amended Complaint fails to state claims.

Is it possible that such a voluminous complaint, with so many allegations, could somehow fail to adequately allege claims? The answer, for the reasons outlined below, is *yes*.

So the Court will be **granting** all five motions. But the dismissals will be without prejudice. The necessary corrections will involve far more than a mere procedural tune-up, however. The Complaint is, to be sure, an impermissible shotgun pleading, as it incorporates every paragraph into every count and lumps Defendants together without indicating which Defendant did what.

But drafting a Second Amended Complaint will require far more than breaking down incorporated counts into specific counts against particular defendants, based on targeted and focused factual allegations. Instead, it will require a comprehensive re-write, modifying and supplementing and editing allegations on both procedural and substantive grounds. It likely will require a substantial amount of additional financial analysis of documents and supplemental legal research. In other words, it will require a *considerable* amount of work.

That financial analysis may well have occurred (and hopefully has *already* occurred), as Plaintiff filed his Amended Complaint on April 16, 2021 [ECF No. 60], which means he and his team have had more than two additional years to evaluate the records and investigate their significance to the claims asserted. Regardless of whether Plaintiff has made meaningful headway reviewing the records and analyzing discovery he presumably has received from Defendants over the past two years, significant effort will be needed to rework the lawsuit. To use a car metaphor, we're not talking about an oil change and a tune up; a 50,000-mile comprehensive servicing is what is needed. Thus, the Court will provide Plaintiff with **60 days** (from the date of this Order) to file a Second Amended Complaint.

## General Factual Background

The plaintiff here is Robert Michaelson ("Plaintiff" or "Michaelson"), of Advisory Trust Group, LLC, who filed the lawsuit in his capacity as debtor representative and

liquidating trustee of the estates of Promise Healthcare Group, LLC ("PHG") and its various debtor affiliates.

PHG and its debtor affiliates filed a Chapter 11 Voluntary Petition ("Petition") in the United States Bankruptcy Court for the District of Delaware on November 5, 2018, captioned *In re Promise Healthcare Group, LLC, et al.*, No. 18-12491-CTG. On September 17, 2020, the Bankruptcy Court entered an order confirming the Modified Second Amended Joint Plan, [No. 18-12491-CTG (D. Del), ECF No. 2072], which became effective on October 1, 2020.

On October 28, 2020, Michaelson filed his initial Complaint in the United States District Court for the District of Delaware. *See* [*Michaelson v. Baronoff, et al.*, No. 20-1465-MN (D. Del.), ECF No. 1]. The Complaint set forth 23 counts against Defendants in their alleged capacities as former directors, officers, principals or persons with "executive control over" two of PHG's debtor affiliates -- Promise Healthcare, Inc. ("PHI") and Success Healthcare, LLC ("Success").

On February 19, 2021, Defendants filed separate Motions to Dismiss based on, *inter alia*, the Complaint failing to state a claim under Rule 12(b)(6) and constituting a "shotgun pleading" which failed to meet the pleading requirements of Federal Rule of Civil Procedure 8. Michaelson elected to voluntarily amend the Complaint. On April 16, 2021, Michaelson filed a Notice of Consent to Transfer Venue to the United States District Court for the Southern District of Florida, [Case No. 20-1465-MN (D. Del.), ECF No. 59],

4

followed by the Amended Complaint.

As discussed below, Plaintiff makes many allegations "upon information and belief," a standard which Defendants view with alarm and suspicion.

### Promise Healthcare Group, LLC

PHG is the sole owner of Success and Promise Healthcare Holdings, Inc. ("PHH") [ECF No. 60, ¶ 153]. PHH owns 96% of PHI. *Id*. The remaining 4% is owned by non-debtor minority shareholders. *Id*.

### Success and its Board and Officers

According to the Amended Complaint, Defendant Brian Dunn ("Dunn") was a director of Success from March 17, 2014 to April 26, 2016 and CEO of Success from March 17, 2014 to September 2017. *Id*. at ¶¶ 17-18. Defendant David Armstrong ("Armstrong") was allegedly an executive vice president and secretary of Success from March 17, 2014 to December 6, 2017; Defendant Richard Gold ("Gold") was allegedly the president and COO of Success from March 17, 2014 to July 12, 2018; Defendant Bryan Day ("Day") was allegedly an executive officer at Success from March 17, 2014 to November 2017; and Defendant Richard Cohen ("Cohen") was allegedly the senior vice president and chief administrative officer of Success from May 27, 2015 to October 15, 2017. *Id*. at ¶¶ 17-29. Aside from additional codefendants, no other board members or officers are named or described.

**PHI and its Board and Officers**

According to the Amended Complaint, Armstrong was also an executive vice president and secretary of PHI from March 17, 2014 to December 6, 2017; Gold was also the president and COO of PHI from March 17, 2014 to July 12, 2018; Day was also an executive officer at PHI from March 17, 2014 to November 2017; Dunn was also the executive vice president of PHI from March 17, 2014 to September 2017; and Cohen was also the senior vice president and chief administrative officer of PHI from May 27, 2015 to October 15, 2017. *Id.* at ¶¶ 17-29. Aside from additional codefendants, no other board members or officers are named or described.

**Defendants**[1]

Defendant Peter Baronoff ("Baronoff") is or was (i) a principal (defined below), (ii) a board member of PHI from March 17, 2014 through May 11, 2018 (during which time he was the sole board member from April 26, 2016 through May 11, 2018), (iii) a board member of Success from March 17, 2014 through May 11, 2018 (during which time he was the sole board member from April 26, 2016 through May 11, 2018), (iv) a board member of PHG from April 26, 2016 through May 11, 2018, (v) an officer of PHI from March 17, 2014 through March 13, 2018 through his role as the president and CEO of PHI, (vi) an

---

[1]    All of Plaintiff's initial, identification-type allegations about the Defendants in the Amended Complaint were made upon information and belief. The defendant-by-defendant descriptions are excerpted here, from the Amended Complaint, in virtually verbatim form.

officer of Success from March 17, 2014 through March 13, 2018 through his role as the president and CEO of PHI, and (vii) a shareholder of PHI. Baronoff, who resides in California, is also the recipient of certain fraudulent and/or preferential transfers.

Defendant Keith Reuben ("Reuben"), a Maryland resident, was (i) a board member of PHI and Success from March 17, 2014 through April 26, 2016 (during which time he was a 50% owner of Specialty Finance, who received approximately $3.5 million from the Companies[2] during the applicable time period) and (ii) a board member of PHG from April 26, 2016 through March 31, 2018. Reuben is also the recipient of certain fraudulent and/or preferential transfers.

Defendant Dunn, a Utah resident, was (i) a board member of Success from March 17, 2014 through April 26, 2016, (ii) an officer of Success from March 17, 2014 through September 2017 through his role as the CEO of Success and/or his position of executive control over operations at Success, and (iii) an officer of PHI from March 17, 2014 through September 2017 through his role as the executive vice president of PHI and/or his position of executive control over operations at PHI. Dunn *may* also be the recipient of certain fraudulent and/or preferential transfers. (Plaintiff himself used the equivocal "may" language in his Amended Complaint.).

Defendant Armstrong, a Florida resident, was an officer of PHI and Success from

---

[2]     The Amended Complaint defines the term "Companies" to mean Success together with PHI. [ECF No. 60, p. 2].

March 17, 2014 through December 6, 2017 through his role as the executive vice president, general counsel, chief compliance officer and secretary of PHI and Success and/or his position of executive control over operations at PHI and Success. Armstrong *may* also be the recipient of certain fraudulent and/or preferential transfers. (same).

Defendant Gold, a Florida resident, was an officer of PHI and Success from March 17, 2014 through July 12, 2018 through his role as the president and COO of PHI and Success and/or his position of executive control over operations at PHI and Success. Gold *may* also be the recipient of certain fraudulent and/or preferential transfers. (same).

Defendant James Hopwood ("Hopwood"), a Texas resident, was an officer of PHI and Success from March 17, 2014 through October 13, 2018 through his role as the executive vice president, CFO and treasurer of PHI and Success, and/or his position of executive control over operations at PHI and Success. Hopwood *may* also be the recipient of certain fraudulent and/or preferential transfers. (same).

Defendant Day, a Louisiana resident, was an officer of PHI and Success from March 17, 2014 through November 2017 through his role as the executive vice president at PHI and Success and/or his position of executive control over operations at PHI and Success. Day *may* also be the recipient of certain fraudulent and/or preferential transfers. (same).

Defendant Stan Grabish ("Grabish"), a Florida resident, was an officer of PHI and Success from May 24, 2015 through at least the Petition Date (November 5, 2018) through

his role as Senior Vice President—Strategic Planning and Financial Analysis at PHI and Success and/or his position of executive control over operations at PHI and Success. Grabish *may* also be the recipient of certain fraudulent and/or preferential transfers. (same).

Defendant Cohen, a Florida resident, was an officer of PHI and Success from at least May 27, 2015 through at least October 15, 2017 through his role as the senior vice president, chief administrative officer of PHI and Success and/or his position of executive control over operations at PHI and Success. Cohen *may* also be the recipient of certain fraudulent and/or preferential transfers. (same).

Defendant Steven Helland ("Helland"), a Texas resident, was an officer of PHI and Success from June 2014 through November 3, 2018 through his role as senior vice president of PHI and Success and/or his position of executive control over operations at PHI and Success. Helland *may* also be the recipient of certain fraudulent and/or preferential transfers. (same).

Defendants Malinda and Shanna Baronoff reside in Florida.

The 100 John Doe Defendants are any employees, officers, managers and/or directors of the Companies and/or any of their subsidiaries which owed duties to the Debtors and their estates as may be subsequently discovered.

### The Primary Theme of the Allegations

Plaintiff contends that the Companies were injured by fraudulent and preferential transfers, unlawful distributions, breaches of fiduciary duties and breaches of contract. He says that Defendants' actions diminished the Companies' available liquidity, resulting in a perpetual cash crisis (and an inability to timely pay their debts) since as early as March 2014, when the Companies emerged from a settlement reorganization.

More specifically, Plaintiff alleges that for more than four years -- between the settlement reorganization and the Companies' filing for Chapter 11 protection on November 5, 2018 -- the directors and officers prolonged the Companies' lives by continually stretching payments to physicians, vendors, and other creditors while borrowing from secured lenders based on the provision of misleading information.

The Amended Complaint alleges that the Companies' directors and officers were aware or should have been aware of numerous, flagrant red flags regarding the Companies' deteriorating liquidity positions and their inability to timely pay vendors and physicians. But, Plaintiff alleges, the Company Directors failed to institute adequate financial controls or monitoring systems at the PHI and Success entity levels.

Further, he alleges, despite the Companies' liquidity crises, the Company Directors and Officers caused the Companies to pay millions of dollars in dividends to insiders and the Companies' parent entities and to waste millions more in risky investments unrelated to the Companies' business model and/or did not take appropriate

action to prevent such imprudent spending.

According to the Amended Complaint, the Company Officers provided misleading financial information to the PHI and Success boards, as well as the board of the Companies' parent entity, PHG (collectively, the "Boards" and each a "Board"), preventing such Boards from understating the true financial deterioration of the Companies. The Company Directors and Officers allegedly delayed the delivery of independent audits, and they provided misleading information to prevent the audits from including going concern qualifications in 2014 and 2015 and then to prevent the going concern qualifications included in 2016/2017 audits from timely reaching vendors and creditors.

Under Plaintiff's theory of the case, the Company Directors and Officers used the better-performing hospitals to subsidize the weaker-performing hospitals, without any reasonable prospect of repayment, to the detriment of the estates and creditors of the better-performing hospitals. These subsidies allowed the weaker hospitals to survive longer than they should have and to incur debt beyond their ability to repay. Finally, the Amended Complaint alleges, the Company Officers failed to adequately prepare and budget for a long-awaited change in federal hospital reimbursement rates that they knew would significantly and negatively impact the already-struggling businesses.

The Amended Complaint describes these financial scenarios as a "carnival," explaining that it finally stopped when the Companies' secured lender declared them in

default and refused to provide further loans, necessitating affiliates of a shareholder of PHG to lend the Companies $15 million as financing to enter Chapter 11. By the Petition Date of November 5, 2018, the Companies and their unsecured creditors were "left holding the bag," which had grown considerably since 2014. Specifically, over those four years, the Companies' accounts payable mushroomed by $30 million while their net income collapsed from negative $12 million to negative $26 million.

The lawsuit seeks to recover from the Company Directors and Officers damages for breach of their respective fiduciary duties of care and loyalty, to recover dividend payments from the Company Directors, to avoid and recover fraudulent transfers from Defendants, to disallow any claim of any Defendant, and to equitably subordinate any claims of the Company Directors and Officers.

### The iCare Transaction

iCare was a cloud-based vendor for electronic health records ("EHR"). [ECF No. 60, ¶¶ 385-86]. In February 2017, PHI and Success entered into transaction documents with iCare, committing to "go live" with a new EHR platform by November 2017. *Id.* at ¶¶ 437, 444-45. As part of these February 2017 transactions, Baronoff also became a director of iCare. *Id.* at ¶ 438. [Thus, he was simultaneously a director of PHI, Success, and iCare.].

Between February and December 2017, "PHI and/or Success" had allegedly invested $4.5 million into iCare's EHR platform. *Id.* at ¶ 447. But, on January 22, 2018, PHI

and Success terminated their relationship with iCare, and iCare's EHR platform never got off the ground. *Id*. at ¶¶ 454-55.

### PHI's Investment in the Rejuvenation Center

Baronoff also served as CEO of the Rejuvenation Center, which offered anti-aging, integrative medicine, and cosmetic therapies. *Id*. at ¶¶ 457, 464. The Rejuvenation Center allegedly promoted the business of Baronoff's wife. *Id*. at ¶¶ 468-70.

The Rejuvenation Center opened in May 2017, and, allegedly, "PHI invested millions of dollars in the Rejuvenation Center." *Id*. at ¶¶ 461, 466. Around October 25, 2017, the Rejuvenation Center decided to close. *Id*. at ¶ 472.

### Post-Motion Practice Developments[3]

As noted, Defendants collectively filed five motions to dismiss. Plaintiff filed opposition responses and Defendants filed replies.

But Defendant Hopwood's motion to dismiss [ECF No. 104] also included an incorporated motion to strike Plaintiff's Jury Demand, arguing that his employment agreement prohibits jury trials. After the motion was fully briefed, however, Hopwood and Peter Baronoff each submitted (along with Plaintiff) a stipulation concerning waiver of jury trial, and the Undersigned then entered the proposed Orders. [ECF Nos. 162; 191].

---

[3]     In his Opposition to the dismissal motion filed by Grabish and Helland [ECF No. 95], Plaintiff conceded that Count XXXI (entitled "disallowance of all claims") does not apply to either Defendant. [ECF No. 116, p. 18]. This concession explains that Count XXXI applies only to Defendants named in Counts XX through XXX -- and then notes that Grabish and Helland are not included in any of those counts.

This resulted in a waiver of the jury trial demand for the following counts against Peter Baronoff: breach of fiduciary duty count, breach of duty of loyalty count, breach of contract count, liability for PHH/PHG equity distributions count under Florida statutory law, liability for PHG equity distributions count under California statutory law, liability for annual equity payments and the disguised equity count under Florida statutory law (Counts I, XII, XIII, XV, XVI, XIX). This also resulted in a waiver of the jury trial demand for the following counts against Hopwood: breach of fiduciary duty and equitable subordination (Counts V and XXXII).

The Court held a four-and-a-half hour, in-person hearing on the motions to dismiss [ECF No. 205]. During the hearing, defense counsel argued, among other points, that the Amended Complaint did not specifically allege that certain Defendants had discretionary authority over, and the power to prevent, the complained-of actions. Defense counsel argued that Plaintiff's actual sole basis for the breach of fiduciary duty allegations was merely Defendants' titles (e.g., they were officers). Phrased differently, defense counsel argued that the Amended Complaint did not allege adequate facts regarding their clients' job duties and responsibilities to demonstrate that each officer had actual authority to exercise "executive control over operations" at the Companies.

Because of these defense arguments, the Undersigned required [ECF No. 207] Plaintiff to file a response pinpointing the specific paragraph numbers where the "control" allegations are asserted or to concede that the allegations are lacking. Although

the Order imposing this requirement mentioned only Defendants Grabish and Helland (because their counsel submitted under-seal written questions targeting the issue), Plaintiff's response [ECF No. 212] also included information about Defendants Dunn, Armstrong, Gold, Day, and Cohen.

**Applicable Legal Standards and Analysis**

Overarching Standard -- Motion to Dismiss

A plaintiff is obliged "to provide the 'grounds' of his 'entitle[ment] to relief'" beyond "labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The plaintiff must provide "enough facts to state a claim to relief that is plausible on its face". *Id.* at 570. The plausibility standard does not rise to a "probability requirement," but requires "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also*, *William Wash., PA v. McGladrey & Pullen, LLP*, No. 10-81078, 2011 WL 13227826, at *2 (S.D. Fla. Apr. 19, 2011) ("Courts need not accept unsupported conclusions, unwarranted inferences or sweeping legal conclusions.") (granting motion to dismiss with prejudice).

Courts need not accept as true allegations upon information and belief that lack sufficient facts to make the allegations plausible. *Mann v. Palmer*, 713 F.3d 1306, 1315 (11th Cir. 2013) (declining to accept as true conclusory allegations made "upon information and belief" because they lacked sufficient allegations of fact to make the statement of

belief plausible (citing *Twombly*, 550 U.S. at 551, 557)); *see also In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.*, 756 F.3d 917, 931 (6th Cir. 2014) ("The mere fact that someone *believes* something to be true does not create a plausible inference that it is true." (citing *Twombly*, 550 U.S. at 551 (finding a complaint insufficient even though it said, "[The] [p]laintiffs allege upon information and belief that [the defendants] have entered into a contract, combination or conspiracy to prevent competitive entry[.]")) (emphasis added)); *see generally In re Zantax (Ranitidine) Prods. Liab. Litig.*, No. 20-MD-2924, 2021 WL 4593943 (S.D. Fla. Oct. 6, 2021) (citing *In re Darvocet*, in multi-district litigation, for the rule that "the mere fact that someone believes something to be true does not create a plausible inference that it **is** true").

The Court also need not accept as true legal conclusions couched as factual allegations. *See Diverse Power, Inc. v. City of LaGrange, Ga.*, 934 F.3d 1270, 1273 (11th Cir. 2019) (citing *Twombly*, 550 U.S. 555).

### Standing

Hopwood (but no other Defendant) contends that Plaintiff lacks standing because the Bankruptcy Proceeding failed to preserve PHI (his employer) and Success's claims with specificity. He notes that the approved bankruptcy plan references "Debtor Rep Causes of Action" and that the exhibit referenced, in turn, defines "Debtor Rep Causes of Action" generically as "all Tort Claims, D & O Claims, Principal Claims, Professional Claims, and Claims under any Insurance Policies applicable to the Debtors." Hopwood

emphasizes that no reference was made to claims against him *specifically*.

The Undersigned rejects the standing argument for the reasons outlined below.

Hopwood's motion concedes that the Eleventh Circuit has not "provided clear guidance on what language should be used in the court-approved bankruptcy plan documents" to preserve a claim, so he relies on non-binding out-of-circuit law and a non-binding trial-level case from the Southern District of Florida.

However, Plaintiff's opposition response points to language in relevant documents which he says is sufficient to preserve the claim against Hopwood: "the Plan Documents preserve all 'D&O Claims' which are defined as follows: 'any and all rights, Causes of Action and Claims arising under state and/or federal law against the Debtors' *current and former directors, trustees, managers and/or officers,* including Claims for *breach of fiduciary duty,* and the proceeds of any such rights and Claims[.]' Plan, Article I(A)(35)." [ECF No. 118, p. 12 (emphasis in original)].

Moreover, Article IV(A)(11)(b) of the Disclosure Statement, approved by the Court on August 5, 2020, provides as follows:

> This reservation, retention, and preservation of Causes of Action further provides notice to Creditors and other parties in interest herein about the types and categories of Causes of Action that might enlarge the Estates, and is based upon information known by the Plan Proponents to date. To the extent that any Creditor or party in interest has any questions or concerns regarding the scope and breadth of the types and/or categories of Causes of Action reserved, retained, and preserved, any such Creditor or party in interest **should object** to this Disclosure Statement and **request** that the Bankruptcy Court require a **more complete description** of the types or categories of Causes of Action **reserved, retained, and preserved.**

(emphasis supplied).

If Hopwood, a creditor[4] (who filed claims against the Debtor's estates for $150.00), did not believe the disclosure about the claims being reserved and preserved were clear enough, then he could have asked for additional details. He did not.

In *In re Bridgeport Holdings, Inc.,* the United States Bankruptcy Court for the District of Delaware provided an analysis which undermines Hopwood's theory:

> [A] substantial body of case law supports the view that clear and unambiguous retention provisions such as those involved here, that specify the **category** of causes of action to be preserved and the potential effect of the pursuit of those causes of action, suffice to preserve such causes of action for post-confirmation adjudication.

326 B.R. 312, 327 (Bankr. D. Del. 2005), as amended (Aug. 12, 2005), amended, No. 03-12825(PJW), 2005 WL 1943535 (Bankr. D. Del. Aug. 12, 2005) (emphasis added).

The court there further stated that a plan need *not* specifically name each potential defendant to preserve a cause of action. *Id.* at 326 ("'We agree with the other courts that regard it as impractical and unnecessary to expect that a disclosure statement and plan must list each and every possible defendant and each and every possible theory.'") (citing

---

[4]       Hopwood filed his motion to dismiss as a defendant in the instant lawsuit, but he is also a creditor (albeit in a modest way) in the bankruptcy proceeding. Section 1123(b)(3) of the Bankruptcy Code states that a plan may provide for "the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest." The purpose of Section 1123 "is not [] to protect *defendants f*rom unexpected lawsuits." Rather, the purpose of the disclosure and notice afforded by a retention provision "is directed toward the estate's *creditors*, not the potential defendants on the reserved claims." *In re Transit Grp., Inc.*, 332 B.R. 45, 57 (Bankr. M.D. Fla. 2005) (internal citations omitted) (emphasis added).

*In re Associated Vintage Grp., Inc.*, 283 B.R. 549, 564 (B.A.P. 9th Cir. 2002)).

Similarly, in *In re Ampace Corp.*, the Bankruptcy Court for the District of Delaware explained that "a **general** reservation in a plan of reorganization indicating the type or category of claims to be preserved *should be sufficiently specific* to provide creditors with notice that their claims may be challenged post-confirmation." 279 B.R. 145, 160 (Bankr. D. Del. 2002); *see also In re USN Communs., Inc.*, 280 B.R. 573, 593 (Bankr. D. Del. 2002) (same).

Florida district courts also follow this approach and agree with the holding described above from *In re Bridgeport Holdings. See generally Samsung Elecs. Co. v. All Am. Semiconductor, Inc.*, No. 09-23203, 2010 WL 11507198, at *5 n.11 (S.D. Fla. Apr. 15, 2010) (categorical reservation can be sufficient, depending on the unique facts); *In re Transit Grp., Inc.*, 332 B.R. at 56 (plan proponent need not "specifically identify every particular chain or each party subject to a preference action, noting that "such minutiae is not necessary").

Even in *In re United Operating, LLC*, 540 F.3d 351(5th Cir. 2008), the Fifth Circuit case cited by Hopwood, the court did **not** state that a plan **must** *specifically list the defendants by name* who may be subject to preserved claims. Rather, it found that the plan's **blanket** reservation of *any and all claims* arising under the Code or its reservation of other types of claims arising under the Bankruptcy Code was not sufficient to preserve common-law claims (not arising under the Bankruptcy Code). *Id.* at 356.

Interpreting this case, the Fifth Circuit subsequently held:

> We observe that *In re United Operating* focused exclusively on the retention of Claims. **It <u>never held</u> that intended defendants must be named in the plan**. But it did cite with approval *In re Ice Cream Liquidation,* for the proposition that 'the plan's categorical reservation of 'preference' claims was sufficiently specific; plan *need not itemize individual transfers that may be pursued as preferential.' In re United Operating,* 540 F.3d at 355 (citing *In re Ice Cream Liquidation*, 319 B.R. at 337-38). *In re Ice Cream Liquidation* held that while creditors must be told in the plan that avoidance actions will be pursued post-confirmation, individual prospective defendants did not have to be identified. 319 B.R. at 337-38.
>
> *In re United Operating's* citation to *In re Ice Cream Liquidation's* holding supports the trustee's argument that a plan **need not identify the prospective defendants.**

*In re Tex. Wyo. Drilling, Inc.,* 647 F.3d 547, 552 (5th Cir. 2011) (emphasis added).

The Undersigned denies the standing portion of Hopwood's motion to dismiss. Preserving *all* D & O claims against current and former directors and officers, including those for *breach of fiduciary duty*, adequately preserved the category of claim which permits the ones filed here. Plaintiff, therefore, has the requisite standing. *See also In Re Texas Wyoming Drilling, Inc.,* 647 F.3d 547, 552 (5th Cir. 2011) (finding that trustee had standing to pursue avoidance actions and holding that disclosure statement was sufficient to preserve claims, without naming defendants, when it identified the prospective defendants as "[v]arious pre-petition shareholders of the [d]ebtor" who might be sued for "fraudulent transfer and recovery of dividends paid to shareholders").

### "Shotgun" Pleading

The Amended Complaint is an impermissible shotgun pleading, for *several* reasons.

The Eleventh Circuit has stated that the purpose of Federal Rules of Civil Procedure 8 and 10 is to "require the pleader to present his claims discretely and succinctly, so that his adversary can discern what he is claiming and frame a responsive pleading." *See Barmapov v. Amuial*, 986 F.3d 1321, 1324 (11th Cir. 2021) (quoting *Weiland v. Palm Beach Cnty. Sherriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015)). Complaints that violate Rule 8 or Rule 10 are termed "shotgun pleadings," and the Eleventh Circuit has consistently condemned such pleadings for more than three decades. *See Davis v. Coca-Cola Bottling Co. v. Consol*, 516 F.3d 955, 979-80 & n.54 (11th Cir. 2008) (collecting cases) (abrogated on other grounds).

Shotgun pleadings must not be tolerated "because they are calculated to confuse the 'enemy,' and the court, so that theories for relief not provided by law and which can prejudice an opponent's case, especially before the jury, can be masked." *Barmapov,* 986 F.3d at 1324 (citation and some internal quotation marks omitted).

Furthermore, shotgun pleadings "waste scarce judicial resources, inexorably broaden the scope of discovery, wreak havoc an appellate court dockets, and undermine the public's respect for the courts." *Id.* (citing *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291 (11th Cir. 2018)).

A district court's inherent authority to control its docket includes the ability to dismiss a complaint on shotgun pleading grounds. *Vibe Micro, Inc.*, 878 F.3d at 1295 (citing *Weiland*, 792 F.3d at 1320). The Eleventh Circuit has also noted that district courts should require a plaintiff to replead a shotgun complaint even when the defendant does not seek such relief. *See Hirsch v. Ensurety Ventures, LLC*, No. 19-13527, 2020 WL 1289094 at *3 (11th Cir. Mar. 18, 2020).

The Eleventh Circuit has identified **four** different categories of shotgun pleadings:

> The *first* is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint. The *second* is a complaint that is replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action. The *third* is a complaint that does not separate each cause of action or claim for relief into a different count. And the *final* type of shotgun pleading is a complaint that assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against.

*Barmapov*, 986 F.3d at 1324-25 (quoting *Weiland*, 792 F.3d at 1321-22 (alteration in original; emphasis added; internal citations and quotation marks omitted)).

Counts III, VII, X and XI incorporate "the allegations set forth in each of the foregoing paragraphs," and the remaining counts incorporate "each of the applicable foregoing paragraphs" (Counts I, II, IV, V, VI, VIII, XIV) or "all prior applicable allegations" (Counts XII, XIII, XV, XVI, XVII through XXXII). With respect to counts III, VII, X and XI, Plaintiff has expressly incorporated the allegations of each preceding cause

of action, which is a textbook example of a shotgun pleading.

Concerning the other counts, Plaintiff's incorporation of all preceding paragraphs or allegations which are **"applicable"** actually makes the pleading *worse* and even more vague, because Plaintiff's inartful and nebulous wording leaves open the possibility that *any* preceding paragraph could be incorporated by reference. Thus, these counts typify a classic shotgun pleading in which each count "amounts to an amalgamation of all counts of the complaint." *Hirsch*, 2020 WL 1289094 at *3. But the flaws are magnified by Plaintiff's attempt to incorporate only "applicable" provisions, a strategy which creates a patent ambiguity and makes it extremely difficult, if not impossible, for Defendants to properly respond to all the allegations.

The Amended Complaint also runs afoul of the second type of impermissible shotgun pleading -- the claims and allegations are vague, conclusory, and unparticularized.

The causes of action set forth are preceded by 93 pages of factual allegations -- which contain virtually no mention of a Defendant's specific actions or omissions. While the Amended Complaint technically presents a separate breach of fiduciary duty count against each Defendant, the allegations are nearly verbatim, are based on the same nucleus of unspecified allegations of fact, and give no indication that any Defendant personally participated in the actions at issue, or otherwise did anything other than hold certain titles with PHI and Success for a limited time that may or may not coincide with

the actions of PHI and Success that are at issue.

From a practical perspective, the Amended Complaint asserts substantially identical breach of fiduciary claims against myriad Defendants. This adds to the confusing nature of the pleading. *See generally In re Wonderwork*, 611 B.R. 169, 199 (Bankr. S.D. N.Y. 2020) ("By lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct," the plaintiff's breach of fiduciary duty claim "fails to satisfy the minimum pleading standard required by Rule 8" and should be dismissed on that basis alone); *cf. Magluta v. Samples,* 256 F.3d 1282 (11th Cir. 2001) (noting that the complaint, which it described as a "quintessential" shotgun pleading, named fourteen defendants and made "no distinction among the fourteen defendants charged").

Thus, the Amended Complaint is also the second type of shotgun pleading.

But there is even more uncertainty.

The Amended Complaint makes no attempt to differentiate the circumstances affecting each company, the roles the board members played (as opposed to the officers), or when the actions that led to the complained of events occurred.

Similarly, the vagueness and lack of details bleed over into a related problem: the allegations focus primarily (though not exclusively) on the mere job titles held by Defendants, rather than specific allegations about their actual responsibilities, authority, and control. The Undersigned will discuss this pleading problem below, in a separately-titled section.

But the detail-challenged nature of the allegations creates problems beyond the lack of specifics about Defendants' responsibilities and authority. The fuzzy and sweeping allegations make it difficult for Defendants to know what they supposedly did to justify a particular allegation. For example, in Count XVII, Plaintiff contends that Dunn (who was allegedly a director of Success from March 17, 2014 to April 26, 2016) consented to, and is therefore liable for, Success making certain equity distributions to PHG in an unspecified amount and at an unspecified time. [ECF No. 60, pp 198-199]. However, the Amended Complaint does not identify any *specific* distribution which is at issue, does not specifically allege that Dunn was involved with approving any distribution, and does not allege that any distribution was made while Dunn was on Success' Board.

Plaintiff uses "upon information and belief" allegations 238 times in the Amended Complaint. While the mere use of this type of allegation is not *per se* prohibited, the rampant use of this mushy type of allegation renders the Amended Complaint even more problematic.

More specifically, while "information and belief" pleading can sometimes survive a motion to dismiss, a plaintiff must allege specific facts sufficient to support a claim. *See Zhejiang Dushen Necktie Co. v. Blue Med, Inc.*, No. 16-24679, 2017 WL 4119604, at *6 (S.D. Fla. Sept. 18, 2017) ("[T]he *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged 'upon information and belief' where the belief is based on factual information that makes the inference of culpability plausible." (alterations added;

25

internal quotation marks and citation omitted)); *see also United Am. Corp. v. Bitmain, Inc.,* 530 F. Supp. 3d 1241, 1261 n.21 (S.D. Fla. 2021) (finding allegations at issue to provide inadequate factual information to support the "upon information and belief" allegation).

As a result, "[c]onclusory allegations made upon information and belief are not entitled to a presumption of truth, and allegations stated upon information and belief that do not contain any factual support fail to meet the *Twombly* standard." *Scott v. Experian Info. Sols., Inc.,* No. 18-cv-60178, 2018 WL 3360754, at *6 (S.D. Fla. June 29, 2018) (citations omitted).

The Undersigned is not going to now embark on the tedious and time-consuming mission of evaluating each and every one of the 238 "upon information and belief" allegations to determine whether they are supported by adequate factual information, as opposed to speculation. Because Plaintiff will be filing a Second Amended Complaint and is on notice of the hurdles associated with relying heavily upon "on information and belief" allegations, the newer version of the lawsuit will presumably contain substantially fewer of these types of allegations and will also allege significantly more factual support when they are occasionally used.

Given that the Court and the parties will be confronted with a newer version of the Complaint, the Undersigned deems it prudent to also note that the current version also constitutes the third type of impermissible shotgun pleading, as it does not separate the causes of action into counts. This is particularly problematic when, as Defendant

Reuben[5] noted in his motion to dismiss, "several counts . . . purport to assert causes of action arising under the laws of multiple jurisdictions." [ECF No. 102, p. 4]. For example, Count XXIII purports to be under federal, Florida and California law. *Id.*

By its very nature, this type of pleading is confusing and makes it difficult for Defendants to obtain adequate notice of the claims against them. *See generally Lacayo v. Wells Fargo Bank, N.A.*, No. 16-cv-23187, 2020 WL 2488377, at *6 (S.D. Fla. Apr. 13, 2020) ("Because the state law claim was **interwoven** in the same count with the federal claim, the Court dismissed the count (and the entire complaint) as a shotgun pleading with prejudice.") (emphasis added).

## Alleged Breaches of Fiduciary Duty

Although Defendants collectively filed five separate dismissal motions, they pursue many common themes, including the following: (1) solely relying on job titles is insufficient to establish that a defendant owed fiduciary duties; (2) the allegations of breaches of fiduciary duties do not pass muster under either state statutory or common

---

[5]      Reuben also argued that the Amended Complaint improperly asserted an equitable subordination claim against him because the claim requires that a defendant has actually filed a claim in the Bankruptcy case (and Reuben has not done that). So this argument, while not technically one of the four types of shotgun pleadings, is, in effect, an argument targeting sloppy and/or lazy pleading, which is a concept implicitly underlying all four categories of impermissible shotgun pleadings. In response, Plaintiff conceded, in an argument heading, that "Count XXXII For Equitable Subordination is Not Applicable to Reuben." [ECF No. 117, p. 15]. So the Court **grants** Reuben's motion to dismiss Count XXXII for equitable subordination. I also grant similar motions by other Defendants when similar concessions were made about equitable subordination.

law; and (3) the facts alleged for breaches of fiduciary duty are overly vague, conclusory, and speculative, and they lack adequate specificity.

Defendants contend, in general, that the Amended Complaint is further burdened by its failure to allege that they had control over certain activities and its reliance on their titles to somehow suggest that they engaged in misconduct. In other words, Defendants say that Plaintiff's approach is problematic: he incorrectly assumes that they *must* be liable for breach of fiduciary duties because, after all, they were officers and surely must have known, or should have known, about significant financial problems.

According to Defendants, Plaintiff relies solely on job titles to assert that individual Defendants owed fiduciary duties in the first place, without specifying their actual job responsibilities or authority over the alleged misconduct. This, they argue, is insufficient to state a claim.

"Simply being an officer of the company is not enough." *In re Greater Se. Cmty. Hosp. Corp.*, 333 B.R. 506, 526 (Bankr. D.D.C. 2005) (noting that the scope of fiduciary duties is "restricted necessarily to those activities within each officer's control" and dismissing fiduciary duty claims against some officers when they included only the officers' titles and were devoid of any precise allegations concerning their roles and whether they were responsible for or could have prevented the challenged transactions); *Continuing Creditors' Comm. of Star Telecomm. Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 462 (D. Del. 2004) (dismissing fiduciary breach claims against corporate officers where little more

28

than status as officers and dates of service were alleged).

Relying exclusively or primarily on an officer's title is a gamble for a plaintiff because that approach risks running afoul of the reality that courts recognize that "[o]fficers do not . . . 'owe fiduciary duties to a corporation regarding aspects of the management of the corporation that are not within their responsibility or are within the exclusive province of the board.'" *In re Nine W. LBO Sec. Litig.*, 505 F. Supp. 3d 292, 316 (S.D.N.Y. 2020) (*quoting In re Verestar, Inc.*, 343 B.R. 444, 474 (Bankr. S.D.N.Y. 2006)). Therefore, officers may only be "held liable for breach of fiduciary duty to the extent that they have discretionary authority over, and the power to prevent, the complained of transactions." *Id.*

In other words, officers generally cannot be liable for breaches of fiduciary duty if they could not have voted to prevent the transaction at issue. *See KDW Restructuring & Liquidation Servs. LLC v. Greenfield*, 874 F. Supp. 2d 213, 224 (S.D.N.Y. 2012).

Michaelson's fiduciary duty claims are premised on a theory that Defendants, in their alleged capacities as corporate officers, caused the Companies to take allegedly harmful actions, or failed to prevent the Companies from doing so -- but Defendants argue that the Amended Complaint lacks sufficient allegations that they actually had *control* over the subject decisions. According to Defendants, in the Amended Complaint, Plaintiff often conflates the actions of the Companies' Officers and Directors. However, they contend that Michaelson identifies no basis under the Companies' bylaws, other

corporate documents or any legal authority to support his assertion that the Defendants had control over the transactions at issue.

Not surprisingly, Plaintiff contends that he *has* asserted sufficient allegations to sustain his claims for breach of fiduciary duties against Defendants. And he pushes back on the attack that he relied solely on Defendants' titles as officers, pointing to allegations which go beyond the mere titles.

For example, in his opposition response to a dismissal motion filed by Defendants Dunn, Armstrong, Gold, Day, and Cohen, Plaintiff argues that the Amended Complaint also relies on "the authority conferred on each member of the Defendant Group through his job." [ECF No. 114, p. 14]. According to Plaintiff, his Amended Complaint "explains how the Defendant Group members performed in their roles (i.e., by attending Board meetings, by approving iCare presentations, by joining the iCare Selection Committee, by reviewing budgets, and by making operational decisions"). *Id.*

Michaelson asserts a similar theme in his response [ECF No. 116] to the dismissal motion filed by Grabish and Helland. In fact, he uses the identical language quoted in the paragraph above. *Compare* [ECF No. 114, p. 14] *with* [ECF No. 116, p. 10].

A review of Plaintiff's post-hearing submission [ECF No. 212] demonstrates that the Amended Complaint **does** in fact contain allegations more substantive than merely saying that certain defendants (i.e., Grabish, Helland, Dunn, Armstrong, Gold, Day, and Cohen) had the title of some type of officer.

So the Undersigned disagrees with (and *rejects)* the defense argument that the breach of fiduciary duty claims are based *solely* on the officer titles of some Defendants.

However, that does not necessarily carry the day for Plaintiff, as he must *also* confront a related argument that Defendants further assert: that he has not adequately alleged that each officer Defendant had the actual authority to "exercise executive **control** over operations." Alleging that an officer knew of a financial impropriety or debilitating financial status but "did nothing about it" may be inadequate to support the claim if the officer did not have the control or authority to implement a remedial change.

Officers do not "owe fiduciary duties to a corporation regarding aspects of the management of the corporation that are not within their responsibility or are within the exclusive province of the board." *In re Nine West LBO Secs. Litig.*, 505 F. Supp. 3d 292, 316 (S.D.N.Y. 2020) (citing *In re Verestar, Inc.*, 343 B.R. at 474). But "officers may be held liable for breach of fiduciary duty to the extent that they have discretionary **authority** over, and the *power to prevent*, the complained of transactions, in which case they will be held to the same standards as a director." *In re Verestar*, 343 B.R. at 474 (emphasis added).

In *Nine West,* the litigation trustee sought to hold the officer defendants liable for failing to take actions that they said were out of their control. In response, the litigation trustee pointed to three allegations which he said were within the scope of the officers' authority: the officers failed to (1) engage an expert to assess RemainCo's solvency or to otherwise investigate solvency; (2) consider whether the company should exercise the

"fiduciary out" clause; and (3) make any recommendations regarding these rights.

These allegations sound similar to the type of allegations which Michaelson makes here against the officers. But the *Nine West* Court held that the three allegations did not state breach of fiduciary duty claims because they did not plausibly support the inference that the officers "had the power to prevent" the transaction at issue. Similar to Michaelson, the plaintiff there alleged that the challenged transaction could have been prevented if the officers had communicated their knowledge "about the danger and unfairness" of the transaction. The Court held that there was no reason to believe that a different result would have occurred if the officers had brought their concerns to the directors' attention.

The allegations and inferences which Michaelson asks the Court to make here are similar to the arguments unsuccessfully asserted by the litigation trustee in *Nine West,* where the court granted the officer defendants' motion to dismiss the breach of fiduciary duty claims. Given that Plaintiff will be filing a new (and, hopefully, improved) version of the Amended Complaint, he will have the opportunity (assuming the necessary facts exist) to bolster the allegations about the officers' control and to generate a plausible scenario outlining how the officers could have prevented, or at least modified, the challenged transactions.

For example, under Delaware law, if an officer could not have voted to prevent the transaction, then he or she is not liable for breaches of fiduciary duty arising out of that

transaction. *KDW Restructuring and Liquidation Services, LLC*, 874 F. Supp. 2d at 224. Assuming that there are adequate facts to permit Michaelson to comply with his Rule 11 obligation, he will have the chance to include in his amended lawsuit additional allegations to avoid the rules discussed immediately above.

## Statute of Limitations

Confronted with a motion to dismiss certain claims under the statute of limitations, Michaelson conceded that breach of fiduciary duty claims which accrued before November 5, 2014 are barred under the applicable four-year statute of limitations. [ECF No. 103, p. 10]. Therefore, the Undersigned grants the motion to dismiss on this point; the amended lawsuit will not pursue breach of fiduciary duty claims which accrued before November 5, 2014 (and it should be precise, not vague, about the specific cutoff for the claims).

## California Law

Movants Dunn, Armstrong, Gold, Day, and Cohen argue in their dismissal motion that Michaelson failed to adequately allege that fiduciary duties were owed to Success under California law. Specifically, they argue that there is no indication that they are members or managers of the LLC. Instead, they note, Michaelson alleges only that they were mere officers of Success (except for Dunn, who allegedly was a director), which is inadequate because trustee duties are imposed only on **members** (but not directors or officers) in a member-managed limited liability company under California law. *In re*

*Shamam*, BAP Nos. CC-14-1274-TaPaKi, CC-14-1300-TaPaKi, 2015 WL 1544581, at *9 (B.A.P. 9th Cir. Apr. 7, 2015) (citing Cal. Corp. Code § 17704.09).

Thus, Movants say they are not subject to fiduciary duties under the California Revised Uniform Limited Liability Company Act ("CRULLCA") – and to the extent CRULLCA preempts any contrary common law in the field, under Cal. Corp. Code § 17704.09, they are also not subject to California common law. Accordingly, under their view, Michaelson's claims that they breached their fiduciary duties to Success must fail.

Michaelson contends that *Shamam* is "irrelevant" because it involved Section 523(a)(4) of the Bankruptcy Code and noted that "under California law . . . officers and directors are imbued with the fiduciary duties of an agent and certain duties of a trustee." [ECF No. 114, p. 16 (quoting *In re Shamam*, 2015 WL 1544581 at *9)]. But Michaelson omitted a critical part of the quote he excerpted in his opposition memo. The full quote should be: "In fact, under California law, 'although officers and directors are imbued with the fiduciary duties of an agent and certain duties of a trustee, **they are not trustees with respect to corporate assets.**'" *In re Shamam*, 2015 WL 1544581, at *9 (quoting *In re Cantrell*, 329 F.3d 1119, 1126 (9th Cir. 2003) (emphasis added).

In addition, Michaelson also omitted the following holding from the Bankruptcy Court's decision: "Thus, even though an officer or director may exercise some control over corporate assets, they are **not a fiduciary** within the meaning of 523(a)(4)." *Id*. (citing *In re Cantrell*, 329 F.3d at 1127) (emphasis added).

34

The Undersigned therefore grants this portion of the motion to dismiss filed by Dunn, Armstrong, Gold, Day, and Cohen. If Michaelson concludes that he can, consistent with his Rule 11 obligations, still somehow craft a claim for breach of fiduciary duties under California law concerning Success, an LLC, then he may do so in his Second Amended Complaint. But Plaintiffs memorandum [ECF No. 114, p. 17] describes Dunn as a *manager* of Success, while Dunn notes [ECF No. 103, p. 13] "there is no indication [in the Amended Complaint] that he was a member or manager of Success."

The facts about Dunn's specific title with Success should not be in dispute: he either was a member or manager or he was not. Both sides should be extremely careful with titles and job descriptions and levels of authority and control. Any future references to Dunn or any other Defendant **must be specific and accurate.**

## Deepening Insolvency

Several Defendants argue that Plaintiff's Amended Complaint is actually pursuing a "deepening insolvency" theory of liability (even though it is not specifically tagged with that title). Defendants' theory is that PHI and Success were insolvent before they joined the company and that Michaelson's allegations (that they failed to take certain steps to prevent the companies from becoming more insolvent or to allow them to file sooner for bankruptcy protections) are disguised claims for deepening insolvency.

Deepening insolvency refers to the "fraudulent expansion of corporate debt and prolongation of corporate life." *In re Citx Corp.*, 448 F.3d 672, 681 (3d Cir. 2006) (quoting

*Official Comm. of Unsec. Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 347 (3d Cir. 2001)).

According to Defendants, the "trend" in recent cases "appears to cast doubt" on the continuing validity of the deepening insolvency theory as a viable cause of action or damages theory. [ECF No. 103, p. 16 citing *In re Bullitt Util., Inc.*, 614 B.R. 676, 683 (Bankr. W.D. Ky. 2020); *In re Conex Holdings, LLC)*, 514 B.R. 405, 415 (Bankr. D. Del. 2014); *In re Virginia Broadband, LLC*, 521 B.R. 539, 567 n.181 (Bankr. W.D. Va. 2014); *In re Hydrogen, L.L.C.*, 431 B.R. 337, 357 (Bankr. S.D.N.Y. 2010); *In re Propex, Inc.*, 415 B.R. 321, 327 (Bankr. E.D. Tenn. 2009); *Fehribach v. Ernst & Young LLP*, 493 F.3d 905, 909 (7th Cir. 2007); *In re Amcast Indus. Corp.*, 365 B.R. 91 (Bankr. S.D. Ohio 2007); *In re Greater Se. Cmty. Hosp. Corp.*, 333 B.R. at 517].

To illustrate their argument, Defendants point to now-retired Judge Richard Posner's explanation in *Fehribach,* where he said:

> the theory [of deepening insolvency] makes no sense when invoked to create a substantive duty of prompt liquidation that would punish corporate management for trying in the exercise of its business judgment to stave off a declaration of bankruptcy, even if there were no indication of fraud, breach of fiduciary duty, or other conventional wrongdoing.

493 F.3d at 909.

The *Fehribach* Court described the theory as "controversial" and explained that it allows damages sometimes to be awarded to a bankrupt corporation that by "delaying liquidation ran up additional debts that it would not have incurred had the plug been pulled sooner." *Id.* at 908. As originally formulated, the theory was premised on the

36

notion that borrowing after a company becomes insolvent would "ineluctably" hurt the shareholders. *Id.*[6]

Defendants say that Plaintiff's claim -- that they breached their duties and caused PHI and Success to not file for bankruptcy earlier -- does not present a claim for recoverable damages. They also contend that (1) the so-called trend (of rejecting the deepening insolvency theory) is also based on the notion that there is no duty to avoid deepening insolvency and (2) there is no duty to file for bankruptcy protection.

Not surprisingly, Plaintiff disagrees. First, he **denies that his claims are based on a "deepening insolvency" theory**. Instead, he classifies his claims as well-recognized ones for breach of the fiduciary duty of care. Michaelson raises the denial-type argument even though he *repeatedly* alleges, under the different counts for breach of fiduciary duty against different defendants, that Defendants' activities "allowed the Debtors to accrue liabilities they were unable to satisfy, resulting in the Debtors' insolvency and **deepening insolvency.**" *See* [ECF No. 60, ¶¶ 536, 570, 614, 649, 689, 751, 791, 818, 858 (emphasis added)].

Second, he says he is entitled to the damages flowing from Defendants' negligence even if a deepening insolvency theory is unavailable. Third, he notes that the Amended Complaint seeks other types of damages, such as those concerning iCare and the

---

[6]    *Fehribach* is a 2007 case. A more-recent case, *In re Bullit Utilities* (issued in 2020), noted that "a number of courts [ ] have raised serious doubts about [the deepening insolvency theory's] viability. 614 B.R. at 684.

Rejuvenation Center.

Significantly, Defendants have not argued that deepening insolvency is a **prohibited** theory here and is absolutely unavailable under applicable law. Rather, they merely point out that the theory has generated *criticism.* Because Defendants have not established that the sometimes-criticized theory is, in fact, legally unavailable, it is inappropriate to outright dismiss the claims implicating the theory (assuming the theory is even in play) at the pleadings stage. Assuming that Michaelson asserts a deepening insolvency claim in his Second Amended Complaint (or that Defendants *construe* his to-be-made allegations as being a *de facto* version of one), then Defendants can either challenge the theory in a dismissal motion if they have grounds to represent that the theory is legally unavailable here or tackle the allegations in a summary judgment forum.

## Business Judgment Rule

Defendants argue that the business judgment rule protects their activities from Michaelson's claims. But Florida courts have held that the business judgment rule, which assumes that directors have acted properly and in good faith, does not extend to corporate officers. Florida's business judgment rule is codified in section 607.0831 of the Florida Business Corporations Act (the "Florida Act"), which provides that a director is not personally liable for actions unless, among other things, the director acted with conscious disregard for the best interest of the corporation, or willful or intentional misconduct. *See FDIC v. Brudnicki,* No. 5:12-cv-398, 2013 WL 2145720 (N.D. Fla. May 15,

2013) (the ordinary negligence count remained viable against a former officer because "the statute does not afford the same protections to officers as it does directors"); *see also FDIC v. Copehnaver*, No. 8:13-cv-2037, 2014 WL 12621202, at \*9 (M.D. Fla. May 10, 2014) ("By its plain terms, section 607.0831 insulates **only directors** from claims for ordinary negligence . . . . Had the legislature intended to insulate *officers* from negligence claims under section 607.0831, it surely could have done so, but it did not." (emphasis added)).

Similarly, the business judgment rule does not protect officers in California, either. Under section 17704.09 of CRULLCA, members and managers of a California LLC are not liable for fiduciary breaches unless such breaches amount to "grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law." The plain language of this section makes it clear that officers of a California LLC, who have a duty to the LLC under common law, are not protected by the business judgment rule. *See FDIC v. Hawker*, No. CV F 12-0127, 2012 WL 2068773, at \*7 (E.D. Cal. June 7, 2012) ("Section 309 [which protects directors of a corporation] does not address officer duties and liability. . . . Clearly, the California legislature **omitted officers** in codifying the business judgment rule in section 309." (emphasis supplied)).

To the extent the business judgment rule applies to Dunn in his capacity as manager of Success, application of the business judgment rule is not appropriate at this motion to dismiss stage. *See, e.g., Hawker*, 2012 WL 2068773, at \*8.

Finally, even if the business judgment rule applies, the Amended Complaint

39

alleges that Dunn acted with gross negligence, which does not trigger the protection of the rule.

So the Undersigned rejects Defendants' effort to convince the Court to *dismiss t*he claims under the business judgment rule at the pleadings stage.

### Florida Statute § 607.08411

Defendant Hopwood contends that all claims premised on Florida Statute § 607.08411 should be dismissed because the statute did not exist at the time (as it was signed into law on June 7, 2020 and because the Florida Legislature did not include any provisions giving the statute retroactive application).

But Plaintiff's response argues that Hopwood mischaracterizes Count V, which alleges that he owed fiduciary duties to PHI for many reasons, including **common law,** as well as the Florida statute. [ECF No. 118]. Therefore, Plaintiff says, the allegations are sufficient to state a claim for breach of fiduciary duties through Florida's common law requirements, *regardless* of whether the statute had yet come into effect. *See McCoy v. Durden*, 155 So. 3d 399, 403 (Fla. 1st DCA 2014) ("Florida courts have continued to describe the duties of a director and an officer to the corporation as arising from trust and equity concepts . . . . In short, Florida courts have recognized that corporate officers and directors owe both a duty of loyalty and a duty of care to the corporation that they serve.").

For his Reply, though, Hopwood notes that Michaelson does not dispute that the Florida statute was not in effect at the time at issue. He also argues that Plaintiff's use of "inter alia" when alleging the violations does not "excuse sloppy pleading." [ECF No. 124, p. 6]. Therefore, he says, the Court should dismiss all of Michaelson's Count V claims based on the not-yet-in-existence Florida statute.

Hopwood also makes several arguments based on his Employment Agreement, which, according to his view, precludes a breach of fiduciary duty claim under Florida common law. But the Employment Agreement was not attached to the Amended Complaint and does not appear central to Plaintiff's claim.

Given this procedural context, the Employment Agreement cannot be considered when evaluating a motion to dismiss. *Tim Minn, Inc. v. Tim Hortons USA Inc.*, No. 20-23481, 2021 WL 4482733, at 8 (S.D. Fla. Aug. 2, 2021) (general rule is that "courts only consider the complaint and the attached exhibits when determining the merits of a motion to dismiss"); *Cont'l Cas. Co. v. Hardin*, No. 8:16-CV-322-17, 2016 WL 11234458, at *10 (M.D. Fla. Dec. 5, 2016) ("[T]he court may consider an extrinsic document without converting dismissal motion into a summary judgment motion if the document is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged.").

Therefore, the Undersigned grants Hopwood's motion, in part, and dismisses the portion of the Amended Complaint which bases the breach of fiduciary duty claim in Count V on Florida Statute § 607.08411.

**Hopwood's Challenge to the iCare and Rejuvenation Center Allegations**

Hopwood's motion seeks dismissal of the Count V claims arising from his purported failure to inform specific boards of directors. He focuses on the allegation that his timely notice of accurate information would have prevented the Companies from entering into the iCare and Rejuvenation Center transactions. According to the dismissal motion, the allegation fails the plausibility test because Baronoff, the person to whom he reported, already had intimate knowledge of the circumstances underlying the transactions.

The Undersigned rejects this argument for two reasons: (1) the allegations and the challenge to them revolve around questions of fact, which make a dismissal at this stage premature and inappropriate; and (2) the Amended Complaint also alleges that Hopwood provided *misleading* information to the Boards about iCare and the Rejuvenation Center. *See MTM Television Distrib. Grp., Ltd. v. Pub. Int. Corp.*, No. 91-1519, 1992 WL 80625, at *1 (M.D. Fla. Mar. 24, 1992) ("Questions of fact are not properly determined on a 12(b)(6) motion to dismiss."); *Tershakovec v. Ford Motor Co.*, No. 17-21087, 2018 WL 3405245, at *2 (S.D. Fla. July 12, 2018)) ("When ruling on a motion to dismiss, a court must view the complaint in the light most favorable to the plaintiff and **accept** the plaintiffs well-pleaded facts **as true**." (citing *St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am.*, 795 F.2d 948, 954 (11th Cir. 1986) (emphasis added)); *St. Joseph's Hosp., Inc.*, 795 F.2d at 954 ("[A] court must accept the well pleaded facts as true and resolve them in the light

most favorable to the plaintiff.").

The Court therefore denies this aspect of Hopwood's motion to dismiss.

### So-Called "Aiding and Abetting"

Hopwood contends that Count V's allegations about fraudulent transfers to persons other than Hopwood is actually a claim under Florida law for a non-transferee's "aiding and abetting of a fraudulent transfer" (even though Michaelson does not describe it that way). Hopwood says there is no cause of action under Florida law for this theory.

But Plaintiff disputes this description of his claim as being incorrect. He contends that the allegations relate to the consequences of Hopwood's breach of fiduciary duty (and are not a claim for aiding and abetting a fraudulent transfer.).

The Court rejects Hopwood's efforts to obtain a dismissal by labeling a breach of fiduciary claim as a *de facto* claim for aiding and abetting a fraudulent transfer. The Court construes the allegations at issue as being alleged facts (i.e., permitting non-salary payments to persons under scenarios which did not benefit PHI and which occurred while PHI and its subsidiary hospitals were unable to pay doctors and vendors) concerning the overarching breach of fiduciary duty theory.

### *Trenwick*

Hopwood argues that Michaelson's breach of fiduciary claims against him in Count V run afoul of *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.* and its progeny. 906 A.2d 168, 172 (Del. Ch. 2006), aff'd sub nom. *Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d

438 (Del. 2007) (unpublished table decision). Specifically, citing *Trenwick*, Hopwood contends that all claims regarding corporate separateness and subsidization of the poorer-performing subsidiaries should be dismissed because "officers of a wholly-owned subsidiary are obligated to manage the subsidiary companies with loyalty to the **parent** company." [ECF No. 104, p. 16 (citing *Trenwick,* 906 A.2d at 200) (emphasis supplied)].

If *Trenwick* applied, then it likely would generate potentially persuasive arguments for Hopwood and other Defendants confronted with Michaelson's breach of fiduciary claims. For example, it explains that: "Delaware law does not embrace the concept that a director of a wholly-owned subsidiary owes a duty to second-guess the business judgment of its parent corporation when following and supporting the parent's strategy would not violate any legal obligation the subsidiary owes to another." *Trenwick*, 906 A.2d at 201. Moreover, the *Trenwick* Court held that this rule (of taking action in aid of the parent's business strategy) applies "even [ ] if" the subsidiary's board "took actions that made [the subsidiary] less valuable as an entity." *Id.*

The Amended Complaint alleges that "[h]ad Hopwood respected the corporate separateness of each of the Companies . . . the assets of the better performing hospitals would not have been depleted by the weaker performing hospitals, allowing for a potentially greater distribution to creditors of the better performing hospitals." [ECF No. 60, ¶ 673]. This, Hopwood argues, violates *Trenwick,* because "use of revenues from one company's subsidiaries to keep an affiliated company's wholly-owned subsidiaries afloat

cannot, standing alone, give rise to a claim for breach of fiduciary duty." [ECF No. 104, p. 16].

As a threshold matter, Hopwood has not established that *Trenwick* even applies.

The Motion to Dismiss alleges that Florida and California courts rely on Delaware law to establish their own corporate doctrines and in cases of first impression. *Id.* However, Hopwood failed to demonstrate that Florida or California courts always (or even at all) look to *Trenwick* for guidance concerning duties of an officer of an insolvent subsidiary. *See Gordon v. Bindra*, No. 2:14-cv-01048, 2014 WL 2533798, (C.D. Cal. June 5, 2014) (In considering *Trenwick*, the court noted that "[w]hile Delaware law might recognize some sort of duty owed by the directors of a parent corporation to a subsidiary, there is no indication that *California* follows this rule as well.").

But even if *Trenwick* is in fact the applicable law used in Florida and California, in general, it seems unlikely that it could apply here now, at the pleadings stage.

*Trenwick* provides that "[t]o the extent that Trenwick America was a wholly-owned **solvent** subsidiary of Trenwick, the fiduciary duties owed by the Trenwick America board ran to Trenwick." 906 A.2d at 200 (emphasis added). The *Trenwick* Court noted that the complaint

> fail[ed] to plead facts supporting a rational inference that Trenwick America [(the subsidiary)] was insolvent before any of the challenged transactions or that any of the challenged transactions would, when consummated, leave Trenwick America unable to satisfy its creditors . . . Because the complaint fail[ed] to support an inference of insolvency, the Trenwick America directors were free to manage Trenwick America for the

45

best interests of Trenwick[.]

*Id*. at 202.

In direct contrast to *Trenwick*, the Amended Complaint here sufficiently alleges the Companies were insolvent as early as 2014, including by demonstrating that (i) the solvency representations in the MidCap Revolver and intercompany notes excluded the liabilities and obligations owed to PHG [ECF No. 60, ¶¶ 229-30]; (ii) the Financial Overview Email described the Companies' insolvency, *id.* at ¶ 232; (iii) on February 1, 2018, a PHG Board member emailed Hopwood stating: "I am the one jumping up and down regarding the insolvency of this place . . .", *id.* at ¶ 381; (iv) the PHG 2016/2017 Audit contained a going concern qualification, *id.* at ¶ 233 and (v) the audited financial statements show the Companies had negative equity since 2014, when not considered on an aggregate basis.

Hopwood's response is to say that the Amended Complaint gives an insolvency date of "no later than March 13, 2018," not "as early as 2014." [ECF No. 124, p. 9]. But the Amended Complaint contains a series of allegations under the heading: "The Companies Were Unable to Pay Their Debts as They Became Due Since their Reorganization in 2014." And paragraph 227 alleges that "[i]n light of the significant debt held by the Companies on March 17, 2014, the PHU Intercompany Loans did not include representations that PHI was solvent when aggregating its financial obligations."

Furthermore, paragraph 231 expressly alleges that "when considering the

aggregate debt owed by the Companies on March 17, **2014**, the Companies **were** insolvent on that date **and at all times thereafter**." (emphasis supplied).

So the Undersigned denies the *Trenwick*-based portion of the motion to dismiss.

## Equitable Subordination

Hopwood contends that Count XXXII does not state a claim for equitable subordination of his $150 claim submitted in the bankruptcy proceeding. He argues that Michaelson's allegations are merely a formulaic recitation of the elements, without the associated factual allegations necessary to support those elements. Michaelson, of course, disagrees, and says that a claim for breach of fiduciary duties is an acceptable ground for establishing the requisite inequitable conduct. *In re Toy King Distribs.*, 256 B.R. 1, 198-99 (Bankr. M.D. Fla. 2001).

Because Michaelson is going to be filing a Second Amended Complaint, presumably in a significantly-streamlined format but with more-detailed allegations, the Undersigned **defers** ruling on this portion of the motion to dismiss concerning only a $150 claim. If Michaelson chooses to pursue this $150 claim in the next version of his lawsuit, then Hopwood is certainly free to file a motion to dismiss if he has grounds to support it.

## Are Heightened Pleadings Standards Applicable?

Defendants Grabish and Helland argue that Plaintiff's claims for alleged breaches of fiduciary duty must meet the particularity standard of Federal Rule of Civil Procedure

9(b) because they "sound in fraud."[7] The Amended Complaint does not contain an express count for fraud and does not unequivocally accuse Defendants of fraud, but Defendants argue that allegations that they provided "misleading" information triggers the heightened pleading standard requirement. Because Plaintiff did not plead the "who, what, when, where and how" of the allegedly false statements, his claim for breach of fiduciary duty fails. *See generally Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006) (also noting that Rule 9(b)'s requirements are akin to "the first paragraph of any newspaper story").

Plaintiff did not address this argument in his response memorandum, and

---

[7]    They also raise the same arguments as other Defendants concerning an impermissible shotgun pleading, alleged breaches of fiduciary duty (and whether the Amended Complaint relied solely on titles), deepening insolvency, equitable subordination, etc. All of the rulings previously outlined above on in-common arguments apply to all Defendants who raised those same arguments. There is no need to rehash or repeat the analysis.

Helland raises the individual argument that he never filed a claim in any of the bankruptcy proceedings (and that equitable subordination therefore cannot possibly be a valid claim). In his response [ECF No. 116, p. 20 n.20], Michaelson agrees that Helland has not filed a claim in the Debtor's Chapter 11 cases nor has a claim in his favor been scheduled. Therefore, Plaintiff says, "[t]o the extent Helland agrees that he does not have any claims against the Debtors' estates, the equitable subordination claim does not apply to Helland." Helland's Reply (jointly filed with Grabish) [ECF No. 125] does not respond further about making a no-claims-against-the-estates concession.

However, Plaintiff made a concession about Helland and Grabish's argument that the claim against them for receipt of fraudulent transfers -- by unequivocally advising [ECF No. 116, p. 18] that they are not recipients of fraudulent or preferential transfers. So the motion to dismiss filed by these two Defendants is **granted** as to Count XXXI (disallowance of claims).

Defendants did not pursue it again either in their Reply.

Defendants have not cited any authority to support the conclusion that the mere use of the word "misleading" in a breach of fiduciary duty claim converts the cause of action into one for fraud, thereby triggering the Rule 9(b) heightened pleading standard of "stat[ing] with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The Undersigned therefore denies that portion of the motion to dismiss filed by Grabish and Helland.

<u>**Peter Baronoff's Contribution Argument**</u>

In his dismissal motion, Defendant Baronoff argues that he has a right of contribution (from shareholders who allegedly received unlawful distributions -- PHH and PHG) concerning the claims made against him in Counts XV and XVI. Even if that argument is correct,[8] though, he has not established that a right of contribution means that the claims should be *dismissed* at the pleadings stage. Indeed, his Reply explains that his purported right to setoff (arising from his contribution theory) is one to be asserted "as a **defensive** matter." [ECF No. 128, pp. 5-6].

The mere fact that Baronoff at trial might be able to offset a judgment does not

---

[8]    In his Reply, Plaintiff asserts two primary reasons why he contends that Baronoff's contribution theory fails: (1) the dismissal motion does not allege that PHH or PHG **knew** that the distributions were unlawful (and both Florida and California statutory law require this for contribution (in Florida) or for impleading a shareholder in order to seek contribution (in California), and (2) Baronoff never filed a timely proof of claim in the Debtors' Chapter 11 cases.

mean that he has an automatic right to *dismiss* the underlying claim on which the setoff/contribution is sought. He has not called the Court's attention to any on-point case, and the Undersigned therefore rejects this argument for dismissal of Counts XV and XVI.

### Peter Baronoff's Double Recovery Argument

According to Baronoff's dismissal motion, Plaintiff is impermissibly seeking a so-called "double recovery." Specifically, he notes that PHG and PHH received transfers from PHI and Success and emphasizes that the assets and liabilities of these companies are "combined by virtue of the substantive consolidation created by the Modified Second Amended Joint Plan of Liquidation." As explained by Baronoff, the "[net] result [of the substantive consolidation] is that the assets of all companies, including any litigation recoveries, must be distributed among creditors of all of the companies, regardless of which company has rights to the asset (or litigation recovery) or which company a creditor has a claim against." [ECF No. 99, p. 4].

Therefore, Baronoff argues, Plaintiff is seeking a "windfall 'double recovery'" in Counts XV and XVI because Michaelson is "seeking to hold Baronoff liable for the transfers that the consolidated estate **received from itself**." *Id*. at 6. (emphasis added).

Michaelson, however, contends that the double recovery argument is an alleged affirmative defense which cannot be considered at the motion-to-dismiss stage. In addition, he argues that substantive consolidation is not a remedy for unlawful distributions under state law.

In the Undersigned's view, the double recovery argument (assuming it is viable) is an affirmative defense to the unlawful distribution claims and therefore inappropriate as grounds for a dismissal here because the affirmative defense does not adequately appear on the face of the Amended Complaint. *In re Moritz*, No. 07-cv-02472, 2009 WL 598260, at *4 (D. Col. Mar. 5, 2009) (declining to decide potential for double recovery at the motion to dismiss stage); *Li v. Walsh*, No. 9:16-cv-81871, 2019 WL 13036113, at *2 (S.D. Fla. Oct. 10, 1019) (striking affirmative defense of "prohibition of double recovery").

The Undersigned therefore rejects this portion of Baronoff's motion to dismiss. If double recovery is an applicable affirmative defense to the to-be-filed Second Amended Complaint and if he does so with adequate specificity, then Baronoff can assert this theory again in either an affirmative defense to the next version of the Complaint or at the summary judgment stage.

### Peter Baronoff's Challenge to the Breach of Contract Count

Peter Baronoff challenges Count XIII's breach of contract claim against him. That count alleges that Baronoff breached the Exclusive Services Provision of his Employment Agreement with the Companies by serving as a board member of iCare. According to Plaintiff, Baronoff's role as a board member of iCare materially interfered with his employment obligations under the Employment Agreement, as he allegedly used his role as president and CEO of the Companies to make an unsuccessful investment of $4.5 million in iCare. [ECF No. 60, ¶ 904].

Baronoff contends that this claim fails as a matter of law for two reasons. First, Plaintiff admits that the Companies were "development partners" with iCare and were entitled to share in its profits. [ECF No. 99, p. 6 (quoting Am. Compl. [ECF No. 60, ¶ 388]]. In other words, Baronoff contends, iCare was an investment of the Companies. As such, Baronoff's role as a board member of iCare was plainly within the performance of his duties and obligations as president or CEO. Therefore, not only did his role as a board member of iCare not materially interfere with his employment obligation, his role as a board member of iCare **was his actual employment obligation.**

Second, even if Baronoff's service as an iCare board member was a restricted outside business activity, the Exclusive Services Provision does not apply if such outside business activity was approved in advance by the Companies in writing. Here, Baronoff argues that Plaintiff admits that Baronoff's service as a board member was in fact approved in advance by the Companies. *Id.* (citing [ECF No. 60, ¶¶ 437-38]).

The Undersigned is not persuaded by these arguments.

First, it is far from clear that the development partner relationship between iCare and the Companies somehow means that Baronoff could not have *still* breached the Exclusive Services Provision. Second, the Amended Complaint alleges facts (required at this point to be viewed in the light most favorable to Plaintiff) supporting the breach of contract claim. It alleges that the Companies (which were allegedly insolvent) should never have become development partners with iCare in the first place because it was a

start-up technology company with no track record and moved forward with the arrangement only because Baronoff breached his contract.

So the Undersigned denies this portion of Baronoff's motion to dismiss (concerning the breach of contract count).

Second, it may well be that Baronoff's activities while on the iCare board may have caused him to breach his *fiduciary duties* to PHI and Success, the existence of another claim arising from the same conduct does not necessarily mean that the *breach of contract* claim somehow disappears. It is possible, based on the facts, for Baronoff to have both breached his fiduciary duties to PHI and Success **and** breached his employment agreement.

Third, the Amended Complaint alleges (at ¶¶ 440-41) that Baronoff was the sole board member of the PHI and Success Boards at the time of the iCare Transaction and thus neither Board had a majority of disinterested directors (or any other directors) to approve Baronoff's position as an iCare board member. Given that Baronoff was the sole member of the PHI and Success Boards, there were no disinterested members of the PHI and Success Boards to approve Baronoff's service as a board member of iCare. Neither Baronoff's Motion nor his Reply cite any legal authority to support the seemingly inequitable view that his role as an iCare director was approved in writing by two boards which he controlled as the sole board member, especially when the Amended Complaint also alleges that he provided misleading information about the iCare transaction.

## Reuben's Specific Challenges

Reuben's dismissal motion [ECF No. 102] contends, *inter alia*, that Count XVIII (Liability for PHG Equity Distributions) does not identify within the limitations period any specific transfer or payment made while he was a Success Director. Count XVIII seeks to hold Reuben liable under California law "for any and all distributions made from Success to PHG within four years prior to the Petition Date (i.e., from November 5, 2014) through April 26, 2016, when he no longer served on [the] Success board." [ECF No. 60, ¶ 970]. While Plaintiff alleges (on "information and belief") that "the total distributions from Success (and/or PHI, as set forth above) to PHG is not less than $4 million," *id.* at ¶ 971, he fails to identify any specific distributions that are included in this figure.

According to Reuben, this lack of specificity is even more concerning given that the only other allegations in the Amended Complaint that would seem to explain how Plaintiff arrived at this $4 million figure relate to time periods when Reuben indisputably was no longer a director of Success and include distributions that were not from Success. Therefore, he concludes, dismissal is the only remedy to these vague, imprecise and seemingly illogical allegations, all of which prevent him from framing a responsive pleading. *See Auf v. Howard Univ.*, No. 19-CV-22065, 2019 WL 2231215, at *2 (S.D. Fla. May 23, 2019) ("The failure to identify claims with sufficient clarity to enable the defendant to frame a responsive pleading constitutes a 'shotgun pleading' that violates Rule 8(a)(2)."); *see also In re Pitt Penn Holding Co.*, 484 B.R. 25, 45 (Bankr. D. Del. 2012) (dismissing § 548

claims "to the extent that [plaintiff] fails to allege relevant transfers or payments within the [applicable period] before the [p]etition [d]ate").

In response, Michaelson says that formal discovery had not started, at the time, and contends that discovery is required to specify particular equity distributions. He also argues that he has been hampered by the Success directors' (including Reuben's) failure to adequately account for Success' distributions in its books and records. Therefore, Michaelson says, he "should not be prejudiced by Reuben's failure to properly account for financial services at Success."

Reuben takes issue with Plaintiff's position, saying that "the mere hope that discovery will revive Count XVII is insufficient."

As a *general* matter, the Undersigned acknowledges *Ashcroft v. Iqbal*, where the Court held that "Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it **does not unlock the doors of discovery** for a plaintiff armed with nothing more than **conclusions**." 556 U.S. at 678-79 (emphasis added). Similarly, the Undersigned agrees, as a general rule, that "[t]he [C]ourt is of the firm belief that facts necessary to state a cause of action must be stated in the complaint and that a plaintiff should not be allowed to file a suit and then conduct discovery to see **if** he, in fact, **has a case**." *LaMar Printing, Inc. v. Minuteman Press Int'l, Inc.*, No. C81–05A, 1981 WL 2080, at *3 (N.D. Ga. May 14, 1981) (emphasis added).

In other words, "[d]iscovery . . . is intended to narrow the scope of the issues and to prevent surprise at trial; it is not intended to allow a plaintiff to go on a fishing expedition to see if the speculative complaint that he has filed has any basis in fact. *Id.* Moreover, "[j]udges are trusted to prevent 'fishing expeditions' . . . for evidence of some unknown wrongdoing." *Cuomo v. Clearing House Ass'n, L.L.C.*, 557 U.S. 519, 129 S. Ct. 2710, 2719, 174 L.Ed.2d 464 (2009).

On the other hand, it seems fundamentally unfair to fault a plaintiff for lacking specificity in the allegations when the defendant challenging the absence of pinpoint transactions is supposedly the one who failed to maintain the records in the first place. *See*, *e.g.*, *Ikeda v. San Francisco Firemen Credit Union*, No. 20-CV-08071-TSH, 2021 WL 4776705, at *9 (N.D. Cal. Oct. 13, 2021) (finding that first amended complaint "reflect[ed] a good faith effort to identify the responsible party in those circumstances where that information [was] currently available to [the plaintiff]" where the plaintiff "ha[d] alleged that [the] [d]efendants deliberately **obfuscated** their respective responsibilities and, as a result, much of the time she had **no idea [which defendant] was responsible** for a particular servicing error, or even which party she was communicating with" and "to the extent information concerning the two defendants' separate roles was available to her, [the plaintiff]'s pleading identifie[d] the responsible party" (emphasis added)).

Because Plaintiff will be filing an updated and revamped version of the operative complaint anyway, there would be no undue prejudice in granting Reuben's motion to

dismiss this count without prejudice. Michaelson filed the Amended Complaint more than two years ago, so he has now had ample time to comb through the records and locate which transactions support Count XVIII. So that is the ruling here (i.e., dismissal without prejudice).

Reuben also contends that Count XXIII does not adequately allege a fraudulent transfer claim against him because the count merely paraphrases, in conclusory fashion, the statutory elements under 11 U.S.C. § 548. He explains that the count relies on Exhibit C, which lists only the dates and amounts of various transfers to Reuben from November 7, 2014 through March 8, 2018, [ECF No. 60-3], along with the check numbers for some.

Significantly, Exhibit C does not allege facts showing that the transfers lacked **reasonably equivalent value**. Reuben argues that this omission is fatal, as those allegations are required, and a failure to do so warrants dismissal. *See, e.g., Kapila v. Bible Baptist Coll. of Pa., Inc. (In re ATM Fin. Servs., LLC)*, No. 6:08-BK-969-KSJ, 2011 WL 2604247, at *4 (Bankr. M.D. Fla. June 21, 2011) ("Under Rule 12(b)(6), to properly plead a constructive fraudulent transfer action the trustee must allege facts sufficient to show the plausibility that . . . the debtor received 'less than a reasonably equivalent value' in exchange for such transfer[.]").

Reuben also contends that Count XXX does not contain allegations adequate to support Plaintiff's effort to recover the Reuben Non-Salary Payments as voidable preferential transfers under 11 U.S.C. § 547(b). As with Count XXIII, the claim here also

relies on Exhibit C, which does not allege any facts to plausibly show that the transfers were for or on account of an antecedent debt.[9]

In addition, Reuben argues that the count is further deficient (and cannot survive a motion to dismiss) because it fails to allege the identity of the debtor/transferor for any of the challenged transfers.[10]

In response, Plaintiff argues that the Amended Complaint does contain facts because it alleges that the Companies received *nothing* in exchange for the non-salary related monetary transfers. Therefore, Michaelson says, Reuben is unfairly asking him to explain a negative: If nothing was received by PHI or Success, then there are no additional facts to allege to demonstrate that the transfers were not for reasonably equivalent value.

---

[9]    To allege a preference claim, a complaint must allege sufficient facts to show:

(a) [the] [d]efendant was a creditor; (b) the transfers were made to or for the benefit of [the] [d]efendant; (c) the transfers were **for or on account of antecedent debt of [the debtor]**; (d) [the debtor] was insolvent when the transfers were made; and (e) [the] [d]efendant received the transfers and would have received less . . . in a case under Chapter 7 of the Bankruptcy Code.

*In re Arrow Air, Inc.*, No. 10-28831-BKC-AJC, Nos. 10-28831-BKC-AJC, 10-28834-BKC-AJC, 12-1710-BKC-AJC-A, 2012 WL 6561313, at *4 (Bankr. S.D. Fla. Dec. 14, 2012) (emphasis added).

[10]    *See In re Tousa, Inc.*, 442 B.R. 852, 856 (Bankr. S.D. Fla. 2010) (concluding that, to survive a motion to dismiss, a preference claim must "make[] clear who transferred what to whom and when"); *see also In re PennySaver USA Publ'g, LLC*, 587 B.R. 445, 462 (Bankr. D. Del. 2018) ("The fact that the exact identity of the [d]ebtor transferor was not alleged is sufficient grounds to dismiss this claim.").

Plaintiff next argues that he asserted the fraudulent transfer and preferential transfer counts *in the alternative.* Therefore, he explains, if it turns out that Reuben *did* provide services to the Companies as a board member for which he received the Reuben Non-Salary Payments after the services were performed (consistent with how the Companies made payments to board members), then the Reuben Non-Salary payments would have been made on account of antecedent debt.

Concerning both counts (for fraudulent and preferential transfer), Plaintiff argues that his failure to allege the identity of the transferors "is the result of the Companies' officers' and directors', including Reuben's, failure to observe corporate separateness." According to Michaelson's Response, "neither Success nor PHI adequately accounted for which entity made transfers or payments."

The Undersigned is not persuaded by Plaintiff's generalized, non-specific efforts to explain away his failures to allege critical elements of both the fraudulent transfer and preferential transfer counts. Michaelson has not cited any authority to support his implicit position that pleading in the alternative somehow exempts him from complying with Rule 8's pleading requirements.

The Court therefore dismisses, albeit without prejudice, Counts XXIII and XXX against Reuben. If Plaintiff decides to pursue these two counts again in his Second Amended Complaint, then he (or the accounting/financial/legal experts or consultants working with him) will need to investigate more thoroughly the records available to them

and determine the specific facts to support each claim so that they can be alleged with adequate detail to pass muster.

Finally, Reuben contends that Count XXXI fails to state a disallowance claim under 11 U.S.C. § 502(d) because "disallowing a claim under Section 502(d) requires a judicial determination that a claimant is liable" and because "[a] debtor wishing to avail itself of this section's benefits must first obtain a judicial determination on the complaint." [ECF No. 102, p. 9].

Plaintiff notes that Section 502(d) of the Bankruptcy Code does not require that the transfer already be voided-- only that it is *avoidable*.

In addition, Michaelson also points out that Reuben has not filed a claim in the Debtors' Chapter 11 cases nor has a claim in his favor been scheduled. Therefore, he says Reuben is barred and estopped from asserting a claim against the Debtors' estates. And finally, Michaelson points out, "to the extent Reuben agrees that he does not have and will not have any claims against the Debtors' estates, **the disallowance claim does not apply to Reuben**." (emphasis supplied).

The Undersigned need not demand that Reuben confirm his lack of a claim against the Debtors' estates as a pre-condition to Michaelson dismissing Count XXXI. Reuben does not dispute the point that his failure to file a claim against the Debtors' estates in the bankruptcy means that he is barred from doing so now. Given that Plaintiff, in effect,

concedes that the disallowance claim is inapplicable to Reuben, the Court grants this portion of Reuben's motion and dismisses Count XXXI.

**Conclusion**

The Undersigned grants in part and denies in part the myriad motions to dismiss, consistent with the rulings contained in this Order. Michaelson shall have sixty (60) days in which to file a Second Amended Complaint.

**DONE AND ORDERED** in Chambers, in Miami, Florida, on May 10, 2023.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
All Counsel of Record